```
 1                 UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
 2                  CENTRAL DIVISION AT LONDON
                              - - -
 3    UNITED STATES OF AMERICA,      .   Case No. 6:19-CR-0016
                                     .
 4              Plaintiff,           .
                                     .   Monday, March 25, 2019
 5         - v -                     .   12:58 p.m.
                                     .
 6    DANIEL SCOTT NANTZ,            .
                                     .   Via Electronic Recording
 7                                   .
                Defendant.           .
 8                              - - -

 9            TRANSCRIPT OF DETENTION HEARING PROCEEDINGS
                BEFORE THE HONORABLE HANLY A. INGRAM
10              UNITED STATES MAGISTRATE COURT JUDGE

11
      For the United States:     JENNA E. REED, ESQ.
12                               Assistant U.S. Attorney
                                 United States Attorney's Office
13                               601 Meyers Baker Road, Suite 200
                                 London, Kentucky  40741
14
      For the Defendant:         BURLEY J. FOLEY, JR., ESQ.
15                               Croley, Foley & Smith
                                 222 North Main Street
16                               London, Kentucky  40745

17    Transcriber:               Linda S. Mullen, RDR, CRR
                                 Official Court Reporter
18                               101 Barr Street
                                 Lexington, Kentucky  40507
19

20    Proceedings recorded electronically, transcript produced by
      computer.
21

22

23

24

25
```

1  (Proceedings in open court, March 25, 2019, 12:58 p.m. by

2  electronic court recording.)

3       THE COURT:  Thank you.

4       Madam Clerk, would you call the 1:00 case, please.

5       THE CLERK:  Yes, Your Honor.  London Criminal 19-CR-16,

6  United States of America versus Daniel Scott Nantz, a/k/a

7  Daniel S. Nantz.

8       THE COURT:  Okay, thank you.

9       Counsel, state your appearances, please.  I see Ms. Reed's

10 here for the United States.

11      MS. REED:  Good afternoon, Your Honor.  Jenna Reed for the

12 United States, and seated to my left is Special Agent Todd

13 Tremaine.

14      THE COURT:  Good afternoon to you both.

15      Mr. Foley.

16      MR. FOLEY:  Good afternoon, Your Honor.  B.J. Foley on

17 behalf of the defendant, Daniel Nantz, which is seated here to

18 my right.

19      THE COURT:  Okay.  Good afternoon to you both as well.

20      Mr. Nantz, the matter was previously scheduled for a

21 preliminary hearing at this time to be followed, if necessary,

22 by a detention hearing.

23      But since the time of that initial appearance that you had

24 on that criminal complaint, the grand jury has returned an

25 indictment, so the hearing has changed a little bit.  You don't

1    have that right to a preliminary hearing anymore.  The grand

2    jury's indictment establishes probable cause for the charge to

3    go forward.

4        So what I'll do today is just remind you of your rights,

5    make sure you've gotten a copy of the indictment, that you

6    understand the charge and its potential penalties.  I'll take

7    your initial plea or response to the charge.  We'll set a

8    schedule for the trial in the case, and then take up the

9    detention posture as well.

10       Let me see how you plan to proceed on that question,

11   Mr. Foley, on the detention, the government's motion for

12   detention.

13       MR. FOLEY:  Your Honor, we would request a detention

14   hearing today.  I intend to proceed by proffer.

15       THE COURT:  Okay.  No -- no live testimony, just proffer?

16       MR. FOLEY:  Correct.

17       THE COURT:  Okay.  Fair enough.  Have you received the

18   indictment, then, Mr. Foley?

19       MR. FOLEY:  I have, Your Honor.

20       THE COURT:  Did you provide a copy to your client?

21       MR. FOLEY:  I have.

22       THE COURT:  Did you have enough time to review it with him

23   before the hearing?

24       MR. FOLEY:  I have, Your Honor.

25       THE COURT:  Okay.  Thank you.

1          I can't imagine there'd be a change, I just want to make

2     sure, are you pursuing appropriate victim notification,

3     Ms. Reed?

4          MS. REED:  Yes, Your Honor.

5          THE COURT:  Okay.  Thank you.

6          Mr. Nantz, let me read this charge to you and review its

7     potential penalties.  Those have changed as well since the

8     first time I saw you in court.  Keep in mind, just by reviewing

9     this with you in open court, it's not meant as a comment on the

10    presumption of innocence you're afforded.  I just want to make

11    sure you understand the charge.  Okay?

12         THE DEFENDANT:  Okay.

13         THE COURT:  I'll remind you, you continue to have the

14    right to remain silent.  You can't be forced to make a

15    statement of any kind about any charge against you.  If you

16    begin to speak, you can stop, but anything that you say could

17    be used against you.

18         Do you understand that?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Okay.

21         The single charge states beginning on or about

22    January 1st, 2018, the exact date unknown, and continuing

23    through on or about October 10th, 2018, in Whitley County, in

24    the Eastern District of Kentucky and elsewhere, Daniel S. Nantz

25    did conspire with others to knowingly and intentionally

1    distribute 50 grams or more of a mixture or substance

2    containing a detectable amount of methamphetamine, a

3    Schedule II controlled substance, in violation of 21 U.S.C.

4    Section 841(a)(1), all in violation of 21 U.S.C. Section 846.

5         If you're convicted on that charge, sir, and it's a first

6    felony drug conviction, you're facing incarceration of not less

7    than five years and not more than 40 years, a fine of not more

8    than $5 million, and supervised release of at least four years.

9         If you have -- I've seen your criminal history, just as a

10   precaution, I'll advise you, if you have in your criminal

11   history a prior conviction for a serious violent felony or

12   serious drug offense that's become final, then the penalties go

13   up to incarceration of not less than 10 years and not more than

14   life, a fine of not more than $8 million, and supervised

15   release of at least eight years.  And there's a hundred dollar

16   special assessment you would have to pay as well if you're

17   convicted.

18        So do you understand the charge and its potential

19   penalties, sir?

20        THE DEFENDANT:  Yes.

21        THE COURT:  All right.

22        Mr. Foley, does your client want the entirety of the

23   indictment to be read?

24        MR. FOLEY:  No, Your Honor.  We do not wish to continue

25   with any formal arraignment.  We'd waive that and enter a plea

1    of not guilty.

2         THE COURT:  Okay.  All right.  Thank you.

3         So, Mr. Nantz, through your lawyer, you've pled not

4    guilty.  And in a moment we'll talk about your trial schedule,

5    but first I want to remind you of certain rights I previously

6    covered with you concerning the trial.  All right?

7         You have the right to a speedy public trial by an

8    impartial jury.  You have the right to confront and

9    cross-examine witnesses that testify at the trial.  You have

10   the right to make people attend the trial and testify as

11   witnesses.  If you cannot afford to exercise that right, the

12   government will pay the cost of that for you.

13        At the trial you can't be forced to testify or offer

14   evidence against yourself.  It would not be held against you if

15   you chose to remain silent at the trial.  And you have that

16   right to counsel, that I've told you about before, at all

17   critical stages, including the trial and appeal.  If at any

18   point you cannot afford to hire your own attorney, one will be

19   provided for you by the Court.

20        Do you understand all the rights?

21        THE DEFENDANT:  Yes, sir.

22        THE COURT:  Okay.  Thank you.

23        Your case has been assigned to District Judge Wier, and

24   he's assigned it for trial beginning on May 30th.  May 30th at

25   9:30, with counsel to be here at 9:00.

1      And, Ms. Reed, how long do you think the trial will take?

2      MS. REED:  Three days, Your Honor.

3      THE COURT:  Okay.  Three days, thank you.

4      Mr. Foley, any comment on the schedule, sir?

5      MR. FOLEY:  No, Your Honor.  I have no reason to disagree

6  with the length of the trial.

7      THE COURT:  Okay.  We'll get the scheduling order entered

8  promptly.  And pay attention to its requirements.  Judge Wier

9  is still relatively new to the docket and the order has a

10  different form than you're probably used to.

11      All right.  So that's your jury trial date, Mr. Nantz,

12  May 30th at 9:30.

13      Now, at the complaint stage, the government moved for

14  detention.  I set the matter for a detention hearing.  The bond

15  report has been generated and circulated so I'm ready for the

16  hearing.  Mr. Nantz was fully advised of all of his rights with

17  respect to that matter.

18      Is there anything I need to take up before I begin to hear

19  the proffer, Mr. Foley?

20      MR. FOLEY:  No, Your Honor.

21      THE COURT:  Ms. Reed?

22      MS. REED:  No, Your Honor.

23      THE COURT:  Okay.

24      Mr. Foley, go ahead with your proffer then.  You have

25  received the bond report?

1     MR. FOLEY:  I have, Your Honor, and --

2     THE COURT:  Okay.

3     MR. FOLEY:  -- I've also reviewed it with him.

4     THE COURT:  Okay.  Fair enough.  Go ahead.

5     MR. FOLEY:  Your Honor, when analyzing whether or not that

6  he shall be released pending trial, obviously pursuant to

7  3142(g), there are certain factors for the Court to consider.

