1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON
                - - -

UNITED STATES OF AMERICA,      : Docket No. 6:19-CR-00016-1
                               :
                    Plaintiff, : London, Kentucky
                               : Wednesday, July 1, 2020
                               : 1:00 p.m.
versus                         :
                               :
DANIEL SCOTT NANTZ,            :
                               :
                    Defendant. :


                - - -
    TRANSCRIPT OF POTENTIAL or ACTUAL CONFLICTS HEARING
              BEFORE HANLY INGRAM
          UNITED STATES MAGISTRATE JUDGE
                - - -


APPEARANCES:

For the United States:      JENNA E. REED, AUSA
                            U.S. Attorney's Office - London
                            601 Meyers Baker Road
                            Suite 200
                            London, Kentucky 40741

For the Defendant:          GARY EDWARD PROCTOR, ESQ.
                            Gary E. Proctor, LLC
                            8 E. Mulberry Street
                            Baltimore, Maryland  21202


                            BURLEY J. FOLEY, JR., ESQ.
                            Croley, Foley & Smith
                            222 North Main Street
                            London, Kentucky  40745


                            PAUL K. CROLEY, II, ESQ.
                            Croley, Foley & Cessna
                            P.O. Box 447
                            Williamsburg, Kentucky  40769

1  Appearing telephonically:    JEFFREY L. ERTEL, ESQ.
                                Federal Public Defender Program
2                               Northern District of Georgia
                                101 Marietta Street
3                               Suite 1500
                                Atlanta, Georgia  30303
4

5  Court Reporter:              KIMBERLEY KEENE, RPR
                                Official Court Reporter
6                               310 South Main Street
                                London, Kentucky  47041
7                               (606) 877-7910

8

9

10

        Proceedings recorded by mechanical stenography,
11  transcript produced by computer.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1        (Proceedings commenced at 1:02 p.m.)

2            THE COURT:  Thank you, Madam Clerk.  Would you call

3    the pending matter, please?

4            COURTROOM DEPUTY:  Yes, Your Honor.  It's London

5    criminal number 19-cr-16-S.  United States of America versus

6    Daniel Scott Nantz, aka, Daniel S. Nantz.

7            THE COURT:  Thank you.  You can be seated, Ms. Reed.

8        I do recognize Ms. Reed on behalf of the United States.

9    Good afternoon to you.

10           MS. REED:  Good afternoon, Your Honor.

11           THE COURT:  Thank you.  I'm going to ask everybody to

12   remain seated throughout the hearing.  We're utilizing masks,

13   obviously.  As you sit, it's better for us, through the

14   microphones, to pick up all of the speaking.

15       It must be Mr. Proctor over here to my right.

16           MR. PROCTOR:  Yes, sir.

17           THE COURT:  Good afternoon to you.

18           MR. PROCTOR:  And to you, sir.

19           THE COURT:  Thank you.  This is the first time I

20   think I've seen you in federal court in London, correct?

21           MR. PROCTOR:  No, sir.  I believe I was here once

22   before, maybe.  I have no idea why.

23           THE COURT:  Okay.

24           MR. PROCTOR:  It was fleeting, so you're forgiven.

25           THE COURT:  Well, welcome back.  Pleased to see you

4

1    this afternoon.

2       I see Mr. Nantz is over here on my far right.  Good

3    afternoon to you.

4           THE DEFENDANT:  Good afternoon.

5           THE COURT:  Now, Mr. Nantz, the set up is different

6    than the last time we were in court.  We're trying to keep

7    everybody as safe as we can.

8       Even though you're distanced from your lawyers, we have a

9    mechanism for you to use to talk to them confidentially if you

10    need to do that, okay, sir?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  So at any point if you need to ask your

13    lawyer a question, or talk to them about something, you let me

14    know and we'll make that happen.  Okay, sir?

15           THE DEFENDANT:  Okay.  Thank you.

16           THE COURT:  You're welcome.  I recognize Mr. Croley.

17    Good afternoon to you.

18           MR. CROLEY:  Good afternoon, Your Honor.

19           THE COURT:  Thank you.

20       I see Mr. Foley as well.  Good afternoon to you.

21           MR. FOLEY:  Good afternoon, Your Honor.

22           THE COURT:  Thank you.

23       The matter is set for a hearing -- -

24           MR. PROCTOR:  Your Honor, if may I interrupt?  I

25    believe Mr. Ertel is on the telephone.

5

1           THE COURT:  Is that correct?

2           MR. ERTEL:  Yes, it is, Your Honor.

3           THE COURT:  Sir, good afternoon to you.

4     Are you able to hear me clearly, sir?

5           MR. ERTEL:  Very well.

6           THE COURT:  Mr. Proctor, there was some information

7 filed with respect to Mr. Ertel on an ex parte basis.

8     Can you describe for the prosecution his involvement and

9 presence this afternoon?

10           MR. PROCTOR:  And, in fact, I talked to Ms. Reed

11 about it yesterday afternoon because it is a perfectly

12 legitimate question for the government to ask, who is this

13 person and why are they on the call?

14     Mr. Ertel works for the Federal Public Defender for the

15 Northern District of Georgia.  They're a community defender.

16 And it is typical, in authorized death penalty cases, for

17 consults such as us to seek a defender organization to come

18 try the case with them, or to be involved in some capacity.

19 It is different in every case as to what capacity.

20     So following the government's notice of its intent to

21 seek the death penalty, I did reach out to a resource

22 consultant and said this would be a benefit.  And they

23 identified Mr. Ertel as someone who was, A, willing and, B,

24 had the correct skill set to assist.

25     Mr. Ertel is substantially along the way.  He can't just

1    enter an appearance in another district case.  It needs to go

2    through defender services and direct to the appeals court and

3    inform them that they intend to do this.  Those letters have

4    all been generated and written.

5        I think, Mr. Ertel, correct me if I'm wrong.  They have

6    14 days to note an objection and we're in day five or six, I

7    think, at the minute.

8        So it is my anticipation that all those approvals will be

9    generated in another week or two.  And in that case, we will

10   be moving his admission to Mr. Nantz's case pro hock vice.

11       Mr. Nantz has already met with him on a video call.  Feel

12   free to inquire directly with Mr. Nantz.  But I understand

13   there to be no objection.

14       So given Mr. Ertel's impending involvement in this case,

15   I just thought it made sense to loop him in via telephone

16   today.

17       Is that a satisfactory explanation, Your Honor?

18           THE COURT:  Oh, yeah.  Of course.  It's fair enough.

19       The only issue I can perceive is this is an open

20   proceeding at this point.  He's certainly allowed to

21   participate.  There may be portions of the proceeding

22   conducted on an ex parte basis, either just with the

23   government or with the defense.

24       Mr. Ertel, you certainly can't stay on the line if I'm

25   going to have an ex parte discussion with the prosecutor.

1          And, Mr. Proctor, if we have an ex parte defense

2    discussion, given that he's not officially on the team, if you

3    have a concern you raise that with me.

4          Okay, sir?

5               MR. PROCTOR:  Absolutely.

6               THE COURT:  You may make yourself a little more

7    comfortable.  I think the microphone will slide closer to you

8    so you don't have to lean over every time you speak.

9          Now, does the filing with respect to Mr. Ertel remain

10   ex parte, Mr. Proctor?  I questioned that when I first saw it.

