**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**LONDON**

**CRIMINAL ACTION NO. 6:19-CR-16-2-REW-HAI**

**UNITED STATES OF AMERICA**                                                   **PLAINTIFF**

**V.**

**DANIEL S. NANTZ**                                                               **DEFENDANT**

**UNITED STATES' CONSOLIDATED RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTIONS TO STRIKE THE DEATH PENALTY:**
**(1) BECAUSE THE FEDERAL DEATH PENALTY ACT DOES NOT**
**GENUINELY NARROW THE CLASS OF DEFENDANTS;**
**(2) AS A PUNISHMENT IN THIS CASE; AND**
**(3) THE WHITE FEMALE VICTIM EFFECT**

\* \* \* \* \*

COMES NOW the United States of America, and hereby opposes defendant Daniel S. Nantz's (1) Motion to Strike the Death Penalty Because the Federal Death Penalty Act ("FDPA") Does Not Genuinely Narrow the Class of Defendants Who are Eligible for Death [D.E. 183]; (2) Motion to Strike the Death Penalty as a Punishment in this Case [D.E. 186]; and (3) Motion to Strike the Death Penalty as Unconstitutionally Applied to the Murder of White Female Victims [D.E. 185]. The defendant's arguments distilled are (1) the FDPA does not narrow the set of eligible defendants; (2) the FDPA discriminates on the basis of geography, race, gender, and political timing; (3) jurors are incapable of fulfilling their duties in capital cases; and (4) the "evolving standards of decency" have rendered the FDPA invalid and the FDPA may lead to the execution of innocent people.

1

## <u>INTRODUCTION</u>

"[I]t is settled that capital punishment is constitutional." *Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015), *citing Baze v. Rees*, 553 U.S. 35, 47 (2008)); *see also Gregg v. Georgia*, 428 U.S. 153, 181-87 (1976).  "It is impossible to hold unconstitutional that which the Constitution explicitly *contemplates*."  *Glossip v. Gross*, 135 S. Ct. at 2747 (Scalia, J., concurring).  This Court does not have the authority to rule inconsistently with controlling precedent of the Supreme Court.  *Bosse v. Oklahoma*, 127 S. Ct. 1, 2 (2016) (per curiam) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raising doubts about their continuing vitality.").

Numerous Circuits have rejected identical arguments from capital defendants.  *See United States v Sampson,* 486 F.3d 13, 23-24 (1st Cir. 2007), *cert. denied*, 553 U.S. 1035 (2008); *United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2007), *cert. denied*, 553 U.S. 1094 (2008); *United States v. Coonce*, 932 F.3d 623 (8th Cir. 2019); *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002).

All recent district courts to have considered motions challenging the constitutionality of the FDPA, which have been similar if not identical to the defendant's motions, have also rejected such challenges.  *See United States v. Candelario-Santana*, 368 F. Supp. 3d 316 (D.P.R. 2019); *United States v. Madison*, 337 F. Supp. 3d 1186 (M.D. Fla 2018); *United States v. Mills*, 393 F. Supp. 3d 650 (E.D. Mich. 2019); *United States v. Christensen*, No. 17-cr-20037, 2019 WL 651501 (C.D. Ill. Feb. 15, 2019); *United States v. Ofomata*, No. 17-201, 2019 WL 527696 (E.D. La. Feb. 11, 2019); *United*

*States v. George*, No. 17-201, 2019 WL 537186 (E.D. La. Feb. 11, 2019); *United States v. Bowers*, No. 18-292, 2020 WL 1675916 (W.D. Pa. Apr. 6, 2020); *see also Duncan v. United States*, No. 2:17-cv-00091; 2019 WL 1320039 at *27-*28 (D. Idaho Mar. 22, 2019) (rejecting defendant's argument in an 28 U.S.C. § 2255 petition that the legal and factual landscape has changed since the district court initially denied the defendant's pre-trial motions challenging the constitutionality of the FDPA and that the court should therefore reconsider its previous denials of those motions).

## RELEVANT BACKGROUND

### I.    SUMMARY FACTUAL BACKGROUND

On March 16, 2019, the defendant left an armed kidnapping to return home and murder Geri D. Johnson.  The defendant planned and executed Ms. Johnson's murder to prevent her further cooperation with federal law enforcement.  The first round tore through the paper-thin walls of the defendant's trailer with the defendant's two minor children still inside.  The second and third rounds struck Ms. Johnson outside the residence.

The defendant shot Ms. Johnson in the back.  Ms. Johnson suffered a perforating gunshot wound entering the back lateral right shoulder and exiting the front right shoulder.  This bullet did not strike any major vessels or bone, causing soft tissue damage only.  The defendant also shot Ms. Johnson through the neck.  Ms. Johnson suffered a perforating gunshot wound that entered through the right side of the neck and exited the left side of the neck.  The bullet penetrated the soft tissue, blood vessels, and oropharynx.

The autopsy report notes this wound caused hemoaspiration within the lung parenchyma, meaning Ms. Johnson *eventually* drowned on her own blood.

Ms. Johnson was in her third trimester of pregnancy at the time of her murder. Ms. Johnson's attempt to flee was evidenced by a blood trail on the defendant's property. As Ms. Johnson's lungs filled with blood, the defendant loaded her into his pickup truck and transported her back to the kidnapping site to obtain his kidnapping accomplice. After which, the defendant took additional time back at his residence to ensure his camera system was dismantled before dumping Ms. Johnson's body at the hospital.

Geri D. Johnson was dead upon arrival at Baptist Health Hospital in Corbin, Kentucky.  Amelia Jo Johnson was delivered at over thirty weeks gestation by emergency Cesarean section.  Amelia soon began seizing due to being deprived of oxygen while being driven around in her mother's corpse.  Amelia was diagnosed with perinatal asphyxia and severe hypoxic ischemic encephalopathy.  Hypoxic ischemic encephalopathy is a type of brain damage that occurs when an infant's brain does not receive enough oxygen and blood.  Ventilator support was withdrawn after three days and Amelia died shortly thereafter on March 19, 2019.  The cause of death was determined to be homicide.