8  I think considering all those factors, release tips in favor of

9  the defendant.

10     As far as the nature and circumstances of the one-count

11  indictment, it is not a crime of violence.  There is not --

12  there are no minor victims.  There are no firearms or

13  explosives involved in the underlying charge that I'm aware of

14  at this point.  The government may suggest otherwise, but at

15  this point, in all the information I've been provided so far, I

16  see no evidence of anything in those circumstances surrounding

17  this indictment.

18     As far as the weight of the evidence, Your Honor, I

19  believe that tips in favor of the defendant.  It is a case

20  based upon what I would consider historical evidence.  I'm not

21  aware of any controlled buys or that he was ever even found by

22  law enforcement to be in possession of any methamphetamine or

23  any other controlled substance.

24     Quite frankly, the evidence, even in reviewing it in favor

25  of the government, is simply historical evidence of other drug

abusers and other drug traffickers and that is the only
evidence that I see. When you consider that factor, I would
believe that release tips again in favor of the defendant.

As far as the history and characteristics of Mr. Daniel
Nantz, he is a lifelong resident of this community. The vast
majority of his family still resides in this area. The -- his
mother or his siblings that do not reside in Lexington,
Kentucky. He has three children, which he had custody of up
until his arrest, I believe, which was last Tuesday.

He has no prior felony convictions.

He's been employed since graduating high school from
Corbin High School.

Your Honor, I believe that he's in good health. His
mental health's strong. His physical health is good.

Based upon that, Your Honor, again, I believe that it's
clear that release tips in favor of the defendant when you
consider his characteristics, his history and his ties to this
community.

He doesn't have any means to flee. And, again, I believe
that it's reasonably assured that the defendant would appear
for trial.

THE COURT: On that last point, where -- what intended
residence do you all propose?

MR. FOLEY: Okay. We would intend that he would live with
his aunt, which is here in London, Kentucky. That is, in fact,

1  even the residence where he was apprehended when he was

2  arrested last Tuesday, which he fully cooperated and there were

3  no issues with the apprehension of Mr. Nantz.

4      And she is willing, even according to probation's report,

5  to allow him to live there.  Obviously, even -- I think that he

6  would appear before this Court for trial is even stronger in

7  his favor.  In fact, he'll be living right here in London,

8  Kentucky.

9      Your Honor, I think there are certain conditions that can

10 be placed upon him by the Court to assure his appearance,

11 whether that be a curfew, home confinement, supervision by

12 probation, drug screens, things of that nature that would

13 reasonably assure his appearance here for his trial.

14     Your Honor, and as far as the nature and seriousness of

15 the danger to any person who sat here now before you, it's

16 simply an indictment.  He continues to be presumed innocent.

17 And the evidence that we've seen up to this point is very

18 minimal; again, all historical evidence from other drug

19 traffickers and drug abusers.

20     And it's the totality of this, when we consider all of

21 those factors under 3142(g), Your Honor, I would ask the

22 defendant be released pending trial.

23     THE COURT:  Okay.  Thank you.

24     Ms. Reed, your position on whether the presumption has

25 been rebutted?

1        MS. REED:  Your Honor, the government does not believe

2   that the presumption has been rebutted by the proffer of

3   defense counsel.

4        Given the nature and circumstance of the indictment

5   itself, there is a presumption for a reason, because of the

6   danger posed by drug trafficking, especially when you have an

7   aggravated weight and a controlled substance, such as

8   methamphetamine, which is what's in this case.

9        I disagree with the state of the evidence, as laid out in

10  the criminal complaint and as confirmed by the indictment by

11  the grand jury.  There is a recorded call on which Mr. Nantz is

12  agreeing to purchase four ounces of methamphetamine from a

13  known drug trafficker from Louisville tracking down half pound,

14  pound quantities of methamphetamine.

15       So I would disagree with the state of the evidence as

16  being weak.  And I would disagree with the only state of the

17  evidence being historical, when he's on recorded calls with an

18  individual he's known to have trafficked with before saying,

19  "yeah, I'll take that four ounces, let me get the money

20  together."

21       So I do not believe that the presumption has been overcome

22  by the proffer of defense counsel without any witnesses or

23  documentation.

24       However, should the Court rule that it has, I'm prepared

25  to call the government's first witness.

1    THE COURT:  Okay.  Any comment on his criminal history

2    with respect to Mr. Foley's contention that he doesn't have any

3    felony convictions?

4        MS. REED:  The government can't disagree that there is no

5    current felony conviction on the defendant's record.  We would

6    not contest the criminal history as provided.  We don't think

7    it's inaccurate.

8        THE COURT:  Okay.  All right.  Thank you.

9        Mr. Foley, any -- you get the last word on rebuttal.  It's

10   a presumption.

11       MR. FOLEY:  Your Honor, I would just briefly wish to

12   respond.  I believe that we have provided, through proffer,

13   sufficient to rebut that presumption.

14       As far as the weight of the evidence and this alleged

15   phone call, I think it's clear from the criminal complaint and

16   the affidavit attached thereto that there may have been those

17   discussions.  There's simply no evidence that that -- that

18   there was ever any type of transaction to go -- that actually

19   proceeded forward with the complaining witness.

20       Your Honor, again, I think again if you just look at the

21   bond report, I think it cannot be disputed that there's no

22   likelihood that he will flee.  He has family ties here to this

23   community.  He has children that reside here in this community

24   that he just recently lost custody of due to this arrest.

25       And I think there are conditions that can be put on by

1   this Court to ensure the safety of the community, whether that

2   be home confinement or curfew or continued supervision by

3   probation.

4        Thank you, Your Honor.

5        THE COURT:  Okay.  All right.  You're welcome.

6        All right.  We took some of the considerations a little

7   bit out of order, and it's a close question on rebuttal, given

8   the weight that is to be accorded to a proffer in the absence

9   of live testimony.

10       On this record, though, given how slight a burden it is,

11  I'm going to find the presumption was rebutted.  We have a

12  proposed residence that's purported to be stable.  It doesn't

13  appear at this stage, in terms of the presumption's

14  applicability, that the substance abuse history that's reported

15  is contested, meaning that, according to Mr. Nantz's

16  description, he's been clean for some time, doesn't need

17  treatment.

18       His criminal history is not good, particularly with

19  respect to nonappearance risk, but it's not -- it's not so

20  weighty that it adds to the presumption so as to overcome what

21  I think is the barely sufficient evidence to rebut the

22  presumption.

23       So that -- that decision can be appealed, of course, but I

24  would need to hear the evidence from the United States on the

25  3142(g) factors as well.

1    MS. REED:  Yes, Your Honor.

2    THE COURT:  Do you want to call your first witness,

3  please, Ms. Reed?

4    MS. REED:  Yes, Your Honor.  At this time the government

5  calls Special Agent Todd Tremaine of the ATF to the stand.

6    THE COURT:  Okay.  Would you come forward to be sworn,

7  please.

8  **TODD TREMAINE, GOVERNMENT WITNESS, SWORN**

9    THE COURT:  State your full name, please.

10    THE WITNESS:  Todd Tremaine.

11    THE COURT:  Okay.

12    Go ahead, Ms. Reed.

13    MS. REED:  Thank you, Your Honor.

14    THE COURT:  You're welcome.

15                       TODD TREMAINE

16                    DIRECT EXAMINATION

17  BY MS. REED:

18  Q.   Special Agent Tremaine, can you please state how you

19  currently are employed?

20  A.   I'm a special agent with the Bureau of Alcohol, Tobacco,

21  Firearms and Explosives in London, Kentucky.

22  Q.   And have you been privy to an investigation into a

23  Mr. Daniel Nantz?

24  A.   Yes.

25  Q.   I don't want to go through the entirety of the

1   methamphetamine conspiracy, but I would like to talk about the

2   events leading up to Mr. Nantz's arrest here more recently in

3   mid March.

4        For example, on March 14, 2019, can you walk us through an

5   interview that was conducted of Victim 1, otherwise known as

6   Confidential Witness 1?

7   A.   Yes.  Detectives with the Kentucky State Police

8   interviewed a victim of a crime who stated that Daniel Nantz

9   pistol whipped this individual, discharged a firearm.  This

10  individual described the firearm to the investigators or the

11  state police as being a revolver, like black grips.  And this

12  was over this individual being accused of stealing something of

13  Daniel Nantz's.

14  Q.   And this individual was assaulted, pistol whipped in your

15  words, or Confidential Witness 1's words, on March 14, 2019?

16  A.   Yes.

17  Q.   And the description that was provided of the firearm that

18  was used to hit this individual on or about the head, was that

19  description consistent with the firearm that was recovered in

20  the death of Ms. Geri Johnson?

21  A.   Yes.  It was found in the vehicle that Daniel Nantz had

22  been operating the day Ms. Johnson was taken to the hospital.

23  Q.   Thank you.  I want to talk now about March 16th, 2019,

24  which was the same day that Ms. Geri Johnson died.