11              Do you want to look back at it?

12              MR. PROCTOR:  Yes, sir.  I think that's -- I'm

13   certainly happy -- would you rather I file the motion to

14   unseal or a motion to remain unsealed or --

15              THE COURT:  It is sealed now.  It's sealed now.

16         File a notice with respect to whether it needs to remain

17   sealed.

18              MR. PROCTOR:  I think once Mr. Ertel's appearance is

19   in, the government is going to know who he is anyway.  I don't

20   have strong feelings, Judge.  I'll discuss it with him and let

21   you know.

22              THE COURT:  Okay.  Ms. Reed, any comment on any of

23   that, ma'am?

24              MS. REED:  No, Your Honor.  Mr. Proctor told me the

25   vast majority of that yesterday as he told the Court.

8

1           THE COURT:  Okay.  Good.

2       All right.  Okay.  So the matter is set for a hearing

3   scheduled at the defense's request concerning some issues with

4   respect to potential or actual conflicts that exist on the

5   part of the defense team.

6       We had a prehearing call to discuss the scope of the

7   hearing, the issues to be presented.  I've gone back and

8   listened to that call a couple of times, done some more

9   research than had been completed before that call, and am more

10  prepared today, I believe, to address the issues.

11      But I do need to start with Mr. Proctor and see what the

12  current posture is, what the status is, what you intend in the

13  hearing that you have requested.

14      And, ultimately, what is the issue that the Court has to

15  decide?

16          MR. PROCTOR:  Well, starting with where you finished,

17  Your Honor, the issue that the Court has to decide is whether

18  Mr. Croley and Mr. Foley may remain counselor of record for

19  defendant.  That's the issue.

20      The one thing I don't want you to be broadsided by that

21  has changed since my pleadings -- and I'll just say that

22  Mr. Nantz has had considerable amount of time to consider

23  this, to mull it over, to think, and he will correct me if I'm

24  wrong.

25      But his position in the pleadings I filed, they indicated

1    that Mr. Nantz, to the extent there was any conflict, would

2    waive it.

3        Mr. Nantz's position, I now understand it, is that he's

4    not asking you to remove either or both of these lawyers.  He

5    likes them.  He has a prior relationship with them.  He

6    respects them.  He thinks they have his best interest at

7    heart.

8        That said, he's also not willing to give up any of his

9    rights, including waiving any conflicts that may exist.

10       So that's where he stands today.  Feel free to check

11   directly with him.  But that's my understanding of Mr. Nantz's

12   position on this issue.

13           THE COURT:  Okay.  So, well, I'm not saying that was

14   careful phrasing, but I want to make sure I understand the

15   last phrase that you said.

16       He's not willing to give up any rights that he has.

17       Now, does that mean he's not -- if there are conflicts

18   that exist on the part of Mr. Foley or Mr. Croley, that are

19   found in the record and defined, does that mean he's not

20   willing to accept their continued representation of him in

21   that posture?

22           MR. PROCTOR:  Mr. Nantz has said to me several times

23   that he wants you to decide, Judge.

24           THE COURT:  Oh.

25           MR. PROCTOR:  He's not lawyer.  He didn't go to law

1  school.  Actual and implied conflict, we tried to explain to

2  him as best we can.

3          THE COURT:  Right.

4          MR. PROCTOR:  But he's unable to process it.  When we

5  do a guilty plea, do you intelligently and knowingly waive.

6          THE COURT:  Yes.

7          MR. PROCTOR:  Despite the discussions he's had with

8  counsel, he is unable and intelligently and knowingly waive

9  any conflicts, such that exist.

10          THE COURT:  Okay.

11          MR. PROCTOR:  So he will leave it to the Court.

12          THE COURT:  Okay.  Fair enough.

13      Has there been any change in the government's position

14  since call that we had?

15      Ms. Reed.

16          MS. REED:  Your Honor, the short answer is no.

17  Although the government was just informed of Mr. Nantz's

18  change in position a few moments ago, prior to coming into

19  court.

20      The government would wholly and unequivocally trust the

21  professional judgment of Mr. Croley and Mr. Foley.  The

22  government is not privy to all of the facts and circumstances

23  that Mr. Croley and Mr. Foley would be privy to given the

24  analysis of their own professional allegations.  So the

25  government would trust their personal and professional

1    judgment in this matter.

2        The government does have a concern upon learning, just

3    prior to coming in, that Mr. Nantz would not feel comfortable

4    waiving on the record, as some of the case law speaks about, a

5    conflict.  So that kind of changes the analysis.

6        But the government's position is still, without being

7    privy to all of the information, which we shouldn't, frankly,

8    be privy to --

9            THE COURT:  Right.

10            MS. REED:  --  that we would trust the judgment of

11    those that we consider to be more than capable of making this

12    decision.

13            THE COURT:  Well, let's think about it this way,

14    then, for a moment.

15        Actually, let me start with some questions of Mr. Nantz.

16        This is just basic competency stuff.  We're not going to

17    talk about anything ex parte.  I'm going to have you placed

18    under oath.

19        You don't need to stand, but you need to pay attention to

20    the courtroom deputy clerk for administration.

21            DANIEL SCOTT NANTZ, DEFENSE WITNESS, SWORN

22            THE DEFENDANT:  I do.

23            THE COURT:  Speak up a little bit for me.

24        State your full name, please.

25            THE DEFENDANT:  Daniel Scott Nantz.

1        THE COURT:  Are you under the influence of alcohol
2    today?
3        THE DEFENDANT:  No, sir.
4        THE COURT:  Are you under the influence of any drug
5    whatsoever?
6        THE DEFENDANT:  No, sir.
7        THE COURT:  Is there any physical health problem or
8    issue that you have that makes it difficult, in any way, to
9    understand me today?
10       THE DEFENDANT:  No, sir.
11       THE COURT:  Do you have any mental health issue,
12   illness, concern, symptoms that affects, in any way, your
13   ability to understand me today?
14       THE DEFENDANT:  No, sir.
15       THE COURT:  Have you taken any prescription
16   medications in the last 48 hours?
17       THE DEFENDANT:  No, sir.
18       THE COURT:  Did you meet with Mr. Proctor today
19   before this hearing?
20       THE DEFENDANT:  Yes, sir.
21       THE COURT:  Here at the courthouse?
22       THE DEFENDANT:  Yes, sir.
23       THE COURT:  About how long did you meet with him for?
24   Just roughly.
25       THE DEFENDANT:  Thirty minutes to an hour.

13

1          THE COURT:  Were you able to understand Mr. Proctor
2    when you met with him?
3          THE DEFENDANT:  Yes.
4          THE COURT:  Were you able to communicate effectively
5    with him when you met with him?
6          THE DEFENDANT:  Yes.
7          THE COURT:  Do you think that you are clear-headed
8    enough today in your thinking to make good decisions about
9    your rights?
10          THE DEFENDANT:  Yes, sir.
11          THE COURT:  Okay.  You hesitated there for a moment.
12      Do you have some doubt about that?
13          THE DEFENDANT:  No, sir.
14          THE COURT:  Is it fair to say that you're not a
15    trained lawyer and some of this may be confusing to you at
16    times?
17          THE DEFENDANT:  Absolutely.
18          THE COURT:  Is that why you hesitated?
19          THE DEFENDANT:  Yes, sir.
20          THE COURT:  Did you hesitate for any other reason?
21          THE DEFENDANT:  No, sir.
22          THE COURT:  Okay.  Well, as you know from the
23    previous proceedings, one aspect of my job that I take
24    seriously is to make sure you understand what your rights are.
25    And that's a part of what I'm going to explain today, of

1    course.