## II.   PROCEDURAL HISTORY

On March 21, 2019, the defendant was indicted on one count of 21 U.S.C. § 846, conspiracy to distribute methamphetamine.  On July 24, 2019, a federal grand jury charged the defendant in a seven count Superseding Indictment, alleging Count 1, the murder of Geri D. Johnson, committed with the intent to prevent the victim from

communicating with federal law enforcement regarding to the defendant's participation in a federal offense, to wit: conspiracy to distribute a controlled substance, in violation of 18 U.S.C. § 1512(a)(1)(C).[1]  [D.E. 32].  The grand jury further charged multiple special findings as to Count 1, alleging all four threshold intent factors (18 U.S.C. § 3591)(a)(2)(A)-(D), that defendant was over the age of 18 years old at the date of the murder, and five statutory aggravating factors, to wit:

- 18 U.S.C. § 3592(c)(5), that the defendant knowingly created a grave risk of death to one or more persons in addition to the victim of the offense;
- 18 U.S.C. § 3592(c)(6), that he committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim;
- 18 U.S.C. § 3592(c)(9), that he committed the offense after substantial planning and premeditation;
- 18 U.S.C. § 3592(c)(11), that he committed the offense against a particularly vulnerable victim due to Geri D. Johnson's late stage of pregnancy; and
- 18 U.S.C. § 3592(c)(16), that the defendant killed more than one person in a single criminal episode, Geri D. Johnson and Amelia Jo Johnson.

[D.E. 32 at 4-5].  The Superseding Indictment was returned by the grand jury, noting that Count 1 was subject to a punishment of Death or not less than Life and not more than a $250,000 fine. [D.E. 32 at 7].

On May 7, 2020, the Government filed its Notice of Intent to seek the death penalty. [D.E. 121].  Therein, the United States alleged all four threshold intent factors (18 U.S.C. § 3591)(a)(2)(A)-(D), as well as the five statutory aggravating factors listed above (18 U.S.C. § 3592(c)(5), (6), (9), (11), and (16). [D.E. 121 at 2-3].  Additionally,

---

[1]  Defendant is also charged with 18 U.S.C. § 1201(a)(1), kidnapping; 2 counts in violation of 21 U.S.C. § 846, conspiracy to distribute 500 grams or more of a methamphetamine mixture; 2 counts in violation of 18 U.S.C. § 924(c)(1)(A), possessing a firearm during and in relation to drug trafficking crimes; and 18 U.S.C. § 922(g)(9), unlawful possession of a firearm based upon a misdemeanor domestic violence conviction.  [D.E. 32]

the Government alleged the following non-statutory aggravating factors, (1) victim impact; (2) obstruction of justice; (3) contemporaneous convictions; (4) future dangerousness; and (5) uncharged crimes of violence [D.E. 121 at 3-6]. *See also* 18 U.S.C. § 3593(a). The defendants now seeks to strike the Notice of Intent to seek the death penalty, based on these general arguments that the FDPA is facially unconstitutional.[2]

## <u>ARGUMENT</u>

### I.     GENERAL LEGAL PRINCIPLES

Statutes may be challenged both facially and as applied to the particular defendant challenging the statute. Statutes enacted by Congress, however, are presumed to be constitutional. *INS v. Chadha*, 462 U.S. 919, 944 (1983). "From the beginnings of statutory construction in federal courts, the Supreme Court has held that 'an Act of Congress ought not to be construed to violate the Constitution if any other possible construction remains available.'" *Rosales-Garcia-Holland*, 322 F.3d 386, 420 (6th Cir. 2003) (quoting *NLRB v. Catholic Bishop*, 440 U.S. 490, 500 (1970)). The challenger of the statute bears the burden of proving that a statute is unconstitutional. *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 198 (2001). A "facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the [defendant] must

---

[2]  Aside from his selective prosecution claim regarding the white female victim effect, it appears that none of the defendant's motions raise an argument that the FDPA is unconstitutional "as applied" in this case. "An as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004). "If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." *Id.*

establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The Sixth Circuit has emphasized the Supreme Court's "disfavor" for facial challenges to Congressional enactments. *See Green Party of Tenn. v. Hargett*, 700 F.3d 816, 826 (6th Cir. 2012). Regarding such facial challenges to Congressional acts, the Sixth Circuit has previously held:

> Courts do not usually grant this "strong medicine…because such efforts do not seek to invalidate laws in concrete, factual settings"- the typical course of constitutional litigation – "but to leave nothing standing." *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 960 (6th Cir. 2009)(internal quotation marks omitted.) Facial challenges, the Supreme Court has noted, are disfavored for several other, somewhat overlapping reasons: they "often rest on speculation" and "thus raise the risk of premature interpretation," they "run contrary to the fundamental principle of judicial restraint," and they "threaten to short circuit the democratic process." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51, 128 S. Ct. 1184 (2008) (internal quotation marks omitted).

*Id.*

The Circuit and district courts that have considered this issue have repeatedly applied the *Salerno* standard in evaluating facial challenges to the FDPA. *See United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006) (denying facial challenge to the FDPA); *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004) (same); *Mills*, 2019 WL 3024715, at *2 (citing *Salerno* standard and denying defendant's facial challenges to the death penalty and FDPA); *United States v. Montgomery*, No. 11-cr-20044, 2014 WL 1453527, at *4-*5 (W.D. Tenn. Apr. 14, 2014) (same); *United States v. Coonce*, 932 F.3d 623 (8th Cir. 2019) (same); *United States v. Sablan*, No. 08-cr-259, 2014 WL 172543, at *4 (E.D. Cal. Jan. 15, 2014) (same); *United States v. Taylor*, 635 F. Supp. 2d 1243, 1246-

7

48 (D.N.M. 2009) (same); *United States v. Natson*, 444 F. Supp. 2d 1296, 1302 (M.D. Ga. 2006) (same).

The defendant requests this Court order discovery and an evidentiary hearing to consider the issues raised generally.  [D.E. 183 at 8-9; D.E. 186 at 54].  To date, however, the government has not received the aforementioned discovery request or motion.  While it is unclear what exactly the defendant is requesting, an evidentiary hearing is required only if a material issue of fact is raised which, if resolved in the defendant's favor, would entitle him to relief.  *See United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980); *United States v. Smith*, 546 F.2d 1275, 1279-80 (5th Cir. 1977); *Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2nd Cir. 1991); *United States v. LaRouche Campaign*, 682 F. Supp. 610, 621-22 (D. Mass. 1987) (discussing factors to be considered by a court presented with a request for an evidentiary hearing, including: "Are the allegations before the court supported by a showing of factual circumstances in which there is at least a substantial likelihood that full exploration of the facts will show that the alleged violation of that cognizable right has caused some substantial impairment of that right?").  As the Court's decision here is bound by Supreme Court precedent such that a factual evidentiary hearing will not bring the defendant the relief he requests, he cannot meet the standard that would warrant holding a hearing. Accordingly, his requests for a hearing should be denied.