25       Did -- was an interview conducted of Confidential

1   Witness 2 or Victim 2 in where a kidnapping was reported to be

2   conducted by Mr. Daniel Nantz?

3   A.    Yes.

4   Q.    And can you please discuss that?

5   A.    Yes.   This was a second individual who stated that this

6   person had been accused of owing Daniel Nantz money.   And this

7   person was at a residence in Whitley County, was forced at

8   gunpoint into the back room, was pistol whipped.

9        During that same time, an individual who was an accomplice

10  of Daniel Nantz's called the victim's mother and explained to

11  the mother that, basically almost like a ransom, pay us what

12  your son owes or he's going to die.   And that happened on the

13  16th.

14       The state police talked to this victim, noticed visible

15  injuries, took photographs of the injuries.   They also spoke

16  with the mother, who confirmed receiving the same phone call.

17  And the mother showed them the incoming phone call on her phone

18  when the ransom call came in.

19       Ultimately, the victim was let go but had -- again, had

20  injuries that the state police documented and photographed.

21  Q.    So this was on March 16th, 2019, when this kidnapping

22  would have occurred?

23  A.    Yes.

24  Q.    And photographs were taken of the victim's injuries?

25  A.    Yes.

1    Q.    And telephone records confirm what the victim reported?

2    A.    Well, they seen a screen shot of the phone.  We haven't

3    received the actual phone records, but the screen shot of the

4    phone would show that there was an incoming call at the time

5    that the victim's mother said this call came in.

6    Q.    And the victim whose mother confirmed this kidnapping and

7    assault?

8    A.    Yes.

9    Q.    Leading up to Miss Geri Johnson's death -- I guess, first,

10   can you first tell us who Miss Geri Johnson is with regards to

11   federal investigations here in the Eastern District of

12   Kentucky?

13   A.    Yes.  Geri Johnson was an individual who had been involved

14   in a couple of federal investigations going back to a case of

15   mine in 2017.  I had interviewed her about that case involving

16   individuals from Georgia trafficking methamphetamine in

17   Kentucky.

18        The most recent time that I interviewed Geri Johnson was

19   in the fall of 2018.  At that time she gave a recorded

20   post-*Miranda* statement involving several drugs dealers in the

21   area, one being Daniel Nantz, who would have been the father of

22   her child.  She stated that Daniel had been obtaining

23   methamphetamine from an individual she knew as Bones.

24        And then I'm also aware that in February of 2019, Geri was

25   indicted on a joint ATF-DEA case involving a conspiracy with

1    several individuals to include James Woods, who went by the

2    nickname Bones.

3    Q.    And this is all around methamphetamine trafficking?

4    A.    Yes.

5    Q.    At the time of Miss Johnson's death, she was dating Daniel

6    Johnson -- or, excuse me, Daniel Nantz?

7    A.    I think it was a -- they had a relationship, I think it

8    was on again and off again.  But the information I had was

9    that -- and this came from Geri as well, but that Daniel was

10   the father of her child.  She was pregnant, approximately seven

11   months, at the time of her death.

12   Q.    So leading up to Ms. Johnson's death, can you tell us

13   about an inmate at Laurel County, Josh Cox, and a recorded call

14   that was made using the Laurel County Jail call system?

15   A.    Yes.  Josh Cox was an inmate at the Laurel County

16   Detention Center.  He called an individual on the phone and

17   wanted information passed along to D, who we believe to be

18   Daniel Nantz.  He wanted this female that he was talking to to

19   pass along that D's name was all over the discovery that was

20   being passed around the jail on Bones, on Mr. Woods.  And that

21   call was intercepted and recorded.

22       And there was also another video chat through the Laurel

23   County Detention Center.  I haven't viewed it, but a DEA task

24   force officer had advised me of this, that there is a

25   conversation with Mr. Cox and Geri Johnson where he is telling

1   her basically the same thing, that D's name is all over Bones'

2   discovery.

3        And there's also a hint that somebody's name was blacked

4   out and there was a question, almost a joke, like, I wonder

5   whose name that is?  And the way the DEA task force officer

6   interpreted it, is that he was implying that it was Geri's name

7   that had been blacked out of the paperwork.

8   Q.    In the discovery paperwork --

9   A.    Yes.

10  Q.    -- involving the methamphetamine trafficking?

11  A.    Correct.

12  Q.    And the point of these video chats and the telephone call

13  was Josh Cox directing both of these individuals to let D, or

14  Daniel Nantz, know that his name was coming up in multiple

15  documents with regards to methamphetamine trafficking, correct?

16  A.    Yes.

17  Q.    Moving to Confidential Witness Number 3, in an interview

18  with regards to what exactly Daniel Nantz knew about Geri

19  Johnson's cooperation with the federal government, can you walk

20  us through the interview with Confidential Witness 3?

21  A.    Yes.  And this interview was conducted by a member of the

22  ATF task force and the Kentucky State Police with this

23  confidential -- or this cooperating witness.

24       This individual stated that Daniel Nantz knew that Geri

25  was on the run, and that he was also concerned about Geri's

1  name being on discovery paperwork for Tim Thornton.  And Tim

2  Thornton is an individual who the DEA indicted a while back.

3  And he expressed those concerns to this CW.

4  Q.   So this CW expressed that Mr. Nantz knew that Geri Johnson

5  was federally indicted, correct?

6  A.   That's my understanding, yes.

7  Q.   In a post-*Miranda* interview, did Mr. Nantz confirm that

8  he, in fact, knew that Geri Johnson was indicted?

9  A.   Yes, he did.

10 Q.   And CW3 also stated that Geri Johnson's name was all over

11 Tim Thornton's discovery?

12 A.   Yes.

13 Q.   And was that for methamphetamine trafficking?

14 A.   It was.

15 Q.   And did CW3 also state that Mr. Nantz knew that Geri

16 Johnson had been in contact with someone to turn herself in for

17 her federal indictment here in the Eastern District?

18 A.   Yes.

19 Q.   And, in fact, did Mr. Nantz think or believe that

20 Ms. Johnson was planning to turn herself in to federal

21 authorities on March 17, 2019?

22 A.   That's my understanding.  And there had been ongoing

23 negotiations with the DEA task force officer and Geri where

24 they had made phone calls trying to get her to turn herself in.

25 And also officers had been out there, to Mr. Nantz's residence

1  looking for Geri in the weeks leading up to her death.

2  Q.  So, again, CW3 relayed that both information from Miss

3  Geri Johnson and Mr. Nantz confirmed that this was their

4  beliefs going into March 16, 2019?

5  A.  Yes.

6  Q.  On March 16, 2019, at 8:21, was Ms. Geri Johnson

7  pronounced dead at the Baptist Health in Corbin?

8  A.  Yes.

9  Q.  And had her body been dropped off by Mr. Daniel Nantz?

10 A.  Yes.

11 Q.  And can you please walk us through Mr. Nantz's first

12 post-*Miranda* statement, his first one?

13 A.  Sure.  Mr. Nantz informed the investigators of the

14 Kentucky State Police that Geri had arrived at his residence

15 the day before, on the 15th, she had spent the night.

16      On the 16th, he stated that he had been feeling tired.

17 Geri was -- had been making statements that she was concerned

18 about the federal indictment.  He went to sleep in his bedroom.

19      He woke up, he wasn't sure what woke him up, but he woke

20 up almost being startled, but he didn't know what it was.

21 Eventually, he found himself outside and Geri had a firearm,

22 and he stated that he tried to -- or she was threatening to

23 kill herself.

24      He tried to pin her down and a struggle ensued for the

25 firearm.  The firearm discharged.  And then eventually she,

1    according to Mr. Nantz, she took the firearm and shot herself.

2         And he gives a vague description of how he got her in the

3    car.  But he states that, in his first statement, that he drove

4    her directly to the hospital in Corbin.  And when -- the reason

5    he left so quickly is because he had to get back to take care

6    of his children, his minor children, who were at the residence.

7    Q.   Left her at the hospital --

8    A.   Yes.

9    Q.   -- so quickly.  And did he also state in his first

10   post-*Miranda* interview that after Ms. Johnson shot herself, she

11   then fled on foot?

12   A.   Yes, that she ran a certain distance.

13   Q.   Now, I don't want to talk about every inconsistency

14   throughout the investigation, but I would like to talk about a

15   few that the investigation uncovered with that statement.

16        Can you please tell the Court who David Huff was with

17   regards to the March 16 -- excuse me, March 16th, 2019, death

18   of Ms. Johnson?

19   A.   Yes.  Through the investigation, the Kentucky State Police

20   identified David Huff as being an individual that Daniel Nantz

21   was close with and who he had contact with immediately prior to

22   the incident happening where Geri Johnson found herself shot.

23        The investigators went and spoke with David Huff, who

24   stated that Daniel Nantz showed up at the residence where

25   Mr. Huff was staying.  Daniel Nantz claims that "she shot

1   herself, she shot herself."  And Mr. Huff was the one who

2   brought up the idea, well, I need to take care of your

3   children.  And at that point, Mr. Huff stated he jumped in the

4   car with Mr. Nantz and what he described as a motionless body

5   in the car.