2        I'll remind you that you continue to have the right to

3    remain silent.  You can't be forced to make a statement of any

4    kind about any charge against you.  If you begin to speak, you

5    can stop.  Anything said could be used against you.

6        Do you understand that?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  That means you need to be a little bit

9    cautious, okay?  You have a lawyer, Mr. Proctor, who is here

10   to protect you today.  But just keep in mind, we may talk

11   about the case.  We may talk about some sensitive issues in

12   the case.

13       You need to be careful not to let anything slip out of

14   your mouth that could hurt you in the case, either in the

15   presentation, the investigation, in any way, okay?

16       Just be cautious about how you respond to any question,

17   particularly if Ms. Reed is in the courtroom, okay, sir?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  Okay.  Mr. Proctor, do you have any

20   competency concerns, sir?

21           MR. PROCTOR:  No sir.

22           THE COURT:  His answers today, that he was able to

23   communicate effectively with you and understand what occurred

24   in your prehearing meeting, do you agree with all of that?

25           MR. PROCTOR:  Yes, sir.  I do.

15

1          THE COURT:  Ms. Reed, do you have any reason to

2    question the defendant's competency?

3          MS. REED:  No, Your Honor.

4          THE COURT:  Well, if there is not a willingness to

5    accept a conflict, let's think about it this way.

6       The question is:  Is there a conflict?  I got varying

7    answers from the defense upon that during the call.  And I

8    know there are different scenarios here.

9       We have the issues with respect to Mr. Foley's prior

10   representation of Ms. Johnson.

11      We have issues with respect to Ms. Price's involvement

12   with the Croley/Foley firm, and her representation of another

13   party in another matter that is pending before the Court that

14   is related; and her involvement in a couple of other matters

15   that have come to light.  So I know there are multiple layers.

16      What I heard on the call from Mr. Proctor is that there

17   is a conflict.  What I heard from Mr. Croley is that there is

18   not.  I need an answer to that.

19      Now, I tried to point everyone, prior to the hearing, to

20   just a couple of the rules that I think are in play under the

21   Rules of Professional Conduct.  Some case law that interprets

22   portions of those rules.  Judge Wier's take on some of the

23   interests that are balanced when there is a waiver.

24      But if the bottom line is to accept a waiver, the only

25   conceivable scenario which Mr. Foley and Mr. Croley could stay

1    on the case is when there is no conflict, right, Mr. Proctor?

2              MR. PROCTOR:  If there is no waiver, I would agree

3    with that.

4              THE COURT:  Now, during the call, Mr. Proctor, you

5    included and said that you think that there is a conflict.  I

6    want to make sure the record is fully developed.

7         Which relationship do you think creates that?  Can it be

8    cured?

9         And then I want to hear from Mr. Croley and Mr. Foley, of

10   course.  I'm not ignoring you.

11        But the first explanation I want to get is from

12   Mr. Proctor.

13             MR. PROCTOR:  Your Honor, I thank you for pointing

14   out Judge Wier's *Shearburn* opinion.  I'm probably

15   mispronouncing that.

16        And in that opinion he talked about the general

17   principles.  The words he used were "serious potential" I

18   think for a con -- for an issue later.

19        And to the extent there is a conflict, I don't think

20   there is an actual conflict.  I don't think Mr. Foley, talking

21   now about the prior representation of the victim in our

22   case -- would do anything different if he had never

23   represented her.  Wouldn't do anything different if he never

24   met. . .

25        I have the highest respect for him.  I am, by no means,

1    looking to jettison counsel here.  I really hope he can stay

2    on.  But when we talk about serious potential, that's the

3    issue, I think, that rises to the level of a conflict.

4        Honestly, Judge, if this was a bank robbery case and

5    Ms. Johnson had been the teller, it's almost a different

6    calculus.  But at the penalty phase of a death penalty trial,

7    victim impact is absolutely admissible.

8        And people would come in and talk about how much they

9    miss her and, frankly, despite as much preparation as Ms. Reed

10   may perform, witnesses go off on tangents all the time.  All

11   of us know that.

12       And it is far from speculative.  Someone may talk about

13   her being a great mother, a wonderful wife, someone who never

14   used drugs a day in her life, or something like that.

15       At that point, unfortunately, there is a "serious

16   potential," as Judge Wier calls it, for there to be an issue,

17   given Mr. Foley.

18       Now, I believe him that he doesn't remember her at all.

19   That he has no privileged information all of these years

20   later.  He has his file with him.  We are happy to pass it up

21   to you, Your Honor, to review in camera.  I can tell you there

22   is nothing in there.

23           THE COURT:  Just so we're on the same page, if at any

24   point you need to request an ex parte session, you don't be

25   shy.  You let me know.

1          Go ahead.  I'm sorry to interrupt, sir.

2          MR. PROCTOR:  I think Ms. Reed has heard all of this

3     anyway.

4          So that's why I believe there is -- it's not an actual

5     conflict, but there is a serious potential.

6          THE COURT:  Okay.

7          MR. PROCTOR:  The Ms. Price ones --

8          THE COURT:  Can I ask you question on that?

9          MR. PROCTOR:  Yes.

10         THE COURT:  I saw a couple of different things in the

11    record on Ms. Price's relationship with the firm.

12         One described it as an office sharing arrangement.  One

13    described it as a strategic partnership with respect to social

14    security matters.  And during the call that we had on June 1st

15    you described it as an "of counsel" relationship.

16         What was it?  What am I to do?

17         MR. PROCTOR:  So let me try to explain.  I would like

18    Mr. Croley -- I would like to start and have him finish.

19         THE COURT:  Okay.

20         MR. PROCTOR:  "Of counsel" is just like an amorphous

21    term that people just use.  Two firms may use it completely

22    differently to describe someone of counsel.

23         I have read some examples.  You're on your way to

24    partnership, so you're not a mere associate, but not a partner

25    yet.  We split certain types of cases.

1       "Of counsel," it's a part-time gig because you're

2   semiretired.  So of counsel means -- the reason on the call I

3   called it "of counsel" is that's what their letterhead said.

4       So on the call, that's how Ms. Price was held out to

5   people in the legal community, as "of counsel" to his firm.

6   Having drilled down on it with Mr. Croley, okay, the

7   letterhead said she is "of counsel."  What does that actually

8   mean?

9       Then the truth is she works on a very limited capacity

10  with them on social security matters, works mostly out of her

11  home.  Doesn't share files.  So both of those things are true,

12  Your Honor.

13      It's just the labelling of "of counsel."  When I drilled

14  down, it was a lot less than what other people call or

15  represent "of counsel" to mean.

16          THE COURT:  Okay.  Okay.  Did you look at the *Bowers*

17  case where --

18          MR. PROCTOR:  I did, yes, sir.

19          THE COURT:  Now, I found it useful in thinking about

20  one of the rules that is definitely in play here.