The defendant also demands "discovery as delineated in a forthcoming motion," and an evidentiary hearing in his selective prosecution claim.  [D.E. 185 at 15].  "A selective prosecution claim asks a court to exercise judicial power over a special province

of the Executive." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citing *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (internal quotations omitted). The Attorney General retains "broad discretion" in the enforcement of federal criminal law. *Id.* However, such discretion is not unlimited. The decision to prosecute cannot be based on an arbitrary classification such as race, gender, or religion, pursuant to the equal protection component of the Due Process Clause of the Fifth Amendment. *Id.* at 464 (citing *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954); *Oyler v. Boles*, 368 U.S. 448, 456 (1962). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" *Id.* at 465 (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)). The defendant bares the burden of "producing some evidence that similarly situated defendants of other races could have been prosecuted, but were not…" *Id.* at 469. "Some evidence" means a credible showing. *United States v. Thorpe*, 471 F.3d 652, 657 (6th Cir. 2006). The Supreme Court in *Armstrong,* as well as the Sixth Circuit in *Thorpe*, found general racial statistics inadequate to meet this burden. Likewise, the Supreme Court in *United States v. Bass*, 536 U.S. 862, 863 (2002), held that "nationwide statistics demonstrating that the United States charges blacks with a death-eligible offense more than twice as often as it charges whites" insufficient under *Armstrong*. The defendant has failed to present evidence of a similarly situated defendant nor alleged any factual predicate to allege disparate treatment of *his* case.

## II.    THE FDPA IS NOT ARBITRARY

Numerous Circuits have rejected any notion that the FDPA runs afoul of the Eighth Amendment's prohibition on arbitrary and capricious punishments. *See United States v. Coonce,* 932 F.3d 623 (8th Cir. 2019); *United States v. Sampson*, 486 F.3d 13, 23-28 (1st Cir. 2006); *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006); *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004); *United States v. Purkey*, 428 F.3d 738, 762 (8th Cir. 2005) (rejecting challenge to duplicative aggravating factors because "the FDPA avoids arbitrary death sentences by requiring juries to weigh aggravating and mitigating factors").

### A.  The FDPA Appropriately Narrows the Class of Offenders Eligible for the Death Penalty

The defendant argues that the FDPA violates the Constitution because it does not narrow the class of defendants eligible for a death sentence. [D.E. 183; D.E. 186 at 12-13; 13-22]. In his omnibus motion, [D.E. 186], the defendant produces statistics which he asserts establish that the federal death penalty is rarely sought and imposed, demonstrating a lack of consistency and therefore arbitrariness. [D.E. 186 at 4-12]. This argument misses the mark and is based upon a misinterpretation of *Furman v. Georgia*, 408 U.S. 238 (1972). *Furman* was a *per curiam* decision in which the Supreme Court struck down state death penalty statutes that offered no guidance to the sentencing body and were, therefore, unconstitutional. *Id.* This lack of guidance created the possibility that the death penalty would be imposed capriciously or, even worse, in a discriminatory manner. *See Furman*, 408 U.S. at 309-10 (Stewart, J., concurring). In the many years

since *Furman* was decided, however, the Supreme Court has "made clear that its decision was not based on the frequency with which the death penalty was sought or imposed," but rather with the manner in which the death penalty was imposed.  *See Sampson*, 486 F.3d at 23 (reviewing Supreme Court cases post-*Furman* and concluding the FDPA's sentencing scheme was not arbitrary).

In *Gregg v. Georgia*, 428 U.S. 153 (1976), the Supreme Court explained that "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."  *Gregg*, 428 U.S. at 195 (upholding Georgia's revised death penalty scheme).  The FDPA is the kind of "carefully drafted statute" contemplated by *Gregg*.  The Supreme Court reaffirmed this principle once again in *Kansas v. Marsh*, 548 U.S. 163 (2006), reiterating:

> Together, our decisions in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (*per curiam*), and *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), establish that a state capital sentencing system must: 1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime. See *id.*, at 189, 96 S. Ct. 2909. So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed. *See Franklin v. Lynaugh*, 487 U.S. 164, 179, 108 S. Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion) (citing *Zant v. Stephens*, 462 U.S. 862, 875–876, n. 13, 103 S. Ct. 2733, 77 L.Ed.2d 235 (1983)).

*Marsh*, 548 U.S. at 173-74.

Quite simply, the frequency that the death penalty is sought or imposed under the FDPA does not affect the statute's constitutionality. *See United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2007), *cert. denied*, 553 U.S. 1094 (2008); *Sampson*, 486 F.3d at 23. As one district court explained, "an examination of the constitutionality of a capital statute must be focused on the <u>guidance</u> provided to the sentencing body as opposed to the statute's <u>application</u>." *United States v. Mills*, 393 F. Supp. 3d, 650, 680 (E.D. Mich. 2019) (emphasis in original). "The FDPA-with its bifurcated scheme that narrows the class of death-eligible defendants using statutory and non-statutory aggravating factors and permits the jury to make an individualized sentencing determination-satisfies the *Marsh* standard." *Id.*

Because the FDPA sufficiently confines the discretion of federal juries, it cannot be said to be unconstitutional simply because juries rarely choose to exercise their discretion to impose the death penalty. *United States v. Taylor*, 648 F. Supp. 2d 1237, 1239-41 (D.N.M. 2008). Applying the foregoing analysis, and relying heavily on the opinions from *Mitchell* and *Sampson* cited herein, numerous federal district courts have explicitly rejected the argument that the FDPA is unconstitutional based on the frequency in which the death penalty is sought or imposed. *See, e.g., United States v. Bowers*, No. 18-292, 2020 WL 1675916, at *2 (W.D. Pa. Apr. 6, 2020) ("The FDPA is a carefully drafted statute with adequate information and guidance such that it is not in jeopardy of being imposed in an arbitrary or capricious manner simply because it is not sought or imposed frequently."); *United States v. Ofomata*, No. 17-201, 2019 WL 527696, at *2 (E.D. La. Feb. 11, 2019); *United States v. Con-Ui*, No. 13-cr-123, 2016 WL 9331115, at

12

*4-*6 (M.D. Pa. Jan. 28, 2016); *United States v. Ciancia*, No. 13-cr-902-PSG; 2015 WL 13798659, at *3 (C.D. Cal. May 15, 2015); *United States v. Briseno*, No. 2:11-cr-00077-PPS, 2015 WL 163526, at *3-*4 (N.D. Ind. Jan. 12, 2015); *United States v. Savage*, No. 07-cr-550, 2013 WL 2060932, at *4-*5 (E.D. Pa. May 15, 2013); *United States v. Williams*, 08-cr-70, 2013 WL 1335599, at *3-4 (M.D. Pa. Mar. 29, 2013); *United States v. Basciano*, 763 F.  Supp. 2d 303, 339-40 (E.D.N.Y. 2011); *United States v. Barnes*, 532 F. Supp. 2d 625, 633 (S.D.N.Y. 2008).