6       And Mr. Nantz dropped him off at the residence, at

7   Mr. Nantz's residence.  And Mr. Huff went inside, gathered the

8   children and then he walked them out the back, went up a hill

9   and eventually met with Mr. Nantz's father with the children

10  and passed off the children there.

11  Q.   So through the course of the investigation, it was

12  determined that Mr. Nantz had not taken Ms. Johnson's body

13  directly to the hospital, but rather drove her body to Mr. --

14  where Mr. Huff was staying?

15  A.   Right.  That was a noticeable inconsistency between

16  first -- the first statement and his second statement.

17  Q.   And then after Mr. Nantz drove the body to wherever

18  Mr. Huff was staying, he then drove Mr. Huff and the body back

19  to his residence?

20  A.   Yes.

21  Q.   Mr. Nantz's residence?

22  A.   Yes.

23  Q.   And left Mr. Huff there, according to Mr. Huff?

24  A.   That's correct.

25  Q.   And then Mr. Huff stated he walked the children up the

1  hill to Mr. Nantz's father?

2  A.    Yes.

3  Q.    Was Mr. Nantz's father interviewed as a course of the

4  investigation?

5  A.    Yes.

6  Q.    And what did he state?

7  A.    Generally, he stated that he received a call from Daniel

8  regarding they needed someone to take care of the children,

9  that Geri had shot herself.  And Mr. -- or Daniel's father

10  stated that he went to the residence and got the children

11  himself, that he did not mention that David Huff was involved

12  in any handing off of the children.  It was himself who went to

13  the residence and took the children.

14  Q.    Moving to the medical examiner.  What did the medical

15  examiner find when Ms. Johnson's body was examined?

16  A.    In general terms, they found two gunshot wounds, the first

17  being a through-and-through, through the neck.  No projectile

18  found.

19      They also found a gunshot wound that would be described as

20  coming in her -- the back of her right shoulder and entering at

21  an angle both upward and in toward the body.  And that round

22  also exited and no projectile was found.

23      They found that she likely died as a result of choking on

24  her own blood from the through-and-through round that went

25  through her neck.  They also determined that, you know, there

1    was no -- these did not look like contact wounds.  It did not

2    look like they were fired from a short distance.

3         And I guess that's pretty much it with the medical

4    examiner.

5    Q.    So one of the rounds went through Ms. Johnson's back?

6    A.    Yes, through the back of her shoulder and coming this way.

7    When -- when both myself and the lead state police investigator

8    tried to figure out how you would do that, it's -- it's almost

9    impossible to us to figure out how you can fire a gun from that

10   direction if you did it yourself.

11   Q.    And another round went straight through Ms. Johnson's

12   neck, and the cause of death was determined to be drowning on

13   her own blood --

14   A.    That's correct.

15   Q.    -- from that round?

16   A.    Yes.

17   Q.    Was Mr. Nantz's bedroom and home searched as part of the

18   investigation?

19   A.    Yes.

20   Q.    And can you walk us through a note that was found in

21   Mr. Nantz's bedroom?

22   A.    Yes.  This has been relayed to me again by a detective

23   with the state police.

24        I think it was in like a plastic Rubbermaid drawer in the

25   master bedroom.  He said it was not hard to find, it was

1    sitting on top.  It was a note that, this probably isn't

2    verbatim, it's what I've been advised.  It said "funeral," and

3    then it alluded that both Geri and Nigel Medlin had been pulled

4    from their cells and had talked to the feds.

5    Q.    So it specifically said "funeral," and then something to

6    the effect of feds pulled Nigel and Geri out to question them?

7    A.    Yes.

8    Q.    And who is Nigel?

9    A.    Nigel Medlin is a federal defendant on a kidnapping case.

10   He was also suspected of being a drug trafficker in Whitley

11   County.

12   Q.    In methamphetamine?

13   A.    Yes.

14   Q.    Was the firearm recovered that's believed to have killed

15   Ms. Johnson?

16   A.    Yes.

17   Q.    And where was that recovered?

18   A.    In the truck.

19   Q.    And what was the condition of that firearm?

20   A.    That firearm was found in the truck.  It had three -- it

21   was a revolver.  It had three spent casings in the cylinder.

22   It had one live round in the cylinder, and one of the cylinders

23   did not have any rounds in it.

24        So it had, again, three spent casings, one live round and

25   an empty cylinder.  The firearm was also found in the cocked

1    position with the hammer back.

2    Q.   So if you took at face value Mr. Nantz's statement,

3    Ms. Johnson shot herself twice and then had to recock the

4    pistol?

5    A.   Yes.

6    Q.   Was Mr. Nantz ever interviewed again based on the

7    inconsistencies found throughout the investigation?

8    A.   Yes.

9    Q.   And can you walk us through some of that second

10   post-*Miranda* interview?

11   A.   Yes.  They asked him about Dave Huff.  He did not claim to

12   know him really well.  And then he eventually came forward and

13   did remember and make a statement that, yeah, he did stop at

14   David Huff's residence.  And that was different than his first

15   account.  So he stopped at David Huff's house before going to

16   the hospital.

17       At this time the search had been conducted in the bedroom

18   and the officers had noticed that there was evidence of where a

19   gunshot round had gone in the bedroom.

20       At this time, Mr. Nantz had not told the investigators

21   that there had been a gunshot in the bedroom.  And when they

22   confronted him with that, hey, we found evidence of the gunshot

23   going off in the bedroom, Mr. Nantz, on his own, without any

24   statements from the state police, stated that it was in the

25   headboard.  And that surprised the investigators with the state

1    police because that's where they found the evidence, it was

2    through the headboard of the bed and out the trailer.

3        Again, they did not find a projectile, but they did find

4    evidence of the bullet hole and Mr. Nantz knew the location of

5    that.

6    Q.   Did Mr. Nantz also identify the handwriting of that note

7    that you previously described as his?

8    A.   He stated it was his handwriting.

9    Q.   Prior to Ms. Johnson's death, in the week leading up to

10   her death, did she report to multiple witnesses that were

11   interviewed and have come forward that if she went missing, her

12   body would be at Daniel Nantz's residence?

13   A.   Yes.

14   Q.   And had she reached out to someone to actually remove her

15   from that residence on that very day?

16   A.   She did via text message.

17   Q.   You stated that at the time Ms. Johnson was seven months

18   pregnant?

19   A.   Yes.

20   Q.   Was the child successfully delivered on March 16th, 2019?

21   A.   Yes.

22   Q.   Was that child transported to Lexington for medical care?

23   A.   Yes.

24   Q.   And the child remained on a ventilator, correct?

25   A.   Yes.

1    Q.   Do you recall when the child was pronounced dead?

2    A.   On Tuesday, the 19th of March.

3    Q.   And was the cause of death homicide?

4    A.   Yes.

5         MS. REED:  I have no further questions, Your Honor.

6         THE COURT:  Okay.

7         Mr. Foley, cross, sir.

8         MR. FOLEY:  Yes, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. FOLEY:

11   Q.   Mr. Tremaine, as far as this, the underlying indictment in

12   this case, you don't have any evidence of any controlled buys

13   from any cooperating witnesses making any controlled buys from

14   Mr. Nantz, do you?

15   A.   No.

16   Q.   And at any time during your investigation, you never

17   personally observed him or found him to be in any possession of

18   any large amounts of cash, did you?

19   A.   No.

20   Q.   Okay.  And, in fact, you also never found him to be in

21   possession of any large amounts of methamphetamine, did you?

22   A.   No.

23   Q.   Okay.  And there's mention in the affidavit that was

24   attached to the criminal complaint -- have you reviewed a copy

25   of that?

1   A.    Yes.

2   Q.    Okay.  And are you aware of the reference of a recorded

3   phone conversation?

4   A.    Yes.

5   Q.    Okay.  And there was nothing -- or there was no controlled

6   buy made after that conversation or any evidence of the

7   transfer of methamphetamine, was there?

8   A.    No.

9   Q.    Were you involved in the arrest of Daniel Nantz on Tuesday

10  of last week?

11  A.    No.

12  Q.    Okay.  Are you -- have you been given information about

13  the circumstances of that though?

14  A.    Not really.

15  Q.    Okay.  So you're not -- are you aware that he was arrested

16  at his aunt's house in London?

17  A.    I knew it was in London.

18  Q.    Okay.  And you've not been given any information he

19  attempted to flee or anything like that, have you?

20  A.    I've not been given any information like that.

21  Q.    Have you been given any information that he wasn't

22  cooperative or it was very difficult to apprehend him there?

23  A.    No.

24  Q.    Now, you briefly talked about several instances.  Let me

25  make sure I'm understanding.  I believe the first one you spoke

1   about was an incident on March 14th, was that correct?

2   A.   Yes.

3   Q.   Okay.  And you received information that Mr. Nantz had

4   pistol whipped an individual?

5   A.   Yes.

6   Q.   How did you receive that information?

7   A.   The state police received the information in the follow-up

8   investigation after Ms. Johnson had passed away.