21      Let's talk for a moment more specifically about

22  Mr. Foley's prior representation of Ms. Johnson.

23      And I want to speak specifically about Rule 1.9 (a).

24      A lawyer who has formally represented a client in a

25  matter -- that's Mr. Foley -- shall not thereafter represent

1   another person in the same or substantially related matter.

2       No one is going to contend that the divorce is the same

3   matter as this case.

4       But the phrase "substantially related" is what *Bowers*

5   defined.

6       And really critically with respect to that phrase,

7   *Bower's* says, "The Court must be able to reconstruct the

8   attorney's representation of the former client, what

9   confidential information could have been imparted in that

10  representation, and to decide whether that information has any

11  relevance to the attorney's representation of the current

12  client."

13      So is the test what Mr. Foley does or does not recall?

14          MR. PROCTOR:  Well, if you read *Bowers*, Judge, I

15  agree.  As would normally be obtained -- *Bowers* is a civil

16  case and, certainly, you have no significant right to counsel

17  of your choice in a civil matter.

18      So it's not directly, I don't believe, on point.  But it

19  is certainly persuasive, I guess, the Court would use.  And,

20  you know, where I part, I guess, is it's related -- is her

21  divorce, it is related to this case, I'm just not sure it is

22  substantial.  At most, it is two or three questions at a

23  penalty phase if someone were to blurt something out.

24      So that's where I come down on this.

25          THE COURT:  It's a fair point, but let me ask it this

1    way.  That, to me, *Bowers* -- and it has been relied on in the

2    criminal context by Judge Van Tatenhove.

3        That test says, well, let's just look at the divorce.  It

4    was a typical divorce case, it appears.  What type of

5    information would Ms. Johnson have revealed to Mr. Foley?

6    What type of information would he have investigated?  What

7    type of information would he have learned from the other

8    lawyer, then had to go to talk to Ms. Johnson about to

9    determine its voracity?

10       The child custody issues are important, of course.  The

11   relationship ended poorly.  He moved to withdraw based on

12   irreconcilable differences.

13       It seems to me that what we're talking about in terms of

14   information that would be related during that representation

15   is all matters that would relate to her fitness as a parent,

16   her personal life, her romantic life, her family connections.

17   All of those things that Mr. Foley would be duty bound to

18   analyze, assess, inquire about, investigate.

19       And what I don't know for sure, but I can expect, I

20   think, is that those are the types of matters that the defense

21   will naturally be investigating in this case with respect to

22   the victim.  Maybe not right now, but at some point.

23       Now, if that's getting into an area where we do need to

24   have an ex parte discussion, we will.

25       But the connection to me is, under *Bowers*, the type of

1     information that could have been relayed, that I have to

2     assume was relayed during the divorce, the type of connection

3     between that and the matters that you would be investigating,

4     possibly even presenting to the Court and to the jury in this

5     case.

6          And the context, the issue with respect to a conflict is,

7     would Mr. Foley, in any way, be bound by duties to Ms. Johnson

8     in that process?

9          Could his memory be jogged and he recalls something that

10    was told to him by Ms. Johnson that he needs to tell Mr. Nantz

11    and you about, but he can't because he owes a duty of

12    confidentiality to Ms. Johnson, which continues past her

13    death.

14         So the substantialness is getting into that very highly,

15    unpredictable area, in my view.  But it's that possible

16    connection, and the breadth of the divorce proceeding, to what

17    you may be investigating and pursuing as any part of a

18    defensive strategy in this case that, I think if not a serious

19    potential conflict, may be an actual conflict.

20         And we'll get to the second portion in just a moment.

21         So any comment?  Again, I want to hear from Mr. Foley.

22         And, Mr. Foley, any comment on that thinking?

23         MR. PROCTOR:  I -- I understand what you're saying,

24    Judge.  I would agree with you, to a limited extent.  That

25    we're not at a point in our investigation where we're able to

1    rule out any potential avenues at this point.

2          THE COURT:  Okay.

3          MR. PROCTOR:  So I would concede with your argument

4    that absolutely that could happen down the line.

5       I think the rest of this conversation is ex parte.  I

6    think Mr. Foley ought to put on the record what exactly he

7    remembers about this case; what's in his file, which he has

8    with him today.

9       And I'm the worst person in this room, by far, to talk

10   about what is customary in a divorce case because I've never

11   had one.

12          THE COURT:  I haven't either.

13          MR. PROCTOR:  It's a civil case.  But Mr. Foley and

14   Mr. Croley do, with some regularity, so they will be better

15   positioned to answer those questions.

16          THE COURT:  We're going to have an ex parte portion

17   clearly.

18       Let's continue with the rule in just a moment.

19       I'm going to start from the beginning.

20       "A lawyer who has formally represented a client in a

21   matter" -- that's Mr. Foley, the matter is the divorce --

22   "shall not thereafter represent another person" -- that's

23   Mr. Nantz -- "in the same or a substantially related matter,

24   in which that person's interest" -- that's Mr. Nantz -- "are

25   materially adverse to the interest of the former client,

24

1    unless the former client gives informed consent confirmed in

2    writing."

3         It's not possible to get that consent in writing,

4    correct?

5             MR. PROCTOR:  That's correct.  And even if there were

6    a next-of-kin, I don't know who that person is, and I'm fairly

7    sure I shouldn't be knocking on their door and asking to waive

8    a conflict.

9             THE COURT:  Did you provide victim notification of

10   this hearing, Ms. Reed?

11            MS. REED:  Yes, Your Honor.

12            THE COURT:  How was that accomplished?

13            MS. REED:  It was accomplished via written letter and

14   there has been discussions on my part with the victim's

15   mother.

16            THE COURT:  Okay.

17            MS. REED:  Although I will put on the record, I did

18   not discuss, nor request, a signed waiver of any conflict that

19   her daughter may have had with regard to this hearing.

20            THE COURT:  Well, I think it's fair to assume, or at

21   least to think, that if Mr. Foley withdrew based on

22   irreconcilable differences, the relationship did not end well.

23   And the likelihood of a waiver, even if one were possible,

24   would be limited in that context.  But that's not going to be

25   any critical part of any ruling.

1    Let's look at Rule 1.7 for a moment.

2    I'm sorry.  Let's not get there just yet.

3    Well, let's go ahead and talk about 1.7.

4    "Except as provided. . ." -- this deals with current

5    clients.  Excuse me.

6    "Except as provided in paragraph B, a lawyer shall not

7    represent a client if the representation involves a concurrent

8    conflict of interest.

9    A concurrent conflict of interest exists if

10   representation of one client would be directly adverse to

11   another client."  That's not going to happen here.

12   But sub 2.  "There is a significant risk that the

13   representation of one or more clients," that's the

14   Foley/Croley representation of Mr. Nantz -- "will be

15   materially limited by the lawyer's responsibilities to a

16   former client."  That would be Ms. Johnson.

17   So subsection B allows the representation of the

18   client -- that would be Mr. Nantz -- under certain

19   circumstances, including subsection 4.

20   "Each effected client gives informed consent confirmed in

21   writing."  So, again, if, in the context of representing

22   Mr. Nantz, Mr. Foley owes any responsibility to Ms. Johnson

23   that materially limits his representation of Mr. Nantz, the

24   representation could only continue if Ms. Johnson consents in

25   writing.