Numerous district courts within this Circuit have also rejected the argument that an infrequency of implementation renders the FDPA unconstitutional.  *See Mills*, 393 F. Supp. 3d at 680; *United States v. Montgomery*, No. 11-cr-44, 2014 WL 1453527, at *6-*8 (W.D. Tenn. Apr. 14, 2014) (adopting *Barnes*, 481 F. Supp. 2d at 631-32 (in stating that because FDPA sufficiently restricts discretion, "it cannot be said to be unconstitutional simply because prosecutors and juries rarely choose to use that discretion…"); *United States v. Green*, No. 5:06-cr-19, 2008 WL 4000943, at *2-*5 (W.D. Ky. Aug. 26, 2008) ("[T]he frequency with which the federal death penalty is sought does not render the FDPA unconstitutional."); *United States v. Taylor*, No. 1:04-cr-160, 2008 WL 217115, at *3-*4 (E.D. Tenn. Jan. 24, 2008) ("*Furman* did not hold it unconstitutional to have some arbitrariness in the Government's selection of who to seek a death sentence against."); *United States v. Johnson*, No. 05-cr-80337, 2009 WL 1856240, at *2-*3 (E.D. Mich. 2009) (holding defendant's reliance on infrequency of those sentenced to death was misplaced under *Furman*.)  The defendant's argument regarding frequency of implementation eschews any analysis of the Supreme Court's robust death penalty

13

jurisprudence since *Furman* and ignores the unanimous holdings of various United States Courts of Appeals and district courts.

Similarly, the defendant's argument that the FDPA fails to adequately narrow the eligible class of offenders has been considered and rejected by numerous Circuits and district courts.  *See United States v. Allen*, 247 F.3d 741, 760-61 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002); *see also Coonce*, 932 F.3d 623, 646 (rejecting argument that the "FDPA itself is arbitrary" and citing to *Allen*'s conclusion that the FDPA adequately narrows the class of persons eligible for the death penalty); *United States v. Webster*, 162 F.3d 308, 354 (5th Cir. 1998) (holding "the FDPA provides sufficient safeguards to prevent the arbitrary imposition of the death penalty").

The FDPA includes several provisions which serve the narrowing function required to make the statute constitutional because, i.e., § 3591 authorizes the death penalty only for certain crimes;  "§ 3593(e) requires that at least one statutory aggravating factor be established before a death sentence may be considered"; "§ 3592(a) mandates consideration of mitigating factors when selecting a death sentence"; and (4) "§ 3595(c) calls for reconsidering any death sentence influenced by arbitrary factors, resulting from insufficient evidence, or involving legal error not harmless beyond a reasonable doubt."  Thus, the FDPA embodies the two basic prongs envisioned by the Supreme Court in a constitutional sentencing scheme. *See Jones v. United States*, 527 U.S. 373, 381 (1999); *Marsh*, 548 U.S. at 173-74.

Accordingly, the defendant has not met his weighty burden of showing that "no set of circumstances exists under which the FDPA would be valid," *see United States v.*

14

*Salerno*, 481 U.S. 739, 745 (1987).  Therefore, the government respectfully requests this Court join the multitude of decisions across the country upholding the constitutionality of the FDPA.

### B.  The FDPA is Not Arbitrary Based on Geography, Race, Gender, or Political Timing

The defendant alleges that regional, racial, gender, and political timing differences create disparities in the imposition of the FDPA and thus render the statute arbitrary and capricious in violation of the Fifth and Eighth Amendments.  [D.E. 186 at 13-27; 36-39] The defendant's evidence consists of statistically-based opinions submitted by Kevin McNally and Dr. Lauren Bell, law review articles, news articles, social science studies, and the reported decision in *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016). [D.E. 186 at 13-27].  Such a limited selection of material allows the defendant to allege generalizations that minority defendants, defendants in the "death belt" states, and defendants who murder white females are more likely to receive death authorization and sentences.

In doing so, the defendant has made a selective-prosecution claim in crafting his equal-protection argument.  The defendant also raises an Eighth Amendment claim arguing that the FDPA is unconstitutional in its application.  With regard to his equal-protection claim, the defendant bears the burden to establish two elements: (1) the decision makers *in his case* acted with "discriminatory purpose" and (2) this purposeful discrimination had a "discriminatory effect" on *him*.  *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (emphasis added).  For the first element, discriminatory purpose, the

defendant must show that discriminatory intent was motivated by racial animus. *Id.* at 298. To establish the second element, discriminatory effect, the defendant must make a "credible showing" that similarly situated individuals with a victim of a different race were not selected for capital prosecution. *United States v. Armstrong*, 517 U.S. 456, 465-69 (1996).

An individual should be deemed similarly situated for the purpose of demonstrating a discriminatory effect only if "their circumstances present no legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996); *see also United States v. Smith*, 231 F. 3d 800, 810 (11th Cir. 1996), *cert. denied*, 121 S. Ct. 1956 (2001). To be similarly situated with respect to the Attorney General's decision to seek the death penalty, the comparator must have "committed the same basic crime in substantially the same manner as the defendant-so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan." *Smith*, 231 F. 3d at 810. Finally, the similar-situated individual's evidence must be as strong or stronger than that against the defendant. *Id.*

The defendant's burden of proof is a heavy one, requiring he establish that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution," and that the government's selection of him was invidious or in bad faith.

*Getsy v. Mitchell*, 456 F.3d 575, 598 (6th Cir. 2006) (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2nd Cir.1974)).[3]

The Supreme Court examined a similar claim to the defendant's in *McCleskey*. McCleskey argued that the Georgia state death penalty was unconstitutional because black defendants and those who killed white victims had a statistically higher probability of receiving the death penalty according to the Baldus study. *McCleskey*, 481 U.S. at 287. The Baldus study was a robust examination of 2,000 murder cases in the State of Georgia which took into consideration approximately 230 different variables, including aggravating factors. *Id.* at 286-87. "One of [the Baldus study] models concludes that, even after taking account of 39 nonracial variables, defendants charged with killing white victims were 4.3 times as likely to receive a death sentence as defendant charged with killing blacks." *Id.* at 287.