9   Q.   Okay.  So you first received information about this a week

10  after it allegedly happened?

11  A.   I think they started investigating the death on the 16th,

12  so two days.

13  Q.   A couple days?  Okay.  Was Mr. Nantz ever charged with

14  anything surrounding that incident that you're aware of?

15  A.   No.

16  Q.   Okay.  Was the individual that was allegedly assaulted

17  ever hospitalized or anything that you're aware of?

18  A.   I'm not aware.

19  Q.   Okay.  Then you spoke about one other incident that I

20  believe happened on the 16th, a kidnapping.

21  A.   Yes.

22  Q.   Okay.  And what day did that allegedly occur?

23  A.   The 16th of March, the same day Ms. Johnson passed away.

24  Q.   Okay.  And how were you provided that information?

25  A.   One of the victims -- or the victim made the statement to

1   the Kentucky State Police detectives.

2   Q.   Okay.  And when did that allegedly happen?

3   A.   The statement?

4   Q.   The kidnapping.

5   A.   The kidnapping?  On the 16th.

6   Q.   Okay.  Early -- do you know about what time that day?

7   A.   I couldn't tell you.  I mean, I believe it was before the

8   incident with -- when he took Ms. Johnson to the hospital, of

9   course, but I don't know the time.

10  Q.   Where did it allegedly occur?

11  A.   In Whitley County.

12  Q.   At a residence or --

13  A.   At a residence.

14  Q.   Do you know whose?

15  A.   I do.

16  Q.   Okay.  Was it at Mr. Nantz's?

17  A.   No.

18  Q.   Was anybody else with him?

19  A.   With Mr. Nantz?

20  Q.   Yes.

21  A.   Yes.

22  Q.   Who?

23  A.   Mr. Huff.

24  Q.   Were police ever called about this, that you are aware of,

25  the actual kidnapping?

1   A.   Well, eventually they were.  They were notified, yes.

2   Q.   But at the time of it, you're not aware that -- there were

3   ever any 9 -- 911 telephone calls or anything made, were there?

4   A.   I don't believe there was a 911 call, no.

5   Q.   Okay.  And as we sit here today, Mr. Nantz has still not

6   been charged with kidnapping of anyone, has he?

7   A.   Not at this time.

8   Q.   Now, you testified that Geri Johnson gave, I guess,

9   information.  I believe your testimony -- I don't want to -- I

10  believe your testimony was that Geri Johnson gave information

11  in the fall of 2018 about Daniel Nantz and the trafficking of

12  methamphetamine.

13  A.   Yes.

14  Q.   Okay.  Was that recorded?

15  A.   Yes.

16  Q.   Okay.  Did she ever make any controlled buys?

17  A.   No.

18  Q.   Okay.  Do you have any information that she ever told

19  Mr. Nantz that she was cooperating against him?

20  A.   I don't have that information.

21  Q.   The only information that you have is simply that

22  Mr. Nantz was aware that she had been indicted and they were

23  looking to arrest her?

24  A.   I had that information.  I didn't have a lot of

25  information.

1    Q.    Okay.

2    A.    But I do have that information.

3    Q.    And you were you present during the interviews of

4    Mr. Nantz?

5    A.    No.

6    Q.    Have you listened to those?

7    A.    No.

8    Q.    Now, you also spoke about some phone calls by Mr. Josh

9    Cox?

10   A.    Yes.

11   Q.    Okay.  Is he still an inmate at the Laurel County

12   Detention Center?

13   A.    He is now.  I think he had been going back and forth

14   between Knox County --

15   Q.    Okay.

16   A.    -- and Laurel.

17   Q.    And Daniel Nantz never participated in this telephone

18   call, correct?

19   A.    That's correct.

20   Q.    Okay.  And do you even know if he is aware that these

21   telephone conversations were ever -- took place about him?

22   A.    I don't know.

23   Q.    Okay.  Anywhere during your investigation, has he ever

24   been referred to as D?

25   A.    I don't believe so.

1  Q.   Okay.  So as we sit here today, you're not sure that he,

2  the person references D is even Mr. Daniel Nantz, do you?

3  A.   I'm fairly sure, given the people he talked to and talking

4  to Daniel's -- the mother of Daniel's child.

5  Q.   And you listened to these telephone conversations,

6  correct?

7  A.   I listened to the audio call, and I've been advised of the

8  video.

9  Q.   And during this telephone call, it was never discussed

10  that Daniel Nantz directed this person to come talk to this

11  individual?

12  A.   No.

13  Q.   Okay.  Then there was a video conference, I believe you

14  said?

15  A.   It was like a jail chat through the video.  They use the

16  tablet system.

17  Q.   Okay.  And what inmate was that?

18  A.   That was Mr. Cox talking directly to Geri Johnson.

19  Q.   Okay.  And during that conversation, Geri Johnson never

20  tells him she's cooperating against Mr. Nantz, does she?

21  A.   No.

22  Q.   She never says anything about Mr. Nantz threatening her

23  life or anything of that nature during that, does she?

24  A.   Not in that conversation.  I'm -- at least I'm not aware

25  that that happened.

1  Q.   Okay.  Do you have any information that Daniel Nantz is

2  even aware that that video conference ever took place?

3  A.   No information.

4  Q.   Now, concerning the death investigation of Geri Johnson,

5  as we sit here today, Mr. Nantz has not been charged with that

6  murder, has he?

7  A.   No.

8  Q.   And on that day, isn't it true that Mr. Nantz made a 911

9  call to dispatch?

10  A.   Yes.

11  Q.   Okay.  And -- and told 911 dispatch that Geri Johnson

12  committed suicide?

13  A.   I believe that is correct.  I haven't listened to the 911

14  call, but I believe that's correct.

15  Q.   Okay.  And he, in fact, was the individual that took her

16  to Baptist Health Hospital in Corbin, Kentucky, correct?

17  A.   Yes.

18  Q.   Okay.  And I think the word "dropped off" was thrown

19  around there.  He actually went and dropped her off at the ER

20  in the ambulance drive thru or drop off location.  Are you

21  aware of that?

22  A.   I'm not aware of that.

23  Q.   Okay.  Are you aware that he dropped her, dropped Geri

24  Johnson off to medical personnel in the hospital?

25  A.   I believe that -- that's a fair statement.

1  Q.  Okay.  And after he left the hospital, he, in fact, called

2  911 dispatch back, didn't he?

3  A.  I can't remember if he called them back or if he stayed on

4  the line.  It seems like it was a long call, is what I was

5  told.  But it could be two calls, but I think he was on the

6  line.

7  Q.  But he told law enforcement, or at least 911 dispatch, of

8  where he was going and where he could be found, didn't he?

9  A.  I couldn't testify to that.

10 Q.  Okay.  Are you aware that he, in fact, waved the police

11 down on a road there in Whitley County?  That's where he was

12 first interrogated by law enforcement.

13 A.  I talked to the state police and they do not believe that

14 he waved them down.  They stopped him based on what was called

15 a BOLO, a be-on-the-lookout, for Mr. Nantz.

16     And then once they got up to him, then he waved.  And you

17 know, like -- almost like I give up kind of deal.  But they did

18 not -- they did not see him wave them down.

19 Q.  But no time -- there's never -- there's not any evidence

20 that he attempted to flee or anything during that

21 investigation, correct?

22 A.  Depends on how you view leaving the hospital.

23 Q.  Well, he stayed on with 911, told them where he was going

24 when he left the hospital, didn't he?

25 A.  I know he stayed on with 911.  I don't know if he told

1   them exactly where he was going.

2   Q.   Now, did you see Mr. Nantz that evening?

3   A.   No.

4   Q.   Okay.  Are you aware that he had a lot of blood on him and

5   in the vehicle?

6   A.   I believe there was blood on him and the vehicle.

7   Q.   But you said Dave Huff said that, when he left the

8   residence, that he got in the vehicle with Geri and Daniel

9   Nantz?

10  A.   Yes.

11  Q.   Okay.  Was there any blood observed on Dave Huff?

12  A.   I'm not -- I can't -- I can't speak to that.  Now, I know

13  that they -- I don't think they talked to Dave Huff until a day

14  or two later, so I couldn't tell you.

15  Q.   There's a bullet -- I believe you testified a bullet hole

16  in the headboard of Mr. Nantz's home?

17  A.   Yes.

18  Q.   Okay.  Is that consistent with the same bullet that

19  inflicted the wound on Geri Johnson?

20  A.   It's hard to tell because there's no -- I mean, I don't

21  think it looks like a shotgun round.  But again, I'm -- I'm

22  relying what the officers are telling me -- telling me combined

23  with what I know about projectile analysis.  One, you don't

24  have a projectile.  But I think they would have told me if it

25  looked like it was a 12 gauge shotgun slug versus what was like

1  a .38 or a .357 diameter.

2  Q.    Now, you testified there was a letter found.  Were there

3  any other letters found in the home?