1          Mr. Proctor, am I missing a component there?

2          MR. PROCTOR:  Again, the only comment I have on that,

3     just as I wasn't sure of substantially related --

4          THE COURT:  Right.

5          MR. PROCTOR:  -- I'm not sure anything would be

6     materially limited.  You know, most of the cases that we read,

7     in fact, I think all of them, Judge, it was one defendant with

8     one lawyer or two defendants with one lawyer.

9          THE COURT:  Yes.  Yes.

10         MR. PROCTOR:  Mr. Nantz is in the enviable position

11    of, right now, having three, with it sounds like a fourth to

12    enter his appearance imminently.

13         So could Mr. Foley be asked to not participate in the

14    penalty phase?  Would that cure the issue?  Perhaps.

15         Could Mr. Ertel and I, for example, say, you know what?

16    We are going to dig into the background records.  We are going

17    to discuss.  We are not letting you in on the conversation,

18    and that will be fine with you and here is why.

19         I didn't find -- and I looked -- a single case that

20    addressed whether efforts by part of the defense team to wall

21    off other parts, for very limited purposes, whether that was

22    ineffective or effective.

23         THE COURT:  It's an interesting point.

24         And no one has separately defined duties among the

25    defense team, correct?  Your duties to Mr. Nantz are uniform.

1          MR. PROCTOR:  Correct.

2          THE COURT:  So it is an interesting point.  I do like

3    the approach of breaking out each individual component of the

4    rule.  That's what we have to do.

5        Let me ask about Rule 1.6 for a moment.

6        Confidentiality owed to a former client, right?

7        That survives the death of the client?

8          MR. PROCTOR:  Absolutely.

9          THE COURT:  So to the extent Mr. Foley has a duty of

10   confidentiality with respect to the representation of

11   Ms. Johnson, it survives today.

12         MR. PROCTOR:  No doubt on that.

13         THE COURT:  Okay.  I think it is appropriate to go

14   into an ex parte discussion at this point unless there is an

15   objection from Ms. Reed.

16         MS. REED:  No, Your Honor.

17         THE COURT:  Ms. Reed, on the call, the government's

18   position was respectful of Mr. Nantz, and I understand that.

19   I need to know if you think there is a conflict.

20       You can think about it during the ex parte discussion,

21   but I do need to know from the government, based on what it

22   knows in the record, if it thinks there is an actual or

23   potential conflict.

24       So you can say that now, or you can say that after the

25   ex parte portion.  I know you won't be informed by the

1    ex parte portion, but the deference is not inappropriate.

2         But now everyone is saying, Judge, it's up to you.  So I

3    need the parties' position.

4              MS. REED:  Yes, Your Honor.

5              THE COURT:  Is that okay?

6              MS. REED:  Yes, Your Honor, that is fair.

7         And before I leave for purposes of the ex parte, I also

8    saw the government's role today as potentially giving some

9    scenarios.

10        And I think the government, with Mr. Proctor and the

11   defense team, has tried to be as open book as much as possible

12   with regard to the discovery and everything, so this shouldn't

13   come as a surprise.

14             THE COURT:  Okay.

15             MS. REED:  But in addition to the penalty phase, the

16   only issue, additional issue, that the government could

17   perceive is that there is a theory, at least from the

18   government's perspective, there has been a theory floated that

19   Ms. Johnson may have shot herself and, therefore, her mental

20   state, and what was going on with regard to the federal

21   indictment, drug use, I mean, we all have the toxicology

22   report.

23        And the fact that she was pregnant.  And the fact that

24   she had gone through some issues before with her children and

25   incarceration may have led to what the government believes was

1     a murder, but what the defense may very well argue was a

2     suicide.

3          And so --

4              THE COURT:  Some of that came in at the detention

5     hearing, if I recall the testimony.

6              MS. REED:  Yes.  Yes, Your Honor.  And both parties

7     are aware of it because I think it also came up with regard to

8     our meeting in D.C.

9          So I just want to put that out there.  As far as her

10    mental state, her family, her position as a mother, her

11    substance abuse could all potentially come in on the merits.

12    That's something the government is not going to be able to

13    control.

14         And then, of course, I think the penalty phase, her

15    entire life is going to be put under a microscope, so --

16             THE COURT:  And then the call, which you relayed with

17    respect to the penalty phase, is that one or both of the

18    children that was involved in the custody dispute could

19    testify.

20             MS. REED:  Yes, Your Honor.

21             THE COURT:  The ex-husband could testify.

22             MS. REED:  I would say -- I can't say a hundred

23    percent --

24             THE COURT:  Right.

25             MS. REED:  -- that he would or would not.  He would

1    certainly be given the opportunity to.

2        The children, of which there are three surviving, reside

3    with different custodians, sometimes at different times.

4    Those custodians, the legal guardians of those children, would

5    all be invited.  Everyone in the family has been consulted

6    extensively, and so they would continue to participate,

7    potentially, all the way through the penalty phase.

8        So it would be very hard for me to say who would and who

9    wouldn't participate, including the ex-husband.

10       That being said, I don't know if the Court mentioned it,

11   moving to Ms. Price for a moment --

12            THE COURT:  Yes.

13            MS. REED:  -- if I may.

14       The government does have a position with regard to

15   Ms. Price.  And it's not so much with regard to this hearing,

16   but I feel like it is appropriate to let the Court know now.

17            THE COURT:  Yes.

18            MS. REED:  The government believes there is a

19   conflict with Ms. Price continuing to represent NM.

20            THE COURT:  Yes.

21            MS. REED:  And my understanding, that the government

22   has learned very recently, is that Ms. Price has also

23   previously represented Mr. Nantz in something that will come

24   in at same potential penalty phase at which she would also

25   represent NM.  So that appears to be a conflict --

1          THE COURT:  Yes.

2          MS. REED:  -- that the government is comfortable

3    stating is an actual conflict.

4          THE COURT:  Yes.  And I appreciate that.

5       When I looked at those issues with respect to the defense

6    of Mr. Nantz in this case, I don't know exactly what the

7    nature of her relationship with the firm is.  I want to hear

8    more about that.

9       Her prior representation of Mr. Nantz would be very hard

10   to see how that could raise any potential conflict, if she's,

11   in any way, associated with the defense of Mr. Nantz in this

12   case.  I don't think she is, but if she is.

13      But I understand the point with respect to the other

14   representations that she has of NM, and that prompts another

15   question by me, that I had for later in the hearing.

16      But I looked at it last night, the notice of related

17   prosecutions in this case is lengthy --

18         MS. REED:  Yes.

19         THE COURT:  -- and it's a web.

20      Is it fair, or should I assume, that any appointed

21   defense counsel in any of those cases would have a conflict

22   representing Mr. Nantz?

23         MS. REED:  With regard to the entirety of the Sergent

24   indictment on which NM is listed?

25         THE COURT:  If you need to think about it and come

1    back, that's fine.  I didn't mean to spring that on you,

2    because it is a web.

3         MS. REED:  Yes, Your Honor.  That entire indictment

4    is conflicted.

5         THE COURT:  Sergent?

6         MS. REED:  The entire Collinsworth indictment is not.

7         THE COURT:  Okay.

8         MS. REED:  The entire Derwin Julien indictment is.

9      I would have to think about the 16 individuals on the

10   Collinsworth indictment and get back with specific names.  But

11   I can do that when I'm sitting out in the hall.

12        THE COURT:  Okay.

13        MS. REED:  I think the Huck indictment, obviously, is

14   as well.