For the first element, discriminatory purpose, the Supreme Court held that McCleskey must offer evidence specific to his case that would support an inference that racial considerations played a part in his sentence. *Id.* at 292-93. McCleskey relied solely upon the Baldus study and argued that the study "compels an inference" based upon purely statistical data. *Id.* at 293. "McCleskey's claim that these statistics are sufficient proof of discrimination, without regard to the facts of a particular case, would extend to all capital cases in Georgia, at least where the victim was white and the defendant is black."[4] *Id.* at 293. Although the Supreme Court had previously accepted

---

[3] *See Getsy v. Mitchell*, 495 F.3d 295, 315 (6th Cir. 2007), upholding the original panel's decision with regards to selective prosecution claim.
[4] The defendant in this case is white, as were both his victims.

such statistics as proof of intent in Title VII and venire-selection cases, the Court held that capital sentencing decisions were "fundamentally different."  *Id.* at 294.  The Court noted the robust number of entities and variables that are taken into consideration in such cases.  *Id.*  Furthermore, the Court found that "far stronger proof" was necessary before prosecutors be asked to rebut McCleskey's statistical allegations given it was uncontested that McCleskey "committed an act for which the United States Constitution …permits imposition of the death penalty," that being murder.  *Id.* at 296-97.  The Court reasoned as follows:

> McCleskey challenges decisions at the heart of the State's criminal justice system. "[O]ne of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves that task is through criminal law against murder." *Gregg v. Georgia*, 428 U.S. 153, 226, 96 S.Ct. 2909, 2949, 49 L.Ed.2d 859 (1976) (WHITE, J., concurring). Implementation of these laws necessarily requires discretionary judgements. Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused. The unique nature of the decision at issue in this case also counsels against adopting such an inference from the disparities indicated by the Baldus study.

*Id.* at 297.

Neither the Baldus Study, McNally Report, nor Dr. Bell's memorandum contend that their "statistics *prove* that race enters into any capital sentencing decisions or that race was a factor in [the defendant's] particular case." *Id.* at 308.  "The capital sentencing decision requires the individual jurors to focus their collective judgement on the unique characteristics of a particular criminal defendant.  It is not surprising that such collective judgements often are difficult to explain." *Id.* at 311.  Therefore, the Court concluded that:

> At most, the Baldus study indicates discrepancy that appears to correlate with race. Apparent disparities in sentencing are an inevitable part of our criminal justice system. The discrepancy indicated by the Baldus study is a far cry from the major systematic defects identified by *Furman*.

*Id.* at 312-13.

The defendant has not met his burden established by the Supreme Court in *McCleskey* to support his claim. He fails to even argue that the race/gender of his victims, geographic location, political timing, or political clout[5] were considerations in deciding to authorize the death penalty in *his* case. The use of generalized statistical disparities and empty accusations of abandoning Department protocol, without evidence specific to the defendant's case, are foreclosed by the Supreme Court's decision in *McCleskey*.

The defendant has likewise failed to prove a constitutional violation by demonstrating that other, arguably similarly situated defendants, did or did not face or receive the death penalty in other cases. *McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987). Rather, the defendant has simply cited selected statistics, journal articles, and social science studies that purport to demonstrate that the death penalty is always sought or imposed in an arbitrary or capricious manner. The defendant's argument for

---

[5] The Government does not have the faintest idea of what protocol the defendant is alleging was "disregard[ed]" in this case. [D.E. 186 at 37-39] On January 22, 2020, the defense team had an in-person meeting with the U.S. Attorney at their request. The defense team had unfettered access to the U.S. Attorney to present both written and oral argument regarding the trajectory of the case. All requested discovery was provided to the defendant prior to the Capital Committee Meeting, including a physical inspection of real evidence. On January 27, 2020, all parties, including three defense counsel, attended the Capital Committee Meeting in-person. The defendant had unrestrained time to present all matters he deemed relevant. The defendant also submitted written matters to the Committee. Finally, the Government was under the impression all U.S. Attorneys probably have some "political clout" given they are presidentially appointed. Yet, probably not as much "clout" as the Attorney General himself who ultimately made the decision to seek the death penalty in this case. Undue influence rarely flows up the chain of command. The defendant fails to cite any information to support his allegations.

consistency in results is a plea for false consistency that would strip decision makers of their ability to exercise discretion that benefits individual defendants.  In fact, the *McCleskey* Court rejected pleas for the kind of false consistency the defendant now seeks: "The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt."  481 U.S. at 307, n. 28; *see also Sampson*, 486 F.3d at 24-25 (applying *McCleskey* to reject same argument submitted by defendant in this case).  The argument that the Constitution condemns such discretion is "antiethical to the fundamental role of discretion in our criminal justice system…[d]iscretion in the criminal justice system offers substantial benefits to the criminal defendant."  *McCleskey*, 481 U.S. at 311.

Furthermore, this Court should not rely on statistically-based opinions submitted by Kevin McNally, a defense attorney employed by the Federal Death Penalty Resource Counsel Project, regarding the Justice Department's decisions to seek the death penalty.  [D.E. 183 at 7, 18-32; D.E. 186 at 8, 22].  He has no qualifying expertise by knowledge, skill, experience, training or education as a statistician.  *Cf*. FRE 702.  To the extent he provides accurate information, his understanding of the decision-making process is necessarily incomplete, and his conclusions are therefore speculative.  *Cf*. FRE 602.  Indeed, McNally's reliance on case summaries was previously rejected by the First Circuit Court of Appeals, which found that his summaries are "devoid of details and fail to account for the objective circumstances of the underlying crimes."  *Sampson*, 486 F.3d

at 25.  The court further "decline[d] Sampson's invitation to ignore individual differences across offenders and offenses."  *Id.*; *see also United States v. Candelario-Santana*, 368 F. Supp. 3d 316, 320-21 (D.P.R. 2019) (citing *Sampson* in rejecting a recent claim of the arbitrariness of the FDPA).

The statistics presented by McNally and Dr. Bell are in stark contrast to the Baldus study.  Dr. Bell actually receives all her baseline data from McNally.  Neither incorporates a single variable seeking to capture the aggravated nature of crimes represented in defendants' cases.  In fact, neither study even takes into consideration what capital offense was charged.  If the Baldus study, with 230 variables and aggravation categories, was not sufficient to force an inference of unconstitutional treatment, there is little hope for a statistical study that ignores every other relevant prosecutorial factor, both aggravating and mitigating.