4  A.    There could have been, but I don't -- I don't know.

5  Q.    Are you aware of the letters found about Geri Johnson

6  talking about suicide?

7  A.    No.

8  Q.    Okay.  The text message, you said that she texted

9  individuals wanting to remove her from Mr. Nantz's residence.

10  Did you review that?

11  A.    I might have seen the screen shot of it.

12  Q.    What exactly does it say?

13  A.    I need to get out of here.  And this is, again, off the

14  top of my head, but this is the gist, is I need to get out of

15  here right now, I need somebody to come pick me up.  And I

16  think she also alluded she needed somebody to help pick up her

17  kids too.

18  Q.    And in that text message, there's not any mention about

19  that Mr. Nantz is going to harm her in any way, is there?

20  A.    There's -- there's no indication of that.

21       MR. FOLEY:  Your Honor, if I could have about 20 seconds,

22  please?

23       THE COURT:  That's fine.  Take your time.

24       MR. FOLEY:  I believe that's all I have, Your Honor.

25       THE COURT:  Okay.

1        Ms. Reed, redirect, ma'am?

2        MS. REED:  Yes, sir.

3                    REDIRECT EXAMINATION

4   BY MS. REED:

5   Q.   With regards to when Mr. David Huff was interviewed and

6   whether or not he had an opportunity to change, or whether it

7   was the same day, Mr. Nantz never reported that Mr. Huff was

8   there at all on the night in question, in his first

9   post-*Miranda* interview, correct?

10  A.   That's correct.

11  Q.   And even at the beginning of his second post-*Miranda*, when

12  confronted with was Mr. Huff there, he pretended at first not

13  to really know who Mr. Huff was, correct?

14  A.   That's correct.

15  Q.   So the interview of Mr. Huff did not take place until the

16  investigation was able to uncover that fact without Mr. Nantz

17  volunteering it?

18  A.   Correct.  Had Mr. Nantz told them that Mr. Huff was there

19  that day, they would have went to Mr. Huff and looked at his

20  clothes.  They would have done all of that, but that

21  information was concealed.

22  Q.   The 911 call starts at approximately 8:14 p.m., correct?

23  A.   Yes.

24  Q.   And by 8:21 p.m., Ms. Johnson was pronounced dead,

25  correct?

1    A.    Yes.

2    Q.    And in your experience in law enforcement, does it take a

3    couple of minutes for someone to be getting to the hospital,

4    them to try to perform life-saving procedures on the person and

5    then to call a time of death?

6    A.    Yes.

7    Q.    And the 911 call does not start until approximately 8:14?

8    A.    Correct.

9    Q.    And at that point in time, Ms. Johnson's body had been

10   transported at least to the residence where Mr. Huff was

11   staying, back to Mr. Nantz's house, and then supposably to the

12   hospital, correct?

13   A.    That's correct.

14   Q.    Did any witnesses see her body in the passenger's side of

15   Mr. Nantz's vehicle going back and forth, up and down the road?

16   A.    I'm aware that multiple witnesses saw him driving up and

17   down the road and was screaming, "She shot herself."  She shot

18   herself."

19   Q.    And the individuals that saw her body, did they describe

20   it as lifeless and her mouth being open?

21   A.    Yes.

22   Q.    Now, she also told multiple people before she died that,

23   if she was dead, to look for the body at Mr. Nantz's residence?

24   A.    Yes.

25   Q.    Had other witnesses seen Mr. Nantz or been told that

1    Mr. Nantz had previously shot at Ms. Johnson?

2    A.    Yes.

3    Q.    Going back to the medical examiner's report, did

4    Ms. Johnson have hematomas or bruising all over her body --

5    A.    Yes.

6    Q.    -- consistent with a physical fight?

7    A.    Yes.

8          MS. REED:  I have no additional questions, Your Honor.

9          THE COURT:  Okay.

10         Is there recross, Mr. Foley?

11                         RECROSS-EXAMINATION

12   BY MR. FOLEY:

13   Q.    Had it ever been -- it had never been reported to police

14   at the time about Mr. Nantz shooting at Geri Johnson, had it?

15   A.    On the previous occasion?

16   Q.    Yes.

17   A.    That's -- I don't believe there had been any report.

18   Q.    Okay.  And -- so -- and just to reiterate, so there are

19   multiple witnesses that saw Mr. Nantz that day and he, in fact,

20   was screaming that she shot herself?

21   A.    Yes.

22   Q.    And Dave Huff and Mr. Nantz, they live in very, very close

23   proximity, would you agree?

24   A.    Yes.

25   Q.    Okay.  And on the same type of little country road there

1    in Whitley County?

2    A.    Yeah.   The way it was described to me, a couple minute

3    drive.

4    Q.    Okay.   And Mr. Nantz, on his way to the hospital, had to

5    drive by Dave Huff's house, didn't he?

6    A.    I'm not sure.

7    Q.    Okay.

8          MR. FOLEY:   That's it, Your Honor.

9          THE COURT:   Okay.

10         Special Agent Tremaine, are you aware of whether -- well,

11   let me back up.

12         You described a bedroom in the residence where the -- a

13   bullet hole was found in the headboard, correct?

14         THE WITNESS:   Yes.

15         THE COURT:   Whose bedroom was that?

16         THE WITNESS:   I believe it's the master bedroom.

17         THE COURT:   In what residence?

18         THE WITNESS:   In Daniel Nantz's residence.

19         THE COURT:   Was anyone else known to live there?

20         THE WITNESS:   Geri Johnson on occasion, and also his

21   children who, I believe, are 11 and 7.

22         THE COURT:   And do you know when that bedroom was

23   searched?

24         THE WITNESS:   I believe it was on the night of the 16th,

25   Your Honor.   It could have went into the 17th as well, but --

1          THE COURT:  Okay.

2          THE WITNESS:  -- within a short time frame.

3          THE COURT:  Are you aware of whether there was blood found

4    in that bedroom?

5          THE WITNESS:  I don't believe they found any blood in the

6    bedroom.  I believe the blood trail was outside.

7          THE COURT:  Okay.  Can you describe for me that blood

8    trail?

9          THE WITNESS:  It was a blood trail, not a heavy blood

10   trail.  It was about a hundred feet, or I think it was 104 feet

11   is what they measured it.  And it went around the side of the

12   trailer toward an outbuilding.

13         And then you can see a point where they could see where

14   the truck tires were.  There was also a piece of the truck, the

15   inside handle, the foam handle of the truck was on the ground

16   and it had blood in it as well.  So they could see the blood

17   trail go 104 feet from the edge of the house on the outside

18   toward this outbuilding.  And then the truck, where -- they

19   could see where the tires had peeled out consistent with

20   somebody leaving in a hurry.

21         THE COURT:  You did, a couple of times during your

22   testimony, refer to a truck.  I want to make sure I know

23   exactly what you're referring to.  What is that?  What does

24   that reference mean?

25         THE WITNESS:  Yeah.  When I refer to the truck, that's

going to be the truck that Daniel Nantz was operating on

March 16th.  The truck that he took Geri Johnson to the

hospital in.  Also the truck that the police found him in

later.  And also the same truck where the firearm was found

during the search warrant.

THE COURT:  Can you describe the truck for me?

THE WITNESS:  I can't, Your Honor.  I just know that it's

a truck.

THE COURT:  Was it a pickup truck or do you know?

THE WITNESS:  It's a pickup truck.

THE COURT:  Dual cab or do you know?

THE WITNESS:  I don't know.

THE COURT:  Okay.  The medical examiner's report indicates

or opines that the cause of death was suffocating on the

victim's own blood; is that correct?

THE WITNESS:  Yes.

THE COURT:  And that's an opinion the examiner rendered?

THE WITNESS:  Yes.

THE COURT:  Was there any opinion in that examination

report concerning the sequence of the wounds, whether the -- in

other words, which wound was created first?

THE WITNESS:  There is not.

THE COURT:  Okay.  All right.

Did counsel have follow-up questions to mine?

Ms. Reed?

1    MS. REED:  If I could have just one minute, Your Honor?

2    THE COURT:  Sure, that's fine.

3                FURTHER REDIRECT EXAMINATION

4  BY MS. REED:

5  Q.   Were Mr. Nantz's children home on the night in question,

6  on March 16th, 2019?

7  A.   Yes.

8  Q.   And did they provide statements with regards to what they

9  heard in the residence?

10 A.   Yes.

11 Q.   And were those statements in part inconsistent with

12 Mr. Nantz's statement?

13 A.   Yes.

14 Q.   Part of the reason why law enforcement knew to look for a

15 third shell casing was because the children described hearing

16 three shots, not one, during Ms. Johnson's time there, correct?

17 A.   Correct.  And one shot coming from the bedroom.

18 Q.   One shot coming from the bedroom, and then describing the

19 second two coming from outside somewhere?

20 A.   Yes.

21 Q.   And the children were also the ones that reported that

22 Mr. Huff came back to the house, that Dad left for 10, 15

23 minutes, came back and Mr. Huff was there, correct?