15        THE COURT:  Yes.  And, of course, a lot of that came

16   in at the detention hearing as well.

17     Okay.  Anything else to cover with Ms. Reed before we

18   have the ex parte portion, do you think, Mr. Proctor?

19        MR. PROCTOR:  I don't believe so.

20        THE COURT:  Anything further, Ms. Reed?

21        MS. REED:  No, Your Honor.  I'm happy to speculate as

22   to any scenario that the defense would request that I do so on

23   given the discovery that has been provided, if it would be

24   helpful in any way.

25     But I think that anything that I can foresee, I think

1    we've all talked about already.

2          THE COURT:  That's fair.  I appreciate that.  If we

3    have questions, we'll ask them, so just be patient with us.

4    Please step outside the courtroom.

5       We don't have that the external TV audio or video feed

6    on, correct, Sheila?

7          COURTROOM DEPUTY:  It is, but I have muted it.

8          THE COURT:  Just shut it down because there is no one

9    here.

10      (AUSA Reed exited the courtroom.)

11

12

13              **A PORTION OF THE TRANSCRIPT**

14              **FILED SEPARATELY UNDER SEAL**

15

16

17

18

19

20

21

22

23

24

25

34

1    (AUSA Reed entered the courtroom.)

2         THE COURT:  Ms. Reed has returned to the courtroom.

3    Thank you for your patience.  I think we had a full and

4    complete discussion of these issues to inform decisions by

5    Mr. Nantz and by the Court as well.

6         Of course, you weren't involved in those.  But to the

7    extent you can take a position on whether you think there is

8    an actual conflict or serious potential for a conflict based

9    on what you know, I would be pleased to hear from you.

10         MS. REED:  Yes, Your Honor.  The government's

11    position, based on the limited information the government has,

12    without being part of the ex parte hearing, would be that

13    there is a serious potential for a conflict.

14         And that would be based, almost entirely, on the analysis

15    set forth in the case that the government read, or, excuse me,

16    that the Court read a portion of.  If I could just turn to

17    that for a second.

18         That was the *Bowers* decision.  And it is just hard for

19    government to get over "to accomplish this inquiry, the Court

20    must be able to reconstruct the attorney's representation of a

21    former client, confer what confidential information could have

22    been imparted in that representation, and decide whether that

23    information has any relevance to the attorney's representation

24    of the current client."

25         And so it is hard for the government to get over the

1    wording there of "any relevance" and it is not information

2    that the attorney remembers or has documentation of.  It is

3    just that "could have been imparted" during that prior

4    representation.

5        Given the fact that it is no secret that the victim's

6    entire life and personal connections, clearly substance abuse

7    history, and likely child custody, and her actions or

8    inactions as a mother will be relevant to potentially the

9    merits and certainly sentencing, should we get there.

10       The government has to say that there is a potential for a

11   conflict in this case.

12       That being said, the government would thank Mr. Croley

13   and Mr. Foley for their candor with the government, extremely

14   early, as soon as the conflict came to light, if there turns

15   out to be a conflict.  And the government is basing this

16   decision on, basically, the hypothetical of what could

17   potentially happen in this trial.

18            THE COURT:  Okay.  That's helpful.

19       Thank you, Ms. Reed.  One of the things that I discussed

20   with Mr. Nantz, I told him I like to watch movies.  We don't

21   have a spoiler for this trial, right?  No one knows what the

22   story will be that unfolds.  I think that's the way to

23   illustrate the uncertainty that you just described.

24       Is that fair?

25            MS. REED:  Yes, Your Honor.  I think it is very

1    difficult for the government and I --

2         THE COURT:  Yeah.

3         MS. REED:  -- I can imagine it is even difficult for

4    Mr. Foley, who was part of the prior representation, to

5    imagine how the two could intermingle.  But when you read

6    something like, quote, any relevance, it is hard to get over

7    that.

8         THE COURT:  Yeah.  All right.  Give me just one

9    moment to look over my notes here.  Everybody be patient,

10   please.

11       All right.  Mr. Nantz, I am finding that there is, at a

12   minimum, a serious potential for a conflict if Mr. Foley and

13   Mr. Croley stay on your case.

14       It exists because of that divorce case that Mr. Foley

15   handled and the unpredictability with respect to whether

16   something could come up in your case that would place

17   Mr. Foley in a position of having duties both to Ms. Johnson

18   and to you that he could not reconcile.  He could not meet at

19   the same time.  That he might recall or have the light bulb go

20   off and recall something from that divorce that would be

21   helpful to you in your case, but he wouldn't be able to reveal

22   it to you because he still has to keep things Ms. Johnson told

23   him in confidence confidential, so he wouldn't be able to tell

24   you.

25       Rule 1.9 applies.  This is an ethical rule.

1    That talks about Ms. Johnson's case and input in all of

2    this.

3    For Mr. Foley to continue to represent you, Ms. Johnson

4    would have to agree in writing.  That's not possible.  So the

5    conflict that exists cannot be waived.  The duty of

6    confidentiality that exists, can't be waived at this point by

7    Ms. Johnson.

8    Those duties to former clients flow through the other

9    rule that I talked about, 1.7.  Again, any waiver would have

10   to be from her in writing.  That's not possible.

11   So the truth is, I think there is a conflict under the

12   Rules of Professional Conduct, such that whether you waive it

13   or not doesn't matter, because we're too limited in that

14   Ms. Johnson cannot waive it.  We don't even get to the point

15   of asking you whether you would waive.

16   You told us that you would not.  I've confirmed that.

17   And so that means there is no waiver by you for the Court to

18   rule on.

19   What I will add, importantly, is that in this case, even

20   if Mr. Nantz fully and fairly waived the potential conflicts

21   we have discussed, and there was a waiver somehow obtained

22   that was valid from Ms. Johnson, what you see in that

23   *Shearburn* case from Judge Wier is that the Court's role has to

24   be mindful of the integrity of the proceedings and the

25   public's confidence in this process, okay?

1          So one thing that I have to always think about,

2     Mr. Nantz, is that the public understands how we're

3     administering justice, and that it is being done fairly and

4     respecting everybody's constitutional rights.

5          What is important in this case, compared to some of what

6     you see in those reported cases that we were talking about, is

7     that Mr. Foley and Mr. Croley are appointed lawyers.  They're

8     appointed by the Court.  Their involvement in the case came

9     through the Court.

10          And, to me, that heightens the weight that I have to

11     afford to ensuring integrity in the proceedings themselves and

12     the confidence of the public in the administration of justice

13     in the case.

14          That's a little bit of a complicated way to tell you that

15     I have to account for the public's interest in this case.  So

16     I'm finding, even if you validly waived these conflicts, I

17     would not accept them because of that heightened interest in

18     preserving the integrity of the proceedings and the public's

19     confidence in the administration of justice.

20          So that means that -- by the way, I think that it is

21     undisputed that conflict is imputed to Mr. Croley.

22          Mr. Proctor, is that correct, that that is undisputed?

23               MR. PROCTOR:  Yes, sir.

24               THE COURT:  So that means the appointments of

25     Mr. Foley and Mr. Croley are rescinded.  Well, terminated.

1    You, Mr. Nantz -- I do thank you both for your service in

2    the your case.