In support of his "inherent arbitrariness" argument, the defendant sets forth five Eastern District of Kentucky death-eligible cases.[6]  [D.E. 186, at 9-10].  Each summary consists of no more than a few sentences at most.  These summaries are so devoid of relevant facts they are themselves meaningless.  The summaries fail to include mitigating factors, aggravating factors, evidentiary considerations, nor any other relevant

---

[6] One of which, *United States v. Eugene Slone* (No. 6:12-cr-28-ART-HAI), cuts against the defendant's argument the Department authorizes every white-female murder.  One of Slone's two victims was in fact a white female. Although, Slone's victim was not in her third trimester of pregnancy and she did not slowly drown on her own blood while being transported between a murder scene and on-going armed kidnapping. This is but a single example of the vast difference in facts separating the two cases.

information that might bare upon their prosecution.  As a result, courts have consistently rejected such vague case summaries.[7]

Nonetheless, the defendant includes a national selection of 21 case summaries when attempting to argue "there is no consistency or predictability in the manner in which federal juries have imposed, or declined to impose, death."  [D.E. 186, at 24-27].  The defendant incorrectly relies upon *Eddings v. Oklahoma*, 445 U.S. 104 (1982), in asserting the FDPA must have consistent predictable results to be constitutional.  "[T]he thrust of the *Eddings* decision is that capital sentencing bodies must consistently apply *procedures* that take into account *individual differences*, not that the results of such a process be consistent."  *Montgomery*, 2014 WL 1453527, at *9 (emphasis added).  Likewise, the Supreme Court has recognized that "[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime…a defendant's ultimate sentence necessarily will vary according to the judgement of the sentencing authority."  *McCleskey*, 481 U.S. at 307 n. 28.

As noted, the same type of discretion endorsed by *McCleskey* exists under the FDPA.  There are opportunities at each juncture of a case for the prosecution or sentencing body to exercise discretion that benefits a defendant.  Absent a showing of

---

[7] *See, e.g., McCleckey*, 481 U.S. at 306-307 (holding "absent a showing that the Georgia capital punishment system operates in an arbitrary and capricious manner, McCleskey cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty."); *United States v. Sampson*, 486 F.3d at 24-25 (holding that case summaries are "wholly inadequate to prove that the death penalty has been imposed in an arbitrary manner" because they are "devoid of details and fail to account for the objective circumstances of the underlying crimes"); *United States v. Taylor*, 648 F. Supp. 2d at 1242 ("These case summaries certainly paint a vivid picture, however, they are ultimately not persuasive."); *United States v. Jacques*, 2011 WL 1675417, at *4 (holding that arguments premised upon case summaries are "not supported by the case law"); *United States v. Barnes*, 532 F. Supp. 2d at 633-34 (same); *United States v. Taylor*, 2008 WL 217115, at *4-*5 (same).

discrimination specific to his case, a defendant cannot prove a constitutional violation by demonstrating that other defendants who are arguably similarly situated did not receive the death penalty.  *See Sampson*, 486 F.3d at 24-25; *Con-Ui*, 2016 WL 9331115 at *5 ("Because of the individualized sentencing determinations under the FDPA, differences among cases fail to demonstrate that there is no principled basis for imposition of the federal death penalty."); *Briseno*, 2015 WL 163526 at *3-*4 (relying on *McCleskey* to reject similar claim and recognizing individual circumstances of Briseno's case); *Getsy v. Mitchell*, 495 F.3d 295, 306 (6th Cir. 2007) ("[the Supreme] Court expressly held that a defendant could not prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty.")(internal citations omitted).

The defendant's geographic Eighth Amendment claims are nearly indistinguishable from identical claims asserted by other capital defendants, which have routinely been rejected by federal courts.  Simply, the defendant argues that the FDPA is arbitrary because the death penalty is sought more frequently in some jurisdictions than others.  [D.E. 186 at 15-19].  The defendant, however, makes no claim that he personally is prejudiced by the location of this prosecution in the Eastern District of Kentucky.[8] Instead, he argues that because in general the federal death penalty is sought more frequently in some states than others, the FDPA is arbitrary and therefore unconstitutional.

---

[8] It appears that the Commonwealth of Kentucky is not an alleged "death belt" state according to the defendant. [D.E. 186 at 15-19]

Numerous courts have rejected the argument that the FDPA is arbitrary as applied geographically. *See United States v. Coonce,* 932 F.3d 623 (8th Cir. 2019). In *Coonce*, the defendant argued that he was arbitrarily sentenced because the Western District of Missouri had more death penalty cases than the average district court. *Id.* at 645-646. The Court rejected the as-applied challenge because Coonce made "no showing that he personally received a sentence of death based on geography." *Id*. The Court also rejected Coonce's argument that the FDPA itself was arbitrary. *Id.* In *Mills*, the court noted that "the use of such a generalized statistical disparity, without evidence of its applicability to Defendants, was foreclosed by the Supreme Court in *McCleskey* [ ]." 393 F. Supp. 3d at 681. The court also noted that—as with the defendant here—"Defendants do not argue that their race, the geographic location of this prosecution, or the race or gender of their alleged victims were considerations in deciding to seek the death penalty against them." *Id.* The court finally concluded that, "Defendants' Eighth Amendment claim similarly fails because they have not articulated that the discrepancies that appear to correlate with race, region, and gender are caused by something invidious rather than the discretion given to juries and judges under the FDPA." *Id.* at \*22; *see also Madison*, 337 F. Supp. 3d at 1199-1200 ("Defendant must point to evidence specific to this case that would support an inference that the victim's race and gender played a part in the decision to seek the death penalty.").

Other courts, including several courts who considered the issue within the past year, have rejected similar or identical claims. *See Sampson*, 486 F.3d at 23-27; *Candelario-Santana*, 368 F. Supp. 3d at 320-22; *Madison*, 337 F. Supp. 3d at 1199; *Con-*

*Ui*, 2016 WL 9331115, at \*4-\*6; *Ofomata*, 2019 WL 527696, at \*2-\*3; *George*, 2019 WL 537186, at \*4-\*5; *United States v. Sanders*, No. 10-00351, 2014 WL 3122418, at \*2-\*4 (W.D. La. July 3, 2014); *Williams*, 2013 WL 135599, at \*2-\*8; *United States v. Jacques*, No. 2:08-cr-117, 2011 WL 1675417, at \*2-\*4 (D. Vt. May 4, 2011), *vacated in part on other grounds,* 684 F.3d 324 (2nd Cir. 2012); *United States v. Basciano,* 763 F. Supp. 2d 303, 339-40 (E.D.N.Y 2011*)*; *United States v. Bin Laden*, 126 F. Supp. 2d 256, 260-63 (S.D.N.Y. 2000).

### C.  Jurors are Presumed to Understand the Court's Instructions

Courts have also routinely rejected the argument that the FDPA is constitutionally flawed because jurors consistently misunderstand their role in the penalty phase regardless of instructions given to them by the Court, which results in an arbitrary application of the punishment.  [D.E. 186 at 28 (Argument II)].  The defendant argues that the FDPA fails to provide jurors with a structure to make a reasoned choice between a sentence of life or death.  *Id.*  However, the defendant fails to cite binding or persuasive legal support for this extraordinary position, relying instead on studies performed under the Capital Jury Project (CJP) and similar studies.  Federal courts have uniformly rejected like claims relying on the CJP and similar studies.  *See, e.g., Candelario-Santana*, 368 F. Supp. 3d at 323; *United States v. Sampson*, No. 01-10384, 2015 WL 7962394, at \*24-\*25 (D. Mass. Dec. 2, 2015); *Con-Ui*, 2016 WL 9331115, at \*12; *Coonce*, 2014 WL 1018081, at \*22; *United States v. Sablan*, No. 08-cr-259, 2014 WL 172543, at \*4 (E.D. Cal. Jan. 15, 2014).