24 A.   That's my understanding, yes.

25 Q.   Was anyone else reported to be in that residence by the

1   children or anyone else at the time of Ms. Johnson's death?

2   A.   No.

3        MS. REED:  I have no additional questions, Your Honor.

4        THE COURT:  Okay.  And those were fair follow-up to mine.

5        Mr. Foley, do you have additional questions?

6        MR. FOLEY:  Yes.

7        THE COURT:  That's fine.  Go ahead.

8                    FURTHER RECROSS-EXAMINATION

9   BY MR. FOLEY:

10  Q.   You spoke about --

11       THE COURT:  But you're limited to the subjects that I

12  elicited and then Ms. Reed followed up on.

13       MR. FOLEY:  Sure.

14  BY MR. FOLEY:

15  Q.   You spoke, when Your Honor was asking you questions, about

16  the blood in the driveway.  Do you recall that testimony?

17  A.   Yes.

18  Q.   Okay.  This is a gravel driveway?

19  A.   I'm assuming so but I haven't been out there.

20  Q.   Okay.

21  A.   And I haven't seen the pictures.

22  Q.   Okay.  Have you been provided any evidence of any type of

23  struggle, that she was drug on the pavement or anything of that

24  nature?

25  A.   Doesn't appear like the body was drug.  It would be

1  consistent with a dripping.

2  Q.   Okay.

3  A.   Not being drug.

4  Q.   Okay.  And there's not any evidence of any type of assault

5  or anything by him prior to any shooting or anything of that

6  nature, is there?

7  A.   Well, as we noted, I think there were bruises on her body.

8  Q.   Where at?

9  A.   I couldn't tell you.  I just know that there were bruises

10 that were found on her body.

11 Q.   And you said it was inconsistent between the child -- is

12 that the 11-year-old child --

13 A.   Yes.

14 Q.   -- you're speaking of?  Okay -- and what Mr. Nantz said.

15 What actually is inconsistent?

16 A.   Mr. Nantz said there were no gunshots, you know, in his

17 first statement.  That he woke up and went outside and there

18 was a struggle.  And then there was the -- the round discharged

19 and then they broke away and Ms. Johnson shot herself.

20     The 11-year-old stated that they were in the residence, he

21 and his sibling, or I guess -- I think it's a he.  But the

22 child heard a gunshot in the bedroom.  The only person that

23 came out from the bedroom was Daniel Nantz.  And they were

24 instructed to go in another room and basically get out of the

25 way.

1    Q.    Okay.  Children also reported that prior to that,

2    Mr. Nantz had been sleeping in there, didn't they?

3    A.    I couldn't tell you that.  I know Mr. Nantz had.

4    Q.    Okay.  And you also alluded to the fact that it looked

5    like the truck left or somebody had left in a hurry.  Do you

6    recall that testimony?

7    A.    Yes.

8    Q.    Okay.  Are you aware that, in fact, that -- well,

9    Mr. Nantz has a gate to his home?

10   A.    I am aware of that.

11   Q.    Okay.  And that he ran through that gate while leaving?

12   A.    I believe that the officers told me that it appeared like

13   he did.

14   Q.    Okay.

15        MR. FOLEY:  No further questions.

16        THE COURT:  Okay.  Officer -- Agent Tremaine, you can step

17   down.

18        THE WITNESS:  Thank you.

19        THE COURT:  Ms. Reed, further evidence from the United --

20   did you have additional questions?

21        MS. REED:  No, Your Honor.

22        THE COURT:  Okay.  That's fine.

23        MS. REED:  No.  And no additional evidence, Your Honor.

24        THE COURT:  Okay.

25        Mr. Foley, evidence to rebut the government's

1    presentation?

2        MR. FOLEY:  No.  Just a simple proffer, if the Court would

3    entertain that.

4        THE COURT:  Well, okay, sure.  But when you say "proffer,"

5    I'm pretty strict in how I define that.

6        So I want to hear argument on the 3142(g) factors.  If you

7    have additional factual evidence, even if it's a proffer, you

8    can make that now.  But I want Ms. Reed to hear it before she

9    makes her argument.  So you're just talking argument then?

10       MR. FOLEY:  Just argument only, Your Honor.

11       THE COURT:  Okay.

12       Ms. Reed, your argument on the overall question before the

13   Court based on the 3142(g) factors, ma'am.

14       MS. REED:  Yes, Your Honor.  The government's position is

15   that there are no conditions that the Court could set that

16   would ensure public safety from Mr. Nantz.

17       THE COURT:  You're only seeking detention based on danger

18   risks?

19       MS. REED:  Yes, Your Honor.

20       THE COURT:  Okay.  Thank you.

21       MS. REED:  And a risk of fleeing as well.

22       THE COURT:  Oh, okay.

23       MS. REED:  The government's argument on the fleeing would

24   be that if Mr. Nantz is willing to go to the lengths that he

25   went to avoid indictment and to being held accountable for his

1    methamphetamine trafficking, which he did in this case, then

2    there's no reason why he wouldn't take the lesser action of

3    fleeing versus, you know, versus what the government will lay

4    out now.

5         THE COURT:  I understand.

6         MS. REED:  So with regard to the public safety, this is

7    just in the 72 hours leading up to Mr. Nantz's arrest, we have

8    a victim reporting that he was called to Mr. Nantz's home and

9    assaulted and pistol whipped with the same weapon that was then

10   used -- that is consistent with being used to shoot Ms. Johnson

11   in the days following.

12        We then have on March 16th a victim stating that Mr. Nantz

13   was involved in a kidnapping where, once again, this victim was

14   pistol whipped and Mr. Nantz and Mr. Huff demanded money,

15   called the victim's mother, and the victim's mother confirms

16   this, screen shots of the telephone calls back and forth

17   confirm this.  The time frame is confirmed; and, furthermore,

18   photographs of the victim's injuries confirm this.

19        Later on the very same day, we have the death of

20   Ms. Johnson.  And what precedes the death of Ms. Johnson is

21   continuous instructions from inmates at Laurel County Detention

22   Center that Mr. Nantz's name is showing up again and again and

23   again in federal discovery with regards to methamphetamine

24   trafficking, and that Ms. Johnson is providing information to

25   federal entities with regards to Mr. Nantz's methamphetamine

trafficking.

The last time that Ms. Johnson sat down with Special Agent Tremaine was to provide information about methamphetamine trafficking and Mr. Nantz. What is the connection that we know Mr. Nantz had this information at the time of Ms. Johnson's death?

One, he admits to writing a note that was kept in the top drawer of his bedroom, in the same room where Ms. Johnson was first shot at, according to the witnesses, that stated, "funeral, Geri and Nigel pulled to talk to feds." So he knows, he's admitted to writing the note, that she has talked to federal entities. And Nigel is, again, another federal defendant in methamphetamine trafficking.

We also know, because Confidential Witness 3 states that she has spoken with both Mr. Nantz and Ms. Johnson, and she knows that at the time of Ms. Johnson's death, Mr. Nantz believes that, one, Ms. Johnson has been federally indicted, and he confirms this in a post-*Miranda* interview.

He knows that she's been in contact with the DEA to turn herself in. He knows that she plans to turn herself in the very next day, on March 17th, 2019. And he believes that she's previously provided information on methamphetamine trafficking to the federal entities.

At this same time, we have Ms. Johnson telling multiple witnesses that, if she is found dead, to look for her body in

1    Mr. Nantz's residence.  If she disappears, her body will be at

2    Mr. Nantz's residence.

3         We have witnesses that previously saw Mr. Nantz shoot a

4    firearm at Ms. Johnson.  We have bruising all over her body in

5    addition to the multiple gunshot wounds.  And we have the text

6    messages where she's pleading with someone to come get her from

7    Mr. Nantz's residence.

8         So based on all of that information and the multiple

9    inconsistencies with the evidence and Mr. Nantz's statement, we

10   believe that there are no conditions that the Court could

11   impose on Mr. Nantz to ensure continued public safety,

12   especially given the breadth of the methamphetamine conspiracy

13   in this particular county and all of the individuals that are

14   involved in this in some way.

15        THE COURT:  As described in the affidavit for the

16   complaint, in terms of the breadth of the trafficking?  I mean,

17   we heard about relationships to a couple of other charged

18   conspiracies, but we didn't hear any detail today about --

19   about that relationship.

20        MS. REED:  Correct, Your Honor.  And that's because what

21   Mr. Nantz has been indicted on is one methamphetamine

22   conspiracy, which is laid out in the criminal complaint.

23        However, what we've heard evidence of today is his

24   involvement in multiple other methamphetamine conspiracies

25   involving multiple other federal defendants that were going on

1   at the same time, which he is not indicted for, but were

2   occurring at the same time and that he was, according to

3   testimony today, also involved in.

4        THE COURT:  Right.  But the specifics or the nature of his

5   involvement, that wasn't fleshed out, was it?

6        MS. REED:  The specific nature of his involvement with

7   regards to how much methamphetamine he was dealing or who he

8   was getting it from or who he was giving it to, that was not

9   fleshed out with regards to all those additional

10  methamphetamine conspiracies, no, Your Honor.