3    Mr. Nantz, you would probably remember Mr. Proctor is

4    your learned counsel.  Okay.  He's the lawyer with a lot of

5    experience in cases like this, which are also entitled to

6    appointment of another lawyer.

7    And I'm going to decide who that is going to be.  I don't

8    know right now, but we're going to get you another lawyer to

9    work on the team with Mr. Proctor to replace Mr. Foley and

10   Mr. Croley.

11   Does that make sense?  Speak up.

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Now, I have a name.  Someone who has

14   occurred to me that might be worth checking to see if he's

15   available and interested in handling the case.

16   Ms. Reed, were you able to learn anything about

17   Collinsworth at all?

18          MS. REED:  Yes, Your Honor.

19          THE COURT:  Help me understand a little bit where the

20   conflicts may arise in those related cases.

21          MS. REED:  Just the names or the specific facts?

22          THE COURT:  Well, what are you comfortable doing?

23   Are you -- do you have a list of lawyers in Collinsworth who

24   would have a conflict in this case?  And you may not be

25   comfortable saying that, because theoretically you're talking

1    about who potential witnesses would be, right?

2              MS. REED:  Yes, Your Honor.  That's exactly right.

3              THE COURT:  Would you rather deal with that off the

4    record if a name comes through Mr. Proctor to you?

5              MS. REED:  Yes, sir.  That -- that would be probably

6    less lengthy than me trying to go through everything right now

7    or in writing anyway.

8              THE COURT:  Mr. Proctor, I have a name that I would

9    like you to contact.

10             MR. PROCTOR:  Yes, sir.

11             THE COURT:  I can say on the open record now or we

12   can go back into an ex parte session, and I can tell you who

13   it is and why.

14        It doesn't matter to me.  He has no idea that I'm going

15   to mention him.

16        Do you have any preference?

17             MR. PROCTOR:  I think what makes sense is -- I mean,

18   there is no point in me contacting this person and talking

19   with them if Ms. Reed says, well, they have a conflict anyway.

20        That said, maybe we could all -- you could put the white

21   noise on and I can talk to Ms. Reed real briefly and decide if

22   that's somewhere where we should begin.

23             THE COURT:  Let me write down the name for Ms. Reed.

24        Ms. Reed.

25             MR. PROCTOR:  That said, Judge, while Ms. Reed

1   considers it, I had not hoped for this -- can I just say on

2   the record something we all know to be true?

3       Mr. Croley, I'm lucky to have.  I have cases in several

4   different places and I'd take him as my co-counsel over anyone

5   every day of the week and twice on Sunday.

6       Mr. Foley has been a great help, especially with the

7   local knowledge and how things work here.  And I wouldn't want

8   someone to get a transcript of this and see the Court

9   rescinded their appointment and somehow to imply there was

10  something untoward here.

11      They have been great.  I'm sorry to see them go.  I

12  understand why the Court made its decision, but they are

13  worthy of appointment to any case in this district.  And I

14  can't commend them enough for the hospitality and generosity

15  they have shown me as I've come here.

16          THE COURT:  I'm sure that's true, and I appreciate

17  you noting it.

18      Mr. Croley is a long time member of the CJA panel.  He's

19  heard me express over and over again how much we appreciate

20  service whenever appointed.

21      I always tell lawyers, I may sound like a broken record

22  when I say that, but I'm not.  It is sincere.  So Mr. Croley

23  knows how much we respect his public service.

24      And Mr. Foley's work in the case has been important as

25  well.

42

1  Nothing I have said should be taken as a criticism of

2  either Mr. Foley or Mr. Croley.

3  Mr. Proctor, do you think I need to amplify this with a

4  written order explaining?

5  MR. PROCTOR:  No, sir.  I think the transcript said

6  it all.  And I'll discuss it.  I -- I don't see this -- I

7  think Your Honor's ruling, such as it was, if you want to

8  write an order, who am I to stand in your way.

9  But I certainly don't think the record needs fleshed out

10  any more.

11  THE COURT:  It really wasn't a decision made.  In

12  court I added some alternative scenarios in which I supported

13  the same result.

14  MR. PROCTOR:  My recollection, Judge, was when you

15  appointed me, I saw the pleadings after the fact, because I

16  got access to the firm's folder and filed.

17  You instructed Mr. Croley and Mr. Foley to write to you

18  with three names.

19  THE COURT:  That's right.

20  MR. PROCTOR:  And you selected from that list.  And

21  that was permitted to be ex parte.  And I'll certainly take

22  whatever name you've got.  And I'm sure Mr. Croley, who knows

23  me better than anyone else in this room, would say, you'd

24  would work really well with this guy, you'd work awesome with

25  this lady, or whatever.

43

1          So my preference would be for the Court to say, Proctor,

2     you've got 14 days, file an ex parte, write me a letter.  I

3     want no fewer than three names.  Based on that, we can either

4     have a call and discuss it ex parte, or I will issue an

5     appointment.

6          Mr. Nantz will be fine with just me.  Mr. Ertel is about

7     to come in the case.  He may have two lawyers real soon

8     anyway.

9               THE COURT:  Okay.

10              MR. PROCTOR:  That would be my preference, rather

11    than me calling people today saying who has an conflict or who

12    doesn't have a conflict?

13         Let's give it a couple of weeks and regroup.

14              THE COURT:  Is there any objection to that, Ms. Reed?

15              MS. REED:  No, Your Honor.  There is no objection to

16    that.  Just a few things for purposes of the record.

17         I don't know of any conflict with the name provided by

18    the Court.

19              THE COURT:  Okay.

20              MS. REED:  If we're going to take the route of taking

21    a few weeks and gathering names as the Court has noted, and as

22    counsel is aware, the Nantz case is into -- I want to say

23    there has to be -- I would -- probably close to a dozen

24    different indictments, and over, well over 20 defendants.

25         So I don't know how fruitful that will be without

44

1      coordination between defense and government.

2              MR. PROCTOR:  I get that she might not want to

3      identify the defendant for me.  But if she were just to send

4      me a list of don't call the following lawyers, they all have a

5      conflict, I'll take her word for it.

6              THE COURT:  Yeah.  Well, the reason that I -- well,

7      there is no harm in mentioning the name --

8              MR. PROCTOR:  I don't think so.

9              THE COURT:  -- that I thought of.

10        Kent Wicker is a lawyer in the western district of

11     Kentucky, former Assistant U.S. Attorney.  I thought of

12     Mr. Wicker because he's an excellent lawyer and because I know

13     he's not connected with these cases.  It is a web.

14        But you can talk to Mr. McNally.

15             MR. PROCTOR:  I will.  I'm supposed to talk to him

16     this evening, sir.

17             THE COURT:  Why don't you do that?  Why don't you

18     mention Mr. Wicker?  Why don't you --  today is the 1st.

19             MR. PROCTOR:  Frankly, Your Honor, I would like to

20     talk to Mr. Ertel.  He's coming in, let's find out, you know,

21     what he thinks would be a good fit for the team and all of

22     that sort of stuff so, yeah.

23             THE COURT:  That's fine.  Let's do it this way.  You

24     can file that list of three candidates on or before July 15,

25     give you two weeks.