The crucial assumption underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). That assumption is rooted in the belief that it represents a reasonable, practical accommodation of the interests of the government and the defendant in the criminal justice process. *Id.* at 206. The presumption is, therefore, almost invariable. *See id.*; *see also Zafiro v. United States*, 506 U.S. 534, 540-41 (1993).

In a capital case, instructions are constitutionally defective only if there is a "reasonable likelihood" that they misled the jury into sentencing the defendant to death. *Boyde v. California*, 494 U.S. 370, 380 (1990) (holding there was no reasonable likelihood that jurors misinterpreted allegedly ambiguous jury instruction in death penalty case).[9] Instructions that are only arguably ambiguous or create "only a possibility of . . . [jury] inhibition" do not fall into this category. *Id.* at 379-84; *see also Tuilaepa v. California*, 512 U.S. 967, 975-76 (1994) (holding instructions in penalty phase of capital case were constitutional because they were "phrased in conventional and understandable terms" and had a "commonsense core of meaning"). Notably, in *Gregg v. Georgia*, 428 U.S. 153 (1976), the Supreme Court upheld a Georgia statute with a weighing sentencing scheme much like that of the FDPA. In so ruling, the Court recognized that:

> Juries are invariably given careful instructions on the law and how to apply it before they are authorized to decide the merits of a lawsuit. It would be

---

[9] Ordinarily, the presumption that juries follow a trial court's instructions is overcome only if there is an "'overwhelming probability' that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citing *Richardson v. Marsh*, 481 U.S. at 208 and *Burton v. United States*, 391 U.S. 123, 135 (1968)); *see also United States v. Ford*, 88 F.3d 1350, 1364 (4th Cir. 1996); *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993); *United States v. Perone*, 936 F.2d 1403, 1410 (2nd Cir. 1991); *United States v. Colombo*, 909 F.2d 711, 715 (2nd Cir. 1990).

virtually unthinkable to follow any other course in a legal system that has traditionally operated by following prior precedents and fixed rules of law.

*Id.* at 193.

Here, the defendant's reliance on empirical studies is insufficient to establish that any federal capital jury (or even a significant majority of federal capital juries) is so incapable of understanding the FDPA's sentencing scheme as to render the statute unconstitutional. The statute guides the jury's discretion by requiring the finding of a Section 3591(a)(2) gateway intent factor and a Section 3592(c) statutory aggravating factor to establish the defendant's eligibility for capital punishment. The statute then allows for individualized sentencing by allowing the broad presentation of information during the selection phase of sentencing. *See* 18 U.S.C. §§ 3592(a) (providing for broad admissibility of mitigating factors), 3593(c) (allowing for relaxed rules of evidence at the selection phase).

The Court and parties in this case, as well as any other federal capital case, are capable of carefully fashioning instructions to the jury that explain the evidence the jury may consider, the various findings that must be made, and the burdens corresponding to those various findings. *See United States v. Sanders*, No. 10-cr-351, 2014 WL 3122418, at *7 (W.D. La. Jul. 3, 2014) ("[W]e believe that the jury can be adequately instructed so it will understand and appropriately apply the FDPA's provisions. Counsel for both parties will be given the opportunity to review and object to the Court's jury instructions."). The defendant has not satisfied the high burden for invalidating the FDPA based upon his citations to various empirical studies.

The opinion from the district court in *Sampson* is particularly instructive.  Indeed, Sampson made nearly identical claims to those now being made by the defendant.  In denying the motions, the *Sampson* court explained:

> The question presented by Sampson's motion is whether there is a "substantial risk" that FDPA jurors do not follow the constitutional and statutory rules governing capital sentencing.  *Gregg*, 428 U.S. at 188.  Given the presumption that capital juries follow their instructions, *Weeks*, 528 U.S. at 234, and the trust that the United States has historically placed in trial by jury, *see Duncan v. Louisiana*, 391 U.S. 145, 148-57 (168), Sampson bears a heavy burden in this challenge.  After considering the CJP studies and other evidence submitted by Sampson, the court finds that it does not show a substantial risk that federal capital jurors do not meet the constitutional requirements of capital sentencing that have been stated by the Supreme Court.  Nor does Sampson's evidence identify any disputed fact that, if proven, would entitle him to relief.  At most, Sampson's evidence shows only that some capital jurors, well after the trial, might fail to remember certain legal principles, hold certain beliefs that may or may not have impacted their deliberations, and have certain recollections of the process that may or may not be accurate.

*Sampson*, 2015 WL 7962394, at *23.  The *Sampson* court went on to criticize the defendant's reliance on the CJP data, highlighting that: 1) the studies concentrated on state death penalty schemes, rather than the FDPA; 2) the CJP interviews took place years after the jurors participated in trials, rendering their recollections less reliable; and 3) at the time of the CJP interviews, the interviewed jurors did not have access to written jury instructions, other jurors, or the trial judge – all of which would be available to a federal juror during trial to help the juror understand his/her instructions.  *Id.* at *24.

This data, even if it were reliable, cannot overcome the balance of Supreme Court precedent as recognized by the *Sampson* court.  Numerous district courts have rejected

similar claims which rely on CJP statistics. *See George*, 2019 WL 537186 at *3 n.10 (collecting cases). The defendant's argument here should likewise be rejected.

### III.   NANTZ'S EVOLVING STANDARDS OF DECENCY ARGUMENT IS FORECLOSED BY BINDING PRECEDENT, AS IS HIS ARGUMENT THAT THE FDPA MAY KILL INNOCENT PEOPLE

The defendant argues that the death penalty violates the Eighth Amendment because "evolving standards of decency" have rendered the death penalty *per se* cruel and unusual. [D.E. 186 at 39 (Argument IV)]. The defendant's challenge is plainly foreclosed by the United States Constitution and Supreme Court precedent. The Constitution expressly authorizes the death penalty as a form of punishment. *See* U.S. Const., amend. V ("No person shall be held to answer for a capital . . . crime, unless on a present or indictment of a Grand Jury . . . nor be deprived of life . . . without due process of law."). Accordingly, the Supreme Court has repeatedly recognized its constitutionality. *See, e.g, Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015) (recognizing in a method-of-execution case that "it is settled that capital punishment is constitutional"); *Baze v. Rees*, 553 U.S. 35, 47 (2008) ("[W]e begin with the principle . . . that capital punishment is constitutional."); *McCleskey v. Kemp*, 481 U.S. 279, 302 (1987) ("[I]n the absence of more convincing evidence, . . . the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe."); *Gregg v. Georgia*, 428 U.S. 153, 169 (1976) ("[T]he punishment of death does not invariably violate the Constitution."); *see also Kansas v. Carr*, 577 U.S. 108 (2016); *Hurst v. Florida*, 577 U.S. 92 (2016).