11       THE COURT:  Right.  I mean, the presentation started with

12  the events on -- the presentation of your evidence started with

13  the evidence on the 14th.

14       MS. REED:  Yes, Your Honor.

15       THE COURT:  And there were some references to these other

16  investigations or indictments, but no description as to how

17  this defendant reportedly was involved in that activity,

18  correct?

19       MS. REED:  Correct, Your Honor.

20       THE COURT:  Okay.

21       MS. REED:  And that's because the government wanted to

22  focus more on the safety of the community and the violent

23  nature of this particular defendant, especially when faced with

24  the possibility of federal indictment, as he believed was

25  coming through the presentation of the multiple CWs that were

1   talked about here today.

2       THE COURT:  Understood.

3       MS. REED:  I don't want to go back and regurgitate every

4   consistency with -- inconsistency with regards to Ms. Johnson's

5   death.  I think the most notable of which are Ms. Johnson was

6   shot in the back at Mr. Nantz's residence with Mr. Nantz's

7   pistol that had previously been fired at another victim within

8   two days of it being fired at Ms. Johnson.  The victim

9   describes the same exact revolver.

10      Additionally, outside of the impossibility of shooting one

11  in one's back/shoulder and the bullet exiting out the front,

12  there is also the issue of the impossibility of, after shooting

13  yourself twice, one allegedly in the back and then one

14  allegedly through the neck, recocking a double action revolver,

15  which is the condition it was found in Mr. Nantz's vehicle.

16      And then there's also the issue with regards to

17  Mr. Nantz's time line, transporting Ms. Johnson as she's

18  bleeding out and drowning on her own blood to Mr. Huff's home,

19  transporting her back to his home, and then transporting her to

20  a hospital who knows how long later, and leaving her there

21  without providing any statement or talking to medical

22  professionals.  The fact that the 911 call was placed at

23  8:14 and she was pronounced deceased at 8:21.

24      The government's position, based on the totality of

25  Special Agent Tremaine's testimony, and the multiple victims

1  that were interviewed in this case, is that Mr. Nantz simply

2  must be incarcerated pretrial to protect society.

3       THE COURT:  Okay.  I just want to make sure I don't -- I

4  think this was obvious by implication, but wasn't specified.

5  The investigation in Ms. Johnson's death is ongoing, correct?

6       MS. REED:  The kidnapping with regards to Victim Number 2

7  is ongoing, and the murder investigation into Ms. Johnson is

8  ongoing, yes, Your Honor.

9       THE COURT:  Okay.  Thank you.

10      Anything further, Ms. Reed?

11      MS. REED:  No, Your Honor.  Thank you.

12      THE COURT:  Okay.  Mr. Foley.  You're welcome.

13      MR. FOLEY:  Yes, Your Honor.  I want to just briefly

14  follow up with the government's position.  And I believe the

15  Court is well aware that they spent a lot -- a large portion of

16  the presentation to the Court today providing testimony to this

17  Court about a case where Mr. Nantz is merely a suspect.  The

18  investigation is still ongoing.  We're nine days -- it's nine

19  days after that event and we still said here he has not been

20  charged and he's not detained on that case.

21      But what we didn't hear, and I want to -- I don't want to

22  regurgitate things I've already said in my previous proffer,

23  but as far as the weight of the evidence and that factor, I

24  really couldn't address it previously because the government

25  had not provided it.

1    But during the testimony of Mr. Tremaine, there was no

2    evidence whatsoever presented about this underlying indictment.

3    THE COURT:  Right.  But the *Stone* analysis requires that I

4    look at -- well, under *Stone*, the statutory analysis requires

5    that I look at the weight of evidence as to dangerousness, not

6    the weight of the evidence of the charge in question, correct?

7    MR. FOLEY:  Sure.

8    THE COURT:  So the government gets to pick and choose

9    whether they proceed on a theory of just a dangerous drug

10    trafficking conspiracy, or dangerousness by virtue of an

11    individual's propensity or nature or conduct, right?

12    MR. FOLEY:  Correct.

13    THE COURT:  Okay.  So I can't separate this evidence I've

14    heard from what's required under the act in terms of evaluating

15    dangerousness.

16    MR. FOLEY:  Sure.

17    Your Honor, as far as the dangerousness in the underlying

18    indictment, we've heard no evidence that -- you know,

19    outside -- let's exclude the evidence we heard about Geri

20    Johnson, but the fact that there were ever any firearms

21    involved, anybody was ever injured, that there was ever --

22    there are any facts or circumstances around the underlying

23    indictment that would lead this Court towards dangerousness.

24    Speaking specifically about the investigation into the

25    death of Geri Johnson, right now, as we sit here today, that is

1    mere speculation.  He -- again, I don't want to say again, but

2    he's not charged.  And everything that the government presented

3    would lead you to believe that it wasn't suicide that was

4    committed.  As we've heard, she was under a federal indictment.

5    She had been on the run for some time.

6        And I would ask the Court to pay specific attention that

7    if this gentleman here had murdered these individuals, about

8    how fast he left the residence and he took her to Baptist

9    Health to get medical attention, was looking for ways to get

10   her there.

11       In fact, immediately they have witnesses that she -- he

12   was immediately yelling, "she's killed herself, she's killed

13   herself."  The fact that he stayed on 911 the entire time

14   letting them know his location leads you to believe it's, in

15   fact, as Mr. Nantz said, that she committed suicide.

16       I disagree with the government.  I believe there are

17   conditions that can be put in place to ensure the safety of the

18   community, whether that be home confinement or putting a curfew

19   on Mr. Nantz.  He has ties to this community, lifelong.

20       As far as fleeing, I don't think there's any evidence that

21   he would flee.  He would live here locally with his aunt.  He

22   doesn't have the means to flee, Your Honor.

23       And I believe that they have not met their burden of a

24   clear and convincing, speak specifically about the danger.  And

25   I don't think they've met the burden by preponderance of

1    evidence when assuring his presence before this Court.

2        THE COURT:  But it's fair for me to think about this

3    evidence in the sense that it's not disputed.  I mean, you

4    didn't present evidence contrary to what Special Agent Tremaine

5    testified about concerning the findings of the investigation.

6        Your argument is the inferences that the government wants

7    me to draw are not supported; is that right?

8        MR. FOLEY:  Yes, Your Honor.

9        THE COURT:  Is it disputed that Mr. Nantz lost his job

10   right around the time of the events concerning Ms. Johnson's

11   death?  That's reported in the bond report.

12       MR. FOLEY:  Your Honor, I believe that he still had his

13   job.  He was working for Nantz Towing Brothers.  His prior,

14   previous employment was with Southeast.

15       THE COURT:  It's says -- the bond report says, "Defendant

16   advised he was employed by his uncle until approximately four

17   days prior to arrest."

18       MR. FOLEY:  I would dispute it.  I think, Your Honor, his

19   position was that he had not worked in four days for Nantz

20   Towing.

21       THE COURT:  Okay.  Okay.

22       Anything further, Mr. Foley?

23       MR. FOLEY:  No, Your Honor.

24       THE COURT:  Okay.  Ms. Reed, you get the last word, ma'am,

25   if you have anything to add.

1          MS. REED:  Nothing to add, Your Honor.

2          THE COURT:  Okay.

3          MS. REED:  Thank you.

4          THE COURT:  You're welcome.  Thank you as well.

5      Okay, Mr. Nantz, there obviously was a lot of testimony

6  presented today that I need to think about.  I'll get my

7  decision out as promptly as I can.  The law requires that you

8  stay in custody until I've made that decision.  So you will

9  continue to be remanded into custody of the United States

10 Marshal.

11         Ms. Reed, anything further in this matter at this time?

12         MS. REED:  No, Your Honor.  Thank you.

13         THE COURT:  Thank you.

14         Mr. Foley, anything further?

15         MR. FOLEY:  No, Your Honor.

16         THE COURT:  Okay.  Thank you.  We'll be recess until 2:30.

17         (Proceedings concluded at 2:10 p.m.)

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2          I, Linda S. Mullen, RDR, CRR, do hereby certify that

3     the foregoing is a true, correct and complete transcript of the

4     audio-recorded proceedings in this matter, recorded on Monday,

5     March 25, 2019 at 12:58 p.m., and transcribed from the audio

6     recording to the best of my ability, and that said transcript

7     has been compared with the audio record.

8

9          Given under my hand this 9th day of October, 2019.

10                         /s/ Linda S. Mullen
                           Linda S. Mullen, RDR, CRR
11                         Official Reporter, United States
                           District Court for the Eastern
12                         District of Kentucky

13

14

15                   I N D E X

16    WITNESS:                              PAGE

17    TODD TREMAINE

18    Direct Examination By Ms. Reed              14

19    Cross-Examination By Mr. Foley              29

20    Redirect Examination By Ms. Reed            40

21    Recross-Examination By Mr. Foley            42

22    Further Redirect Examination By Ms. Reed    46

23    Further Recross-Examination By Mr. Foley    47

24

25