1        If you think one of the three you are considering might

2    have a conflict, check with Ms. Reed.

3            MR. PROCTOR:  Absolutely.

4            THE COURT:  How's that, Ms. Reed?

5            MS. REED:  That's fine, Your Honor.

6            THE COURT:  Now, the file needs to be transitioned,

7    of course.  To the extent Mr. Foley and Mr. Croley have

8    portions of the file that needs to be transitioned, it does.

9    So I'll order that.

10      Once that is concluded -- I shouldn't have used the term

11    "rescinded."  I did not mean that.  I meant your appointment

12    is terminated.

13           MR. PROCTOR:  Your Honor, may I ask one thing?

14           THE COURT:  Yes.

15           MR. PROCTOR:  In another one of the districts I

16    regularly practice --

17           THE COURT:  Yeah.

18           MR. PROCTOR:  -- let's say on January 1st they say no

19    death penalty.  At that point they would usually remove me

20    from the case.  But they always give me a month so that I can

21    turn the file --

22           THE COURT:  Wind down.

23           MR. PROCTOR:  -- meet with the client and explain why

24    I'll no longer be a part of the case; allowing me to tell the

25    client's mother you still have the other counsel, you're in

1   good hands.

2      So I would just ask, just purely for CJA purposes, a

3   transition period of 30 days for Mr. Croley and Mr. Foley,

4   because I think it is completely fair that they talk to his

5   dad and explain why it happened, and talk to his aunt and

6   explain this wasn't something they wanted out of the case and

7   abandon Daniel.

8      I would ask if you, at least for billing purposes --

9   maybe not filing pleadings in open court -- but at least for

10  billing purposes, that you allow them a 30-day, I think they

11  call a hand-over period.

12         THE COURT:  Well, your vouchers can certainly include

13  wind-down work that happens after this day.  That's fine.

14     But the potential for conflict is such that to do items

15  in the case that you are working on, they need to be

16  transitioned.

17         MR. PROCTOR:  I'm not asking --

18         THE COURT:  Yeah.

19         MR. PROCTOR:  I'm not asking them to do legal

20  research or meet with Mr. Nantz, just transitional work, Your

21  Honor.  That's it.

22         THE COURT:  Yeah.  Well, Mr. Croley and Mr. Foley can

23  speak to that.  When I say "transition the file," I mean

24  delivery of the file.

25     Are there other matters that you need guidance from the

47

1       Court on with respect to sort of winding up portion?

2           Mr. Croley.

3           MR. CROLEY:  I mean, I don't anticipate other than

4       providing the documents that we have stored in our file, it's

5       quite an extensive file, obviously --

6           THE COURT:  I'm sure.

7           MR. CROLEY:  -- and to go through them with

8       Mr. Proctor.  He's already been through the file.  So, yeah.

9       There is not going to be a, much of a transition, really, that

10      I would anticipate.

11          THE COURT:  I mean, it is, obviously, it is fair to

12      include in your next vouchers the windup work.  But the

13      statutory appointment is terminated with respect to

14      Mr. Nantz's defense.

15          So, Mr. Nantz, what that means is we need to take a

16      little bit of time to get you a replacement lawyer.  We'll all

17      work hard on that, and we'll just get that done as promptly as

18      we can.

19          I'll just ask you again if you have understood everything

20      that we have covered here today, sir.

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Okay.

23          Helpful discussion.  Difficult in many ways because of

24      the complexities and the uncertainties, but everyone was

25      appropriate today and helped understand the issues and I can

48

1    tell help Mr. Nantz understand them as well.

2        Anything further from the government, Ms. Reed?

3        MS. REED:  Your Honor, just for purposes of the

4    record, the government just wants to be clear.  It's obvious

5    that Mr. Proctor is staying on, and he has been on for some

6    time.  I know there was a lot of discussion early on prior to

7    the capital committee meeting with regard to setting a trial

8    date and when that estimated time frame would be.

9        Obviously, COVID occurred.  Now we have an issue with the

10   local counsel being replaced.

11       I would just like some reassurance, from either

12   Mr. Proctor or Mr. Nantz, that if they would like to set a

13   trial date, or they want things to be moving quicker than what

14   they are, the government is open to that and ready to proceed

15   at any point.

16       THE COURT:  Neither side needs leave to file a motion

17   for a trial date.

18       MR. PROCTOR:  Your Honor, additionally, I mean, I'm

19   not in a position ask for one.  I need another lawyer.  We

20   have COVID.

21       I will either draft a motion to toll a speedy trial, or

22   if the government wants to draft one, they usually do.  I'll

23   be happy to consent to whatever period through the next

24   whatever makes sense with the government.  I'm not -- I'm not

25   pressing a right to a trial any time soon.

1     If Ms. Reed wants to talk to me separately outside, we

2  will have no problem tolling the Speedy Trial Act.

3          THE COURT:  I understand that.  File whatever you

4  think is appropriate.  There are certain scheduling matters

5  Judge Wier handles, well, refers to me, but most of them he

6  handles on his own.  I can't tell you exactly what the process

7  will be.

8          Anything further?

9          Ms. Reed.

10          MS. REED:  No, Your Honor.  Thank you.

11          THE COURT:  You're welcome.

12          Mr. Proctor.

13          MR. PROCTOR:  Yes, Your Honor.  Two things, both of

14  which would be real brief.  Sorry.

15          THE COURT:  No problem.

16          MR. PROCTOR:  The paralegal appointed in this case is

17  someone who has taken to the bar but not passed it yet, I

18  believe, who is a member of Croley and Foley.

19          So I'm assuming that the Court's ruling today, I should

20  actually find myself a new paralegal.  That's question number

21  one.

22          THE COURT:  Yes.

23          MR. PROCTOR:  I think that's right.

24          Question number two, when I go to file this on July 15th

25  -- everything should be -- it's amazing to me -- should be the

50

1    same, but it's different in every jurisdiction.

2        One of the questions in the drop down menu is, did the

3    Court give you permission to file this ex parte?  If so, how?

4    So --

5            THE COURT:  You have my permission to file it

6    ex parte.

7            MR. PROCTOR:  Can it be in the minutes of this

8    hearing?  The Court granted leave to -- and then I can just

9    say this is how?  That's all.

10           THE COURT:  Yes.  It will be in the minutes.

11           MR. PROCTOR:  That's all I have, Judge.

12           THE COURT:  Sure.  Okay.

13        Mr. Croley, anything further, sir?

14           MR. CROLEY:  No, Your Honor.

15           THE COURT:  Okay.  Thank you.

16        Mr. Foley, anything further?

17           MR. FOLEY:  No, Your Honor.

18           THE COURT:  Well, Mr. Nantz, we'll try to get the new

19    lawyer appointed promptly and then the case will proceed, okay

20    sir?

21           THE DEFENDANT:  Yes, sir.

22           THE COURT:  All right.  Thank you, all.  We'll be in

23    recess.

24        (Proceedings concluded at 2:48 p.m.)

25

51

1                    C E R T I F I C A T E

2          I, KIMBERLEY ANN KEENE, RPR, certify that the
   foregoing is a correct transcript from the record of
3  proceedings in the above-entitled case.

4

5  Kimberley Ann Keene, RPR            September 3, 2020
   KIMBERLEY ANN KEENE, RPR           Date of Certification
6  Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25