Because these precedents are binding upon this Court, the defendant's evolving standards of decency claim fails.  *See Runyon*, 707 F.3d at 521, n.7 (stating that accepting defendant's claim "would run afoul of the Supreme Court"); *United States v. Candelario-Santana*, 368 F. Supp. 3d 316, 322 (D.P.R. 2019) ("Because [Supreme Court cases] are binding [on this issue], this Court rejects Candelario's claim that the death penalty itself is unconstitutional."); *United States v. Mills*, 393 F. Supp. 3d 650, 683 (E.D. Mich. 2019) ("the Court is bound by Supreme Court precedent, and, therefore, Defendant's argument is rejected."); *United States v. Ofomata*, No. 17-201, 2019 WL 527696, at *5 (E.D. La. Feb. 11, 2019) ("Absent the Supreme Court announcing a change in the law, the Court cannot declare the FDPA unconstitutional based on Ofomata's broad arguments that the death penalty is contrary to changed societal standards."); *United States v. George*, No. 17-201, 2019 WL 537186, at *7 (E.D. La. Feb. 11, 2019) ("A federal trial judge is without authority to rewrite the law [in a manner that] overrule[s] the majority position at the Supreme Court.") (quoting *United States v. Fell*, 224 F. Supp. 3d 327, 328 (D. Vt. 2016)); *United States v. Con-Ui*, No. 13-cr-123, 2016 WL 9331115, at *7 (M.D. Pa. Jan. 28, 2016) ("I am bound by Supreme Court precedent and therefore, Defendant's contention that it is unconstitutional must fail."); *United States v. Johnson*, 900 F. Supp. 2d 949, 963-64 (N.D. Iowa 2012) (same).

Notably, even the *Sampson* court, which, over the United States' objection, exercised its independent judgment to review modern trends in legislation, executions, and public opinion, ultimately concluded that "objective indicia of evolving contemporary standards of decency . . . did not include sufficient objective evidence to

prove that the FDPA provides for cruel and unusual punishment in violation of the Eighth Amendment." *United States v. Sampson*, No. 01-10384, 2015 WL 7962394, at *12 (D. Mass. Dec. 2, 2015).[10]

The defendant relies heavily on *Fell* in support of this argument. [D.E. 186 at 20]. However, in the end, even the *Fell* court recognized that it was constrained by the decisions of the Supreme Court indicating that a capital sentencing scheme such as the FDPA is constitutional. *See Fell*, 224 F. Supp. 3d at 358-59. It is not necessary for this Court to opine at all (either favorably or unfavorably) upon the findings made by the *Fell* court. Rather, this Court may recognize, as did the *Fell* court and the numerous others cited above, that the defendant's claims are contrary to law, and therefore must fail. As the Supreme Court has acknowledged, "a judge's belief that a case should be overruled does not make it so." *Agostini v. Felton*, 521 U.S. 203, 238 (1997).

The defendant's arguments are more appropriately tendered to legislative bodies. *McCleskey,* 481 U.S. at 319. "It is not the responsibility – or indeed even the right – of this Court to determine the appropriate punishment for particular crimes. It is the legislatures, the elected representatives of the people, that are 'constituted to respond to the will and consequently the moral values of the people.'" *Id.* at 319 (quoting *Furman v. Georgia*, 408 U.S. 238, 383 (1972) (Burger, C.J., dissenting). Accordingly, this Court should reject the defendant's evolving standards of decency claim.

---

[10] The United States maintains, as it did in *Sampson*, that the instant claim is legally foreclosed by binding Supreme Court precedent, regardless of the facts presented by the defense. Nonetheless, the United States cites to *Sampson*, herein, to offer the Court a complete picture regarding the status of similar claims, and to elucidate that even after examining evidence of modern trends, the "evolving standards of decency" claim must fail.

Finally, the defendant argues that the FDPA is unconstitutional under the Eighth Amendment because it *may* lead to the execution of an innocent person.  [D.E. 186 at 50-54][11].  There exists a long line of federal cases holding that "the death penalty is not unconstitutional under the Eighth Amendment based on the mere possibility that an innocent person might be sentenced to death…"  *United States v. Bowers*, No. 18-292, 2020 WL 1675916, at *1 (W.D. Pa. Apr. 6, 2020) (citing *United States v. Honken*, 541 F.3d 1146, 1174 (8th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 27-28 (1st Cir. 2007); *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004); *United States v. Arnold*, 412 F. Supp. 3d 732, 739-40 (E.D. Mich. 2019); *United States v. Ofomata*, No. 17-201, 2019 WL 527696, at *5-*6, No. 18-201 (E.D. La Feb. 11, 2019)).  Consequently, this Court should likewise reject the defendant's Eighth Amendment claim.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motions, to include: (1) Motion to Strike the Death Penalty Because the Federal Death Penalty Act ("FDPA") Does Not Genuinely Narrow the Class of Defendants Who are Eligible for Death [D.E. 183]; (2) Motion  to Strike the Death Penalty as a Punishment in this Case [D.E. 186]; and (3) Motion to Strike the Death Penalty as Unconstitutionally Applied to the Murder of White Female Victims [D.E. 185].  Equally, the Court should deny the

---

[11] In support of his argument, the defendant makes a single factual assertion regarding the weight of the evidence against him.  [D.E. 186 at 53].  Such an assertion is irrelevant for purposes of the "evolving decency" argument. However, the Government strongly disagrees with the defendant's characterization of the evidence in his case.

defendant's request for discovery and an evidentiary hearing on these matters given he

has failed to meet his burden.

Respectfully submitted,

CARLTON S. SHIER, IV
ACTING UNITED STATES ATTORNEY


By: /s/ Jenna E. Reed
Jenna E. Reed
Assistant United States Attorney
601 Meyers Baker Rd.  Suite 200
London, KY  40741
(606) 330-4829
FAX (606) 864-3590
Jenna.reed@usdoj.gov


## **CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2021, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send notice to counsel of record.

/s/ Jenna E. Reed
Assistant United States Attorney