UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL ACTION NO. 6:19-CR-16-S-REW

UNITED STATES OF AMERICA                                    PLAINTIFF

V.                    SENTENCING MEMORANDUM, ADDRESSING
                      UNRESOLVED GUIDELINE OBJECTIONS

DANIEL S. NANTZ                    *  *  *  *  *                    DEFENDANT

This matter is before the Court preceding Defendant Daniel S. Nantz's sentencing. Pursuant to the Court's sentencing order, the United States submits the following memorandum regarding the material objections to the Defendant's Presentence Report (PSR), specifically (1) the application of U.S.S.G. §3C1.1 for the Defendant's willful obstruction of justice; and (2) the application of U.S.S.G. §3A1.1(b)(1) for the Defendant's knowledge that his victim was vulnerable. Furthermore, the United States submits this memorandum to address the following factual disputes, (1) the victim's physical state at the time she was transported to and from the murder scene to the kidnapping site [PSR, ¶16], (2) the Defendant's participation in a kidnapping to secure a murder weapon [PSR, ¶35], (3) the length of premeditation and planning of the murder [PSR, ¶36], and the Defendant's propensity for violence [PSR, ¶53].

The government respectfully disagrees with the Defendant's objections concerning the above U.S.S.G. enhancements and factual disputes for the reasons set forth below:

I.    **Factual Summary:**

A.   Geri Danielle (Bays) Johnson & Amelia Jo Johnson:

Geri Danielle (Bays) Johnson of Williamsburg, Kentucky was only 29 years old at the time of her murder. Geri was born on April 5, 1989, in Corbin, Kentucky to Sandra F. Bowman and the late Jerry S. Bays. Mr. Bays was a United States Army veteran, local Chief of Police, and Lead Court Security Officer at the Federal District Courthouse, London, Kentucky. Mr. Bays passed away on March 3, 2015, several years before his daughter's murder. Ms. Bowman was a practicing nurse and mother during Geri's and her sibling's childhoods. Geri had a stable, loving, and supportive childhood, surrounded by family, friends, and community.

Geri attended Whitley County High School, obtained her GED, and went on to attend the University of the Cumberlands and Eastern Kentucky University. While at school, Geri participated in numerous extracurricular activities, including competitive dance, varsity basketball, and cheerleading. [Ex. 1]. Geri was described by her friends and family as "beautiful inside and out", and someone who could have "conquered the world with [her] intelligence, [her] wonderful sense of humor, and [her] brilliant confidence". Others have described Geri in the following ways:

> The world lost a beautiful soul when it lost you. I consider myself lucky to have been your friend. [Y]ou could lite up a room with ur beautiful smile and warm personality. You made me laugh many times when I thought I never could.
>
> You [were] always so sweet in school and had a smile on your face.
>
> Geri's laughter was contagious, you couldn't help but laugh with her. Her smile was beautiful and I think that's the one thing I will remember most about her. She was a strong, intelligent young woman and had she been given a chance I think she would have made a lot of changes in her life and could have helped

2

other women do the same.

Croley Funeral Home, *Geri Danielle and infant, Amelia Jo Bays Johnson*, https://www.croleyfh.com/obituaries/Geri-Danielle-And-Infant-Amelia-Jo-Bays-Johnson?obId=4234933 (last visited Jul. 17, 2023).

Like many American and Kentuckian youth, Geri was exposed to drugs while at school. Given the purity and availability of the poison that is modern methamphetamine, she soon found herself in the grips of addiction. Geri went from a vibrant college campus to surrounding herself with methamphetamine pushers and dealers like the Defendant.

Geri was survived by three children, all boys. During periods of sobriety, Geri continued to play an active and loving role in her children's lives. There is no doubt that Geri's loss was felt far and wide by her family, friends, and community, as will be attested to by her family, friends, and children on July 26, 2023.

Amelia Jo Johnson was born on March 16, 2019, to Geri Danielle (Bays) Johnson, in Corbin, Kentucky. [Ex. 2]. Amelia was Geri's only daughter. Amelia was born at approximately 33 weeks gestation or moderate preterm[1], which normally carries a 99% survival rate. See Healthline, Premature Baby Survival Rates, https://www.healthline.com/health/baby/premature-baby-survival-rate (last visited Jul. 18, 2023). Amelia suffered severe hypoxic ischemic encephalopathy (HIE), as a result of being starved of oxygen and blood while trapped in her mother's corpse for a prolonged period of time. [Ex. 3]. HIE is an umbrella term for a brain injury that happens before, during, or shortly

---

[1] Amelia's medical records show varying gestational ages between 30-33 weeks. The gestational age of 32-33 weeks was taken from the primary treating NICU MD's reports versus other ancillary provider reports. [Ex. 3].

after birth when oxygen or blood flow to the brain is reduced or stopped. The severity of HIE-related issues depends on many factors, including (1) how long the brain is without oxygen or blood flow, (2) how much of the brain is affected, and (3) how the individual's brain repairs itself. National Institute of Neurological Disorders and Stroke, *Hypoxic Ischemic Encephalopathy*, https://www.ninds.nih.gov/health-information/disorders/hypoxic-ischemic-encephalopathy (last visited Jul. 18, 2023). Amelia began suffering seizures soon after her birth. [Ex. 3]. Amelia was transported to University of Kentucky's Children's Hospital in Lexington where she was placed on life support measures. [Ex. 3]. Amelia passed away on March 19, 2019, in her grandmother's arms. [Ex. 4]. Amelia's cause of death was determined to be homicide, due to "complications of maternal demise due to gunshot wounds." [Ex. 11].

 

B. The Defendant's Drug Trafficking Enterprises and Their Downfall:

The Defendant, Daniel S. Nantz, ran multiple large scale methamphetamine operations for years throughout the District. He received large quantities of methamphetamine from multiple suppliers and distributed his poison throughout Whitley, Knox, Laurel, and

4

numerous other counties. [PSR, ¶8]. The Defendant's prolonged and aggravated methamphetamine trafficking alone undoubtably touched countless lives.

In the Spring of 2017, the Defendant was being supplied by Louisville suppliers Jonathan Harper [6:18-CR-62-REW], Derwin Julien [6:18-CR-62-REW], and Jordan Britt [6:18-CR-57-SS-REW[2]]. [PSR, ¶9]. The Defendant was introduced to Jonathan Harper via Rex Fox [6:20-CR-35-REW][3]. [Ex. 5]. Fox met Harper while incarcerated locally together in 2017. [Ex. 5-6]. Upon being released, Fox started facilitating Harper supplying the Defendant with large quantities of methamphetamine between 8-10 ounces per trip. *Id.* The transactions took place at Fox's residence and elsewhere. *Id.* When interviewed in 2019, the Defendant identified Harper as "Jon Jon", who introduced the Defendant to Derwin Julien as "Jay." [Ex 7].

Beginning in June of 2018, the Defendant started obtaining distribution quantities of methamphetamine from Tammy Vest as well [6:19-CR-10-CHB]. [PSR, ¶8]. Vest delivered 6-8 ounces of methamphetamine to the Defendant at a time and recalled making at least five deliveries. [Ex. 8]. Vest's adult children also delivered methamphetamine to the Defendant a couple times. [Ex. 8]. The Defendant told Vest that Geri helped him sell methamphetamine and Geri was present during a couple of deliveries at the Defendant's residence. [Ex. 8]. Finally, the Defendant was obtaining kilogram quantities of methamphetamine from Marti Smith. [Ex. 9]. The Defendant traveled to Smith, with co-conspirators Tim Thornton, Ronnie Smith (aka "Country"), Herbert Hood, and Geri to obtain

---

[2] Harper, Julien, and Britt have all since been convicted of aggravated methamphetamine trafficking.
[3] Rex Fox has likewise since been convicted of aggravated methamphetamine trafficking.

methamphetamine. [Ex. 9]. On August 23, 2018, Marti Smith, Tim Thornton, and several other co-conspirators were indicted for methamphetamine trafficking. [6:18-CR-44-CHB]. However, other members of the conspiracy, including the Defendant, continued to distribute methamphetamine up until February of 2019. [Ex. 9].

In early 2019, the Defendant's methamphetamine enterprise began to crumble around him. [PSR, ¶9]. On December 20, 2018, one of the Defendant's Louisville suppliers, Derwin Julien, Harper's brother and meth runner, was indicted. [6:18-CR-62-REW]. On February 28, 2019, James Woods "Bones", Tammy Marie Vest, Geri D. Johnson "Geri D. Bays", and six other defendants [6:19-CR-10-CHB], were indicted for conspiracy to distribute an aggravated amount of methamphetamine. During this same period, the Defendant also learned that Geri had cooperated with law enforcement. [PSR, ¶9-10].

In the summer of 2018, the Defendant started dating Geri. On October 3, 2018, Geri was arrested on state drug charges. Geri provided the ATF and DEA statements concerning multiple methamphetamine conspiracies involving the Defendant, as did many of her co-conspirators. Geri's statements were reduced to redacted Reports of Investigation (ROIs) and included as part of the government's discovery obligations to numerous defendants. Geri was released from custody on November 7, 2018. Throughout her pregnancy, Geri maintained an apartment with her friend Alecia Rains but would often spend days or weeks at the Defendant's residence as well. The Defendant's children recounted that Geri was a positive influence in their lives and "really nice." She would fix them food, help with homework, and throw the football with them outside. [Ex. 22-23].

The Defendant engaged in multiple conversations with Geri about her indictment

and the fact the Defendant was a target of the federal investigation. [PSR ¶10]. Such

information is skillfully summarized in paragraph 10 of the PSR. In one such conversation,

the two discussed their theory that Geri was indicted because the "feds" wanted to get to the

Defendant. *Id.* The Defendant also discussed with multiple witnesses his belief that Geri was

"telling" and/or in other co-conspirator's discovery documentation. *Id.* Finally, law

enforcement recovered a handwritten note from the Defendant's bedroom dresser which read,

"Funeral/fed's pulled [redacted name] and geri out asking questions." *Id.* [Ex. 10].



C. The Defendant Became Increasingly Violent and Begins Planning Ms. Johnson's Murder:

In the months and weeks leading up to her murder, Geri talked to her friend and

roommate Alecia Rains about the Defendant's escalating violence. [Ex. 13]. Geri showed

Alecia bullet holes in the Defendant's residence where the Defendant had previously shot at

her. [Ex. 13-14]. Geri stated that the Defendant shot at her anytime she attempted to leave.

[Ex. 13-14]. On a separate occasion, Amber Smith witnessed the Defendant shoot at Geri

when Geri attempted to leave the Defendant's residence. [Ex. 15]. In February 2019, Breton

Hopkins also witnessed the Defendant fire a round at Geri inside the Defendant's trailer. [Ex.

17]. Hopkins was sitting in the living room with the Defendant's minor children when the

Defendant fired a round towards Geri in the hallway during an argument. [Ex. 17]. On or

about March 14, 2019, David Huff witnessed the Defendant fire two rounds at Geri over a

missing cell phone. After the incident the Defendant asked Huff where in the house he could

find more .38 caliber shells. [Ex. 21]. Those closest to the Defendant noticed that he was

losing control after learning of the looming federal indictments. [Ex. 17].

The Defendant told Geri herself how dangerous she was for him. [Ex. 45]

| | | | | |
|---|---|---|---|---|
| From<br>+16065957333<br>Daniel*<br>Direction:<br>Incoming | 3/13/2019<br>9:42:22<br>PM(UTC+0) | | Unknown | I swear to God if your fuckin with me again. |
| To<br>+16065957333<br>Daniel*<br>Direction:<br>Outgoing | 3/13/2019<br>8:36:12<br>PM(UTC+0) | | Unknown | , I love you buddy I'm going to jail |

| | | | | |
|---|---|---|---|---|
| To<br>+16065957333<br>Daniel*<br>Direction:<br>Outgoing | 3/14/2019<br>1:50:01<br>AM(UTC+0) | | Unknown | I'm so sorry Daniel |
| From<br>+16065957333<br>Daniel*<br>Direction:<br>Incoming | 3/14/2019<br>1:49:28<br>AM(UTC+0) | | Unknown | Your very dangerous for me. Very very dangerous. |
| To<br>+16065957333<br>Daniel*<br>Direction:<br>Outgoing | 3/14/2019<br>1:47:42<br>AM(UTC+0) | | Unknown | And u could care less, it hurts so bad |
| To<br>+16065957333<br>Daniel*<br>Direction:<br>Outgoing | 3/14/2019<br>1:46:07<br>AM(UTC+0) | | Unknown | Only 1 person has said that to me about now you, well I'm sorry that I am dangerous for u to be around, I be don't want that, you have hurt me to my soul and I literally feel like I'm Dyijg every second of every day |
| To<br>+16065957333<br>Daniel*<br>Direction:<br>Outgoing | 3/14/2019<br>1:44:29<br>AM(UTC+0) | | Unknown | say what u want, you were busy, so i was unimportant, plus I'm dangerous so u say.... |

Geri was in love with the Defendant at the time of her murder. She believed any prison time would "be good" for her. [Ex. 46]. On March 6, 2019, Geri wrote the Defendant a letter in which she said she will make sure any prison time is a good thing; "[t]his will be what changes my life." [Ex. 46]. "I've already told you that I will do anything & everything that I can to come home to you & Amelia as fast as possible." [Ex. 46].



The common theme of Geri attempting to remove herself from the Defendant's when he was upset continued up until the day of her murder. On the day of Geri's murder, March 16, 2019, Geri texted Alecia for a ride out of the Defendant's holler:



[Ex. 13; PSR, ¶11]. Geri also messaged friend Jacob Vann attempting to flee the Defendant's property on March 16, 2019:




[Ex. 16; PSR, ¶11]. Unfortunately, neither Alecia nor Jacob were able to pick up Geri until it was too late.

In addition to taking practice shots at Geri, the Defendant also started looking for a firearm that would not trace back to him. The firearm that the Defendant carried with him on a daily basis was a black Taurus model .38 revolver (.38 special caliber, S/N GN90513) that he stole from his brother-in-law's father. [Ex. 18]. The Defendant's ex-wife confronted him in February 2019 about the missing firearm and told the Defendant the family would be filing a

missing gun report if he did not bring it back. [Ex. 18]. Therefore, the Defendant reached out to Earl McIntosh[4], one of his methamphetamine dealers/runners, about getting a new pistol, prior to the murder. [Ex. 19]. McIntosh had secured a pistol for the Defendant. [Ex. 19]. However, before McIntosh could deliver the firearm, he had to toss it into S.M.'s yard because the police came by. [Ex. 19]. S.M. later found the firearm and sold it, never knowing it was earmarked for Daniel Nantz. [Ex. 20]. In a Facebook thread from March 10, 2023, McIntosh talks to the Defendant about S.M. owing McIntosh the firearm or money in exchange for the firearm. McIntosh also states that S.M. is "telling" Geri and the Defendant responds, "He does it's over for him." [Ex. 24]. Facebook messages read from the bottom up.

| | |
|---|---|
| **Author** | Daniel Nantz (100032835082488) |
| **Sent** | 2019-03-10 03:08:41 UTC |
| **Body** | He does it's over for him. |
| | |
| **Author** | Earl Mcintosh (100029376049739) |
| **Sent** | 2019-03-10 03:08:05 UTC |
| **Body** | But ill find out |
| | |
| **Author** | Earl Mcintosh (100029376049739) |
| **Sent** | 2019-03-10 03:06:58 UTC |
| **Body** | Yet |
| | |
| **Author** | Earl Mcintosh (100029376049739) |
| **Sent** | 2019-03-10 03:06:56 UTC |
| **Body** | Im not foraure |
| | |
| **Author** | Earl Mcintosh (100029376049739) |
| **Sent** | 2019-03-10 03:06:37 UTC |
| **Body** | Yeah an he is telling geri i know he is |
| | |
| **Author** | Earl Mcintosh (100029376049739) |
| **Sent** | 2019-03-10 03:01:18 UTC |
| **Body** | Im boooout to steall all hisss stuff |
| | |
| **Author** | Earl Mcintosh (100029376049739) |
| **Sent** | 2019-03-10 03:00:56 UTC |
| **Body** | Ur right |
| | |
| **Author** | Daniel Nantz (100032835082488) |
| **Sent** | 2019-03-10 03:00:26 UTC |
| **Body** | Cause that boy been retelling him who's there |
| | |
| **Author** | Earl Mcintosh (100029376049739) |
| **Sent** | 2019-03-10 02:55:13 UTC |
| **Body** | Hes still not here |
| | |
| **Author** | Earl Mcintosh (100029376049739) |
| **Sent** | 2019-03-10 02:55:03 UTC |
| **Body** | In waiting on my pistol or money tyler is gonna grt ficked up |

---

[4] Earl McIntosh was indicted for aggravated methamphetamine trafficking on February 27, 2020 and convicted on May 14, 2021.

In the next thread on March 15, 2023, the Defendant voices his disappointment in McIntosh's inability to secure him a pistol. [Ex. 24].

> **Author** Earl Mcintosh (100029376049739)
> **Sent** 2019-03-15 20:00:33 UTC
> **Body** Yeah i know bub i had wat i was suppsed to let somekne take it from me not again
>
> **Author** Daniel Nantz (100032835082488)
> **Sent** 2019-03-15 19:59:41 UTC
> **Body** Show me u make pro ml uses that u cant keep I really wish u would show me something I do nm like ya and I dont like people at all
>
> **Author** Earl Mcintosh (100029376049739)
> **Sent** 2019-03-15 19:58:54 UTC
> **Body** Im get u that 10 millmeter

S.M.'s inability to return the firearm earmarked for the Defendant left the Defendant irate. In March of 2019, the Defendant traveled to S.M.'s residence armed with his .38 and David Huff[5], the Defendant's drug enforcer. S.M. was made to partly undress and sit on the floor, after which S.M. was told he would be shot through the spine if he did not get back the Defendant's gun. [Ex. 20].

Ultimately, S.M. and McIntosh were unsuccessful in obtaining a clean firearm for the Defendant. The Defendant ended up murdering Geri Johnson with the .38 special he stole from his brother-in-law's father. The box bearing the same serial number was located in the Defendant's ex-wife's family's residence. [Ex. 27]. Shell casings at the murder scene, ballistics, and the victim's injuries all confirmed the .38 special bearing serial GN90513 was used to murder Geri Johnson.

D.  The Murder of Geri Danielle (Bays) Johnson and Amelia Jo Johnson:

On March 16, 2019, the Defendant awoke in his home with his two minor

---

[5] David Huff entered a guilty plea to an information on April 24, 2019, for the armed kidnapping of S.M.

children, Geri, and David Huff. In the morning, the Defendant and Huff ran errands, including

delivering methamphetamine, while Geri stayed home to watch the Defendant's children. [Ex.

21; PSR, ¶12]. While in the Defendant's truck together, the Defendant told Huff, "Geri's

talking to the feds. I think she's telling. If so, I'll just kill her." [Ex. 21; PSR, ¶12].

On March 16, 2019, at 2:51pm EST, the Defendant sought out S.M.'s whereabouts

from McIntosh, down to what vehicle S.M. was in. [Ex. 24].

**Author** Earl Mcintosh (100029376049739)
**Sent** 2019-03-16 18:59:00 UTC
**Body** Car

**Author** Daniel Nantz (100032835082488)
**Sent** 2019-03-16 18:58:51 UTC
**Body** SUV or car

**Author** Earl Mcintosh (100029376049739)
**Sent** 2019-03-16 18:58:13 UTC
**Body** Newer

**Author** Earl Mcintosh (100029376049739)
**Sent** 2019-03-16 18:58:10 UTC
**Body** Black honda

**Author** Daniel Nantz (100032835082488)
**Sent** 2019-03-16 18:57:50 UTC
**Body** What kind of vehicle

**Author** Daniel Nantz (100032835082488)
**Sent** 2019-03-16 18:57:48 UTC
**Body** In what

**Author** Earl Mcintosh (100029376049739)
**Sent** 2019-03-16 18:54:55 UTC
**Body** He left with gage to turdys

**Author** Daniel Nantz (100032835082488)
**Sent** 2019-03-16 18:51:27 UTC
**Body** Wheres tyler

After arriving at Terry Mullis's (aka "Turdy's")[6] trailer, the Defendant and Huff

ordered S.M. into a back room, where Huff pistol whipped S.M., and the Defendant once

again interrogated him about the missing firearm. [Ex. 20-21]. S.M. was made to call his

mother for money to satisfy the perceived debt for the firearm. [Ex. 20-21]. By 4:09pm EST[7],

---

[6] Terry Mullis was yet another methamphetamine distributor that worked for and was supplied by the
Defendant [6:20-CR-12-REW]. He was indicted on February 27, 2020 and entered a guilty plea on
May 20, 2021.
[7] In order to calculate EST from UTC during mid-March 2019, subtract -4 hours.

McIntosh messages the Defendant that S.M.'s mother received a very upsetting call:

**Author** Earl Mcintosh (100029376049739)
**Sent** 2019-03-16 20:09:41 UTC
**Body** She told me to stay till he got back

**Author** Earl Mcintosh (100029376049739)
**Sent** 2019-03-16 20:08:30 UTC
**Body** Saying she recievd a call about tyler

**Author** Earl Mcintosh (100029376049739)
**Sent** 2019-03-16 20:08:10 UTC
**Body** Aye tyler mom jest left here triping out

At 4:52pm EST, Geri texts the Defendant that she is concerned KSP is in the area and she wants a ride out of the residence. [Ex. 45].

| Party | Time | All timestamps | Status | Message |
|---|---|---|---|---|
| To +16065957333 Daniel* Direction: Outgoing | 3/16/2019 8:52:25 PM(UTC+0) | | Sent | They said that the state police are everywhere. Why won't u just take me, or have someone take me? This is so childish |

At some point during the kidnapping, the Defendant decided to leave stating, "I gotta take her somewhere or do something with her. Somethings got to give" referring to Geri. [Ex. 21; PSR, ¶12]. The Defendant left Huff with S.M. at Mullis's trailer and returned to his secluded trailer in Woodbine, Kentucky:



On March 16, 2019, the Defendant's son, Minor #1, reports being in the living room watching tv with his younger brother when the Defendant returned from somewhere. [Ex. 23]. The Defendant and both minors then walked down to close and lock the property's front gate, at the Defendant's direction. [Ex. 23]. The minors then started to watch tv again. [Ex. 23]. The Defendant was in the master bedroom when Geri joined him. [Ex. 23]. Minor #1 reports being in the living room with his younger brother when the first shot rang out in the master bedroom. [Ex. 22-23]. This was confirmed by a bullet hole through the headboard, located at the right height and angle for someone of the Defendant's stature. [Ex. 25 and 26].





After the first shot, the Defendant came out of the master bedroom and told his children to go clean Minor #2's room. [Ex. 22-23]. Sometime later, Minor #1 heard two more gunshots outside the residence. After which, Minor #1 heard his father's truck startup and leave. [Ex. 22-23].

After the Defendant fired the first round in the master bedroom, Geri attempted to leave, like she always did when the Defendant became violent. She carried her already packed white tote bag, with all her makeup, curling iron, and personal belongings, with her outside as she prepared to walk out of the holler, having been unable to secure a ride. Geri's blood-soaked tote was recovered in the Defendant's driveway. [Ex. 25].

16



The Defendant was not going to let Geri leave this time. He could not risk Geri turning herself in or being picked up by law enforcement. The Defendant followed Geri outside into the driveway where he shot her in the back. The round pierced through the back of Geri's right shoulder blade and exited out the top of her right shoulder without injuring any bone or major blood vessels. [Ex. 12]. While painful, this would not have been a life-threatening injury and Geri could still flee. The Defendant then fired another round. This time striking Geri in the right side of her neck. [Ex. 12]. The projectile traveled through the soft tissue, vasculature of the right neck, the oropharynx, and left neck vasculature. [Ex. 12]. Geri suffered hemorrhaging, soft tissue disruption, and hemoaspiration within the lung parenchyma from this fetal gunshot wound. In layman's terms, Geri Danielle (Bays) Johnson eventually drowned on her own blood as it dripped down her neck and filled her lungs.

Looking out from the front of the trailer, there was a blood trail beginning in front of the S-10 pickup truck to a blue barrel which was located to the left of the drive. [Ex. 29].

The blood trail then leads away from the front of the trailer, where an armrest covered in blood was located and a blood covered white tote bag. [Ex. 29]. The trail of blood extended on away from the home, then made a right turn and continued in front of three white outbuildings. [Ex. 29]. The end of the blood trail was in between the pile of tires and the Dodge Charger. [Ex. 25 and 29].



After firing the third round, the Defendant re-cocked the .38 special revolver manually, just in case Geri continued to struggle or flee. [Ex. 25]. The revolver was recovered from the Defendant's truck with the hammer locked to the rear. [Ex. 25].



The Defendant then backed up his pickup truck to Geri's body and loaded her into the passenger side as Geri continued to fight for her life. [Ex. 25].



Rather than transport Geri to the hospital as she bled out beside him, the Defendant decided to return to the scene of the kidnapping of S.M. at Terry Mullis's trailer. [Ex. 20-21; PSR, ¶14]. Half a dozen witnesses saw the Defendant drive to and/or from the kidnapping scene with Geri's body in the passenger side of his truck, many described her as being slumped over and her mouth wide open. [Ex. 20, 21, and 28]. The Defendant called for David Huff to come help him and yelled at onlookers that "she shot herself." [Ex. 28; PSR, ¶14]. Huff jumped in the Defendant's truck and drove back to the Defendant's trailer as instructed. During the ride back, the Defendant propositioned Huff, "should I get rid of her body", as the Defendant held Geri's now lifeless body up. [PSR, ¶14].

E.  <u>The Defendant's Continuous Efforts to Obstruct Justice for Self-Preservation:</u>

Minor #1 reports his father returned sometime later with "Dave", whom babysat the children regularly. [Ex. 22-23]. Minor #1 described "Dave" as an "uncle" or "cousin" figure. [Ex. 23]. Once the Defendant and Huff returned to the Defendant's trailer, the Defendant ordered Huff to dismantle the DVR recording system. [Ex. 21; PSR, ¶14]. Law enforcement located two cameras at the Defendant's residence. [Ex. 29]. They were CopCam brand. [Ex. 29]. One was hanging on a wire in the master bedroom, and the other was on the front porch. [Ex. 29]. Law enforcement did not locate a DVR receiver to which the cameras would have connected. That is because Huff dismantled the DVR receiver upon being instructed to by the Defendant. Huff ultimately decided to leave it sitting on top of a pile of clothes in the kitchen versus removing it from the trailer. [Ex. 21; PSR, ¶15].

Minor #1 was told by Dave that the Defendant was taking Geri to the hospital. [Ex. 23]. The children continued playing Xbox for a couple minutes before Dave took them "on a walk" out the back door and through a field. [Ex. 21-23]. As they were walking towards the road, Minor #1 identified his grandfather, William "Bill" Nantz, entering the Defendant's residence. [Ex. 23] Huff left the DVR receiver in the kitchen upon his exit, the next person to enter the murder scene was Bill Nantz. The DVR receiver was no longer in the home when law enforcement arrived to secure the scene at 7:15pm EST.

At approximately 6:12pm EST on his way to Baptist Health in Corbin, KY, the Defendant finally called 911. [Ex. 30]. The call is approximately 18 minutes in length. The Defendant is wailing while he tells the 911 operator that Geri shot herself, that he tried to chase her, and tried to grab her. [Ex. 30]. The Defendant asks the 911 operator "why would

20

she do that?" [Ex. 30]. He also states he "doesn't even own a gun." [Ex. 30]. The Defendant

continues by stating:

> "She said she was federally indicted today. Ok."  "She said she was federally
> indicted. I was lying down with a headache. [inaudible] I said what do you mean,
> what happened? She said a couple months ago she was doing, she may, she was
> doing illegal stuff. [inaudible] She said she had been on the run and that's why
> she didn't want to be around me for a while. I said on the run for what? She said.
> I don't know much about the law. She said she was ah … indicted or [inaudible]."
> [Ex. 30 at 12:24].

> "She said her life was over and she might as well end it. I said what are you talking
> about? Don't talk crazy. Because she never talked like that before. [inaudible]
> She was serious. Ok." [Ex. 30 at 13:00].

> "I'm so scared. I just want her to be ok. She said I'm gonna go away and if I never
> see you again I really do love you. I don't remember if I even answered.
> [inaudible] I got up and I that's when I heard the front door slam…I walked
> outside. Ah. I don't know what happened."
> *[911 Operator]: Where did she get the gun at?* "I don't know she just got there
> this morning, I hadn't seen her in a while." [Ex. 30 at 14:23]. "I hadn't seen her
> in like 5 days." [Ex. 30 at 15:24].

The Defendant is told to wait outside the emergency room however he quickly

leaves the area and drives towards his father's, Bill Nantz's, towing yard. [Ex. 30]

> **Subjective**
> Patient is a 29-year-old female who presents the emergency department with a gunshot wound to the base of her
> skull.  Patient presented via private vehicle and was dropped off by her supposed boyfriend who simply states "she is
> pregnant ".  Once the patient was out of the vehicle boyfriend left the scene in his pickup truck and no further history
> was available.  Patient appears to be in advanced stages of pregnancy and CPR was initiated.

[Ex. 31]. Geri has no pulse or respiratory function at the time the Defendant drops her off,

however hospital staff are able to establish a fetal heartbeat via Doppler. CPR is continued on

Geri in an effort to maintain Amelia's heartbeat. Dr. Travis Gilbert is called into deliver

Amelia via emergency c-section, which he does in less than one minute.

21

**Procedure Details:**
I was called by the emergency room physician secondary to a pregnant woman being dropped off at the emergency room with a gunshot wound to the head.  They were actively doing CPR and they were able to get separate fetal heart tones with Doppler on the baby.  Per his report the mother was most likely not going to make it and they wanted me to come in to deliver the baby.

I arrived very quickly after being called.  A visual examination of the mother revealed a probable third trimester pregnancy.  There were fetal heart tones by Doppler.  The mother was actively getting CPR and was otherwise in asystole.  She was intubated and had a gunshot wound to the head.

I quickly made a Pfannenstiel incision with the scalpel and entered the abdomen bluntly.  I made a transverse incision into the uterus and delivered the baby in less than 1 minute.  We handed the baby off to the waiting nursery staff and neonatologist who were present.

As soon as I deliver the baby the emergency room physician called the code and resuscitative measures were stopped.  I returned the uterus to the peritoneal cavity but did not close as the patient was pronounced dead.

[Ex. 31].

At 6:32pm the Defendant calls his father, William "Bill" Nantz, and they talk for 44 seconds. [Ex. 32]. At 6:33pm the Defendant talks with his wife, Alayna Nantz, for over 1 minute. Bill Nantz initially lies to law enforcement when questioned about the call and his presence at the murder scene prior to law enforcement. [Ex. 32]. Bill Nantz claimed that the Defendant called him to go pick up the minor children and that when Bill Nantz arrived the children were still inside playing Nintendo alone. [Ex. 32]. This was contradicted by David Huff, as well as statements from the two minors who were eventually picked up by Bill Nantz along the side of road, sometime after Bill Nantz left the murder scene. [Ex. 21-23].

The Defendant is approached by law enforcement on the side of road at approximately 6:36pm EST. At approximately 7:15pm EST, law enforcement secures the murder scene at the Defendant's trailer. The Defendant ultimately provides a total of five conflicting statements to law enforcement throughout the evening. [Ex. 33-34]. The general

themes of the Defendant's multiple statements are that Geri was pregnant with his "baby girl." On March 16, 2019, Geri awoke the Defendant from a nap by slamming the front door. The Defendant went outside and Geri had a gun. She shot herself twice while the Defendant attempted to take the gun from her. The Defendant then drove Geri straight to the hospital.

During his second statement, the Defendant adds that he found out last night, March 15th, that Geri was federally indicted. [Ex. 33-34]. The Defendant also adds that he taught Geri self-defense and Geri hip tossed him when he tried to take the firearm. [Ex. 33-34]. During his third statement, the Defendant added that Geri shot herself on the passenger side of his truck and then ran away towards the buildings. [Ex. 33-34].

During the Defendant's fourth statement he claimed to not know who "David" or "Dave" was. [Ex. 33-34]. Then the Defendant offered that Detective Armstrong may be referring to "Dave Huff" but that the Defendant would have no idea where to find Dave. [Ex. 33-34]. In his fifth statement, the Defendant added that Dave must have walked to the trailer. [Ex. 33-34]. In his fifth statement, the Defendant also adds that he saw the bullet hole in the headboard this morning and had no idea how it got there. [Ex. 33-34]. Finally, when asked about .38 shell casings in the driveway, the Defendant stated he used to have a .38 but it was stolen. [Ex. 33-34].

The Defendant was indicted on March 21, 2019, for methamphetamine trafficking and detained pretrial. [R. 7]. A superseding indictment was returned on July 24, 2019, for the murder of Geri Johnson, as well as numerous other counts. [R. 32].

On April 21, 2019, the Defendant conducts a recorded jail with his sister Stephanie Nantz. The Defendant instructs his sister to find a "case" that the Defendant hid somewhere

23

on the Defendant's property:

> **Defendant:** Did he [William "Bill" Nantz] ever find that case?
> **Stephanie**: Oh I don't know I've not asked him. I will ask him though.
> **Defendant:** Alright Well get ahold of Bret if you can't, when you can because Bret knows where it is exactly, he was there when I put it there.
> **Stephanie:** Ok tell me one more time where it's at?
> **Defendant:** I don't want to keep repeating it on this phone, you know what I mean, just get a hold of Bret and Bret can take you to it.
> **Stephanie:** Ok, I gotch ya.
> **Defendant:** You know? Bret knows he is the only one that knows. [Ex. 35 at 9:40].

On April 24, 2019, the Defendant calls Stephanie again attempting to describe the case he has hidden that he needs removed from the property.

> **Stephanie:** You remember whenever we talked a little while back and you told me where to find something?
> **Defendant:** Yeah
> **Stephanie:** So, I walked my ass off trying to find it and I can't so you are going to have to give me, without saying it again, give me some more context clues.
> **Defendant:** I told you to get a hold of Bret.
> **Stephanie:** I have tried. I even tried to get Sasha to find me numbers. And I can't get a hold of him.
> **Defendant:** Listen, there is only two places he will be [explains two places where Bret could be living]
> **Defendant:** He can tell you exactly where it is, it's behind a big rock, there is a big rock right there. [inaudible] Left, if you are going up the driveway, right if you are coming back down. It's right there, like as soon as you get past the Kudzu, where the Kudzu ends. On the left up there behind the rock. But you have to get there fast now.
> **Stephanie:** Yeah, from London. I know. Left. And it's on, the one, you know where I'm talking about, if you're coming out of the holler, the one before the log cabin, that's the place?
> **Defendant:** Before you get out of my driveway. [Defendant continues to provide detailed instructions.]
> **Defendant:** Up the hill, there is big ass rock, as big as your car, as big as the front end of your car, you have to go up the hill behind that rock, laying on the ground covered up. It is like 7 foot long. It's right there you can't miss it, it's got a lock on it.
> **Stephanie:** Ok, I'll go today. Ok, I think I got it. [Ex. 36 at 4:00].

On April 25, 2019, law enforcement re-interviewed Bill Nantz regarding the DVR

system they were unable to find. [Ex. 47]. Bill Nantz stated that law enforcement missed a set of cameras that "recorded the whole-time you guys was in there." [Ex. 47] When asked where the recording was, Bill Nantz responded "I'm not showing it to you til court time comes." [Ex. 47]. On May 1, 2019, law enforcement obtained search warrants for Bill Nantz's home and business based in-part on the statements concerning the DVR system. They were unsuccessful in ever recovering the DVR receiver.

Additionally, on April 25, 2019, the Defendant and Stephanie discuss the "case" yet again. Stephanie tells the Defendant she is heading to the holler now and going to get "that thing" they talked about yesterday. The Defendant gives detailed instructions once again on where to find the case. After which, the Defendant tells Stephanie once she gets the case she needs to take it to Dad because "it is nothing she needs to be hauling around." [Ex. 37 at 2:35].

On April 28, 2019, the Defendant had an in-person visit with Stephanie and his father, William "Bill" Nantz. [Ex. 38]. During the call, it sounds like the Defendant has written something on paper and put it up to the glass. [Ex. 38 at 8:00]. The conversation pauses as if Stephanie is reading and then the Defendant says, "look, don't say nothing." There is an awkward attempt to continue the conversation without "saying anything" and then the Defendant says, "DV."[8] [Ex. 38 at 8:41].

> **Stephanie:** Yeah, well that's um they had asked Dad about some ah … so.. I don't know.
> **Defendant:** They never did find that cow?
> **Stephanie:** Mmmm, no well that's the one that Dad says was dead. Um so, I don't know. But I know that its, um.   I think it drowned. But anyway, I'm not really

---

[8] The government contends that "DV" is short for DVR or the missing DVR receiver that would have recorded the cameras setup around the residence.

sure but, anyway, no getting it back because it's gone. [Ex. 38 at 8:41].

On April 28, 2019, the Defendant and Stephanie engage in a recorded jail call during which they once again discuss the "drowned cow." [Ex. 39 at 1:00].

> **Defendant:** Did you get what I was saying?
> **Stephanie:** Yeah, I did.
> **Defendant:** Okay.  I hate that black calf drowned like that.
> **Stephanie:** Yeah, I know but it's for the best.

On May 1, 2019, the Defendant and Stephanie engage in a recorded jail call during which the Defendant asks, "hey did you for sure see what I was talking about?" [Ex. 40 at 5:17].

> **Stephanie:** Yes, absolutely and its unavailable.
> **Defendant:** Ok. For sure?
> **Stephanie:** Yeah, but a statement isn't [inaudible].
> **Defendant:** I don't know.  Listen, there wasn't nobody, nothing nobody can say, nobody else was there.
> **Stephanie:**  I know that.
> **Defendant:**  So, if anybody says anything they are lying." [Ex. 40 at 5:17].

On May 2, 2019, the Defendant and Stephanie engage in a recorded jail call during which they discuss the "drowned cow" once again. [Ex. 41 at 5:13].

> **Stephanie:** This is what, is so crazy. And I have to be very vague, but I just learned this. Ok. But first of all, you know that cow that ah ….that drowned?
> **Defendant:** Yeah.
> **Stephanie:** The cow that drowned? I don't know if, I don't know if it did. I don't know. But, I will know in the next couple days because Dad is going to go look, and count, and wrangle them up, so I'm just sitting here holding my breath for that. So ah. Mmm. I will find out for sure. But. Anyway, furthermore than that. Apparently, there is a, you're.  We will talk more about stuff.… [Ex. 41 at 5:13].
> **Defendant:** So ah, yeah well, and the thing we just talked about – I mean, is there a chance? [Ex. 41 at 7:00].
> **Stephanie:** Yeah. We found out today, that yeah. Right after I talked to you today, when we was at BJ'S office, we found out, I walked in there and they started a conversation and we found out that there is a chance. So, I will know in the next two days. For sure. You understand what I'm saying. There is nothing that I can do but I will know in the next two days.

26

**Defendant:** If it didn't?
**Stephanie:** Yeah, anyway I need to get off that subject moving on.
**Defendant:** Well, I thought it was for sure
**Stephanie:** No, I did too. [Ex. 41 at 7:00].

On July 28, 2019, the Defendant has an in-person visit with his father, William

"Bill" Nantz. [Ex. 42 at 7:10].

**Defendant:** Remember, you and Steph come up here that one time and she mentioned something. Is all that square?
**Bill:** Yeah, no, no they aint found it. Do you know where the truck was thrown over the hill at? The tow unit for the State Police?
**Defendant:** No, not right off I don't.
**Bill:** Yeah [inaudible]
**Defendant:** Destroyed?
**Bill:** I don't know. I'm trying to figure it, I'm trying to figure it out. You talking about the Kudzu?
**Defendant:** No, remember Steph come down here and we were talking about that black cow drowning? Ah…. I was wondering if any more of them drowning or not?
**Bill:** Well, that one did. [inaudible rambling].  [Ex. 42 at 7:10].

On July 30, 2019, the Defendant and Stephanie engage in a recorded jail call

during which the Defendant asks, "do you remember what we talked about, when you come to

see me, where do we stand with that?"

**Stephanie:** Yes. Oh, all dead.
**Defendant:** 100 percent sure? Are you 100 precent sure?
**Stephanie:** Yes, Yeah. [Ex. 43 at 6:00].

On July 30, 2019, the Defendant and Bill Nantz engage in a recorded jail call

during which Bill states, "that thing you were mentioning about, they never did find that,

[inaudible] neither one, you know what I'm saying?" [Ex. 44 at 1:55]. The Defendant says he

understands and he already talked to Stephanie.

27

**II.     U.S.S.G. §3C1.1 applies under two sets of facts; (1) the Defendant instructed David Huff to destroy the DVR receiver at the murder scene, and (2) the Defendant conspired with multiple family members to remove and/or destroy evidence post-indictment.**

U.S.S.G. §3C1.1, states, "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels." U.S.S.G. §3C1.1, Application Note 4, provides examples of covered conduct, including:

> (D) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so…

Additionally, obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction. U.S.S.G. §3C1.1, Application Note 1.

The government carries the burden of demonstrating the obstruction enhancement applies by a preponderance of the evidence. *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002). Although the Sixth Circuit reviews legal conclusions de novo and factual findings for clear error, our Circuit has "sent mixed messages" on how to "review the application of th[is] guideline to the facts"; sometimes the Sixth Circuit applies a de novo review of the district court's application, for others they turn to the more deferential clear-error standard, and occasionally they pick something in between. United States v. Essex, 2022 WL

17078717, at 4 (6th Cir. 2022). *Also see United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019) (collecting cases). No matter the standard employed, the Defendant in this case satisfies application of the obstruction enhancement based on the facts set forth and Sixth Circuit caselaw.

In *United States v. England*, 2023 WL 1777533 (6th Cir. 2023), the defendant was interviewed by local law enforcement regarding exposing himself to a minor in a Walmart. Immediately following that interview, the defendant returned to work and ran software program CCleaner that deleted his child pornography collection. *Id.* at 15-16. In pertinent part, the defendant argued that at the time the child pornography was deleted he was not under investigation for that offense and the government could not prove the investigation was thwarted. *Id.* The Sixth Circuit found that it did not matter that England was not being investigated at the time of obstruction, but rather that the action of deletion was purposeful; "running CCleaner manually and deleting files suggests that England's actions were purposeful and likely to thwart the investigation into his offenses of conviction." *Id.* at 16. The Sixth Circuit cited trial testimony concerning the following facts: that the majority of England's child pornography collection was in unallocated or deleted space, and deleting images, while sometimes recoverable, can obscure where they were located and how they were accessed. *Id.* Therefore, evidence that such deletion was likely to or did thwart the investigation into the instant offense.

As in *England*, the Defendant ordered the destruction of evidence prior to the beginning of law enforcement's murder investigation. While an investigation into the instant offense had not begun, the Defendant, like England, acted very purposefully to thwart any

29

investigation into Geri Johnson's murder. First, the Defendant took the affirmative step of driving to pickup Huff. Furthermore, the Defendant brought Huff back to the murder scene and instructed him to destroy the DVR system. These manual affirmative steps, as in *England*, were designed to obstruct the future investigation into the instant offense.

Similarly to *England*, there is evidence that the Defendant's purposeful steps were effective. The DVR receiver was never recovered after being removed from its original location by Huff. The Defendant himself pointed out the importance of the DVR receiver being destroyed when he told his sister that there are no statements or witnesses because no one else was present at the time of the murder. [Ex. 40 at 5:17]. Law enforcement found cameras in the master bedroom and porch that would have captured the location of all three gunshots. [Ex. 29]. Multiple witnesses will testify to the Defendant's surveillance system within and outside the home. [PSR, ¶21]. The Defendant continued to follow-up with his father and sister to ensure the DVR receiver was 100 percent "destroyed", "dead", "drowned", and "unavailable" via multiple recorded jail calls and visits. Ultimately, statements made by Stephanie Nantz and Bill Nantz imply that Bill Nantz ensured the DVR receiver was destroyed. [Ex. 35-44]. That coupled with Bill Nantz's own statements to law enforcement that law enforcement would get the recordings in court. [Ex. 47]. Making sure the recording(s) of Ms. Johnson's murder no longer existed was of paramount importance to the Defendant.

In *United States v. Wellman*, 26 F.4th 339 (6th Cir. 2022), the Sixth Circuit addressed whether it was impermissible double-counting to apply the obstruction enhancement to an instant offense requiring obstruction. "That category of error occurs if

'precisely the same' conduct supports the underlying offense and an enhancement." *Id.* at 355 (quoting *United States v. Sabino*, 307 F.3d 446, 450 (6th Cir. 2002)). "By the same token, no double counting occurs if the defendant is punished for distinct aspects of his conduct." *Id.* (citing *United States v. Walters*, 775 F.3d 778, 782 (6th Cir. 2015)).

Here the Defendant murdered Ms. Johnson to obstruct the on-going federal investigation into his methamphetamine trafficking enterprise. Whereas the Defendant's instructions to Huff and follow-up conspiracy with his family post-indictment were designed to obstruct the murder investigation and prosecution. They are distinct affirmative actions and separate harms.

### III.   U.S.S.G. §3A1.1(b), the vulnerable victim enhancement, applies because the Defendant chased and gunned down a 33-week pregnant woman, whom he knew to be very pregnant.

U.S.S.G. §3A1.1(b)(1) states, "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." For purposes of subsection (b), "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct. U.S.S.G. §3A1.1, Application Note 2. Finally, if an enhancement from subsection (b) applies and the defendant's criminal history includes a prior sentence for an offense that involved the selection of a vulnerable victim, an upward departure may be warranted. U.S.S.G. §3A1.1, Application Note 4.[9]

---

[9] On March 16, 2010, the Defendant was convicted of Fourth Degree Assault, Domestic Violence

Contrary to the Defendant's contention, the Sixth Circuit no longer requires that a Defendant target a victim *because* of his or her vulnerability. *United States v. Brawner*, 173 F.3d 966, 973 (6th Cir. 1999); *United States v. Curly*, 167 F.3d 316 (6th Cir. 1999). There is no doubt that Ms. Johnson was in her third trimester of pregnancy. [Ex. 1, 3-4, 11-12]. There is no doubt the Defendant knew Ms. Johnson was very pregnant. On March 16, 2019, the Defendant told the 911 operator, ER staff, and law enforcement that Ms. Johnson was pregnant with his daughter. [Ex. 30-31, 33-34]. Therefore, the only remaining questions are (1) whether Ms. Johnson's physical condition made her unusually vulnerable to assault and murder; or (2) whether the relationship and history between Ms. Johnson and the Defendant made her particularly susceptible.

The third trimester of pregnancy, or the last phase, lasts from weeks 29 through 40. WebMD, *Pregnancy & Health Guide Third Trimester*, https://www.webmd.com/baby/third-trimester-of-pregnancy (last visited Jul. 20, 2023). This part of pregnancy can be the most challenging. *Id.* As the baby grows, it takes up more room in the mother's abdomen, making it harder to breath or move around. *Id.* As the mother's uterus expands, it rises until it sits just under the rib cage, leaving less room for the mother's lungs to expand. *Id.* That added pressure on the mother's lungs can make it more difficult to breath. *Id.* Pregnancy hormones relax the connective tissue that holds the mother's bones in place, especially in the pelvic area. Mayo Clinic, *Third Trimester Pregnancy What to Expect*, https://www.mayoclinic.org/

---

with Minor Injury in Whitley County District Court for holding down K.H. and cutting the back of her neck with a pair of scissors and striking her in the head with his hand when she was 33-weeks pregnant. The Defendant then took K.H.'s minor child and led officers on a high-speed chase. [PSR, ¶39, 53(b)]. Therefore, the Defendant has a prior criminal conviction involving a vulnerable victim as well.

healthy-lifestyle/pregnancy-week-by-week/in-depth/pregnancy/art-20046767 (last visited Jul. 20, 2023).

In the third trimester, a mother's blood pressure may decrease as the fetus presses on the main vein that returns blood to the heart. John Hopkins Medicine, *The Third Trimester*, https://www.hopkinsmedicine.org/health/wellness-and-prevention/the-third-trimester (last visited Jul. 20, 2023). Maternal blood volume increases by 45% to approximately 1 200 to 1 600 ml above non-pregnant values. By the late third trimester the plasma volume increases by more than 50–60%, with a lower increase in red blood cell mass, and therefore plasma osmolality falls by 10 mosmol/kg. The increase in plasma volume plays a critical role in maintaining circulating blood volume, blood pressure and uteroplacental perfusion during pregnancy. Priya Soma-Pillay, MB ChB, MMed (O et G) Pret, *Physiological changes in pregnancy*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4928162/#:~:text=Maternal%20blood%20volume%20increases%20by,falls%20by%2010%20mosmol%2Fkg. (last visited Jul. 20, 2023). The platelet count tends to fall progressively during normal pregnancy. *Id.* Platelets are the cells that allow blood to clot.

There are also significant changes to a mother's cardiovascular system:

Changes in the cardiovascular system in pregnancy are profound and begin early in pregnancy, such that by eight weeks' gestation, the cardiac output has already increased by 20%. The primary event is probably peripheral vasodilatation. This is mediated by endothelium-dependent factors, including nitric oxide synthesis, upregulated by oestradiol and possibly vasodilatory prostaglandins (PGI2). Peripheral vasodilation leads to a 25–30% fall in systemic vascular resistance, and to compensate for this, cardiac output increases by around 40% during pregnancy. This is achieved predominantly via an increase in stroke volume, but also to a lesser extent, an increase in heart rate. The maximum cardiac output is found at about 20–28 weeks' gestation. There is a minimal fall at term.

An increase in stroke volume is possible due to the early increase in ventricular

wall muscle mass and end-diastolic volume (but not end-diastolic pressure) seen in pregnancy. The heart is physiologically dilated and myocardial contractility is increased. Although stroke volume declines towards term, the increase in maternal heart rate (10–20 bpm) is maintained, thus preserving the increased cardiac output. Blood pressure decreases in the first and second trimesters but increases to non-pregnant levels in the third trimester.

*Id.*

Late-stage pregnancy also greatly affects a mother's athletic aptitude. March of Dimes, *Exercise During Pregnancy*, https://www.marchofdimes.org/find-support/topics/ pregnancy/exercise-duringpregnancy#:~:text=Any%20activity%20that%20has %20a,%2C%20boxing%2C%20soccer%20or%20basketball (last visited Jul. 20, 2023). For example, mothers lose their balance more easily, a mother's body temperature is slightly higher during pregnancy, mothers require more oxygen as their baby develops, and a mother's heart is working harder and beats faster during pregnancy to drive blood and oxygen to the baby[10]. *Id.* Expecting mothers are cautioned to avoid high impact activities, jerky bouncing movements, activities that carry a risk of falling, and activities that could result in getting hit in the stomach. *Id.* "Overexertion and strenuous aerobic exercise are not recommended and could compromise the infant's well-being due to the diversion of blood flow to the vital maternal organs away from the fetal-placental unit." Danielle B. Cooper; Lily Yang, National Library of Medicine, *Pregnancy and Exercise*, https://www.ncbi.nlm.nih.gov/books /NBK430821/ (last visited Jul. 20, 2023). Other common symptoms include fatigue, urinary incontinence, sciatica, and edema. *See* WebMD, *Pregnancy & Health Guide Third Trimester.*

Everyone has heard of the third trimester "waddle." When a woman is so pregnant even walking is a challenge, let alone bending over, getting dressed, or clipping their toenails. Logic follows that engaging in a chase and struggle with a grown man for one's life would be significantly impaired. At 33-weeks pregnant, Geri Johnson, attempted to flee the Defendant's trailer on foot after being shot at in the master bedroom. [Ex. 23, 25-26]. Once outside she continued to fight for her life as evidenced by the blood trail. [Ex. 25, 29, 48]. Geri's agility, speed, balance, breathing, and strength were undoubtably hampered by being in the third trimester of pregnancy with a near full term baby in her abdomen compressing her lungs, stretching her tendons, and compromising her cardiovascular abilities generally. Even in her vulnerable condition, it took the Defendant three rounds to finally bring down Geri, which is a testament to her will to live. This was not a situation in which Geri's condition played no role, such as single shot to the head, an explosion, or other acute catastrophic event. Rather, the struggle began in the master bedroom and spilled out into the Defendant's driveway.

Geri was also susceptible to violence at the hands of the Defendant due to their relationship. The Defendant asserted that Geri was carrying his child, the two were engaged in a long-term romantic relationship, they cohabitated, and Geri suffered repeated instances of verbal and physical abuse at the hands of the Defendant. She was numb to his pattern of extreme violence, including shooting at her. [Ex. 14-17].

In *United States v. Cline*, 986 F.3d 873 (5th Cir. 2021), the defendant knew his victim was pregnant with his child and that the victim was "particularly susceptible" to the defendant's conduct, due to prior incidents of "verbal and physical abuse" during the course of their romantic relationship. *Id.* at 880. In *United States v. Stokes*, 392 Fed.Appx. 362 (6th

Cir. 2010), the Sixth Circuit acknowledged that a relationship *alone* can render a victim "particularly susceptible to criminal conduct." (emphasis added)(citing *United States v. Gawthrop,* 310 F.3d 405, 410 (6th Cir.2002)). But there is a limited "range of relationships upon which a finding of victim vulnerability can be predicated," *id.,* and that range thus far extends only to familial or quasi-familial relationships. *United States v. Gawthrop,* 310 F.3d 405, 410 (6th Cir.2002) (grandfather-granddaughter relationship); *see also United States v. Niece,* 9 F.3d 110 (table), 1993 WL 424960, at *9 (6th Cir. Oct.19, 1993) ("father figure-daughter" relationship). Here, the relationship between the Defendant and Geri tracks the same pattern as the one laid out in *Cline,* romantic partners with a child on the way.

### IV.   18 U.S.C. § 3553(a) argument: the Defendant has earned a Life sentence for the murder of Geri Johnson and the death of Amelia Johnson:

Daniel Scott Nantz deserves every second, of every hour, of every year this Court will adjudge. The Defendant personifies the depraved violence that goes hand-in-hand with methamphetamine trafficking. But make no mistake, the Defendant's conduct has taken methamphetamine violence to an extreme end based on his *individual* characteristics. The Defendant gunned down a woman in her final weeks of pregnancy all to save his own skin and avoid accountability for his criminal actions. At its core, the Defendant's motivation was cowardice. Unlike dozens of other co-conspirators across five different methamphetamine conspiracies and multiple indictments, the Defendant was unwilling to face the consequences of his actions within this Court.

His co-conspirators were brought before this Court and either accepted responsibility or attempted to assert their innocence, as is their Constitutional right. Not the Defendant, the Defendant decided he was going to try to game the system by murdering the most vulnerable

witness closest to him. Now instead of pulling years for drug trafficking, Daniel Nantz will spend the rest of his Life in a federal prison; his last breath will be taken behind bars as a consequence of his actions. If there is a message of general deterrence in this case, it is that the combination of drug trafficking and violence will have devasting life altering consequences, not only for the victims and communities that suffer but for those who inflict such pain and suffering.

It is telling that the Defendant did not go after his methamphetamine suppliers, middlemen, or the dozen men he enlisted to peddle his poison. The Defendant's suppliers, middlemen, and distributors were all doing the same exact thing as the victim, cooperating with law enforcement in hopes of pulling less jail time. Yet, the Defendant decided to target the most vulnerable and closest to him: a 29-year-old woman, who the Defendant believed was carrying his child, who at the time was at his home caring for his children so he could engage in an armed kidnapping down the street. That is the person the Defendant decided to take out his agitation, frustration, and rage upon.

Frankly, selecting the most vulnerable victim is nothing new for the Defendant. He has taken out his rage and frustration upon the most vulnerable people around him for years: K.H. mother of his child, B.M. mother of his child, Geri Johnson expecting mother. [PSR, ¶53]. Whether it's scissors to K.H.'s neck and punching her in the back of the head while she was 33-weeks pregnant or threatening to kill B.M. and their child while holding a 12-gauge to her head – not much has changed. The Defendant has established a propensity for threatening and assaulting women and children. Which has ended in the crescendo of gunning down a near term pregnant woman outside his single-wide while his two minor kids are inside listening to the whole thing. That is the Defendant's character.

The Defendant's driving *need* to escape accountability for his actions, to hide his crimes,

continued beyond even the murder. What was the Defendant's number one concern when he transported Geri's body back to the kidnapping site? Not saving Geri Johnson; not saving Amelia. What was the Defendant's number one concern when he drove Huff back to the murder scene? Not saving Geri Johnson; not saving Amelia. As Geri's lungs filled with blood and Amelia starved of oxygen in the seat next to him, the Defendant's only concern was himself. The only things on the Defendant's mind were (1) would Huff help him get rid of the body? and (2) getting rid of the DVR system that recorded the murder. Because God forbid Daniel Nantz be held accountable for his depravity. It was only when he ran out of options, that he started off towards Baptist Health and finally called 911.

Even the 911 call is calculated and masterfully executed to protect Daniel Nantz. He pretends to fight through tears of shock while he weaves a tale of a sorted suicide over a federal indictment. He tells the 911 operator a story of a young woman so distraught and torn up over facing a federal indictment for "something illegal" that she took her own life. Who was the hero, the savior, of this tale? None other than Daniel Nantz, he tried his hardest to stop her, he chased her, grabbed for her. He tells the 911 operator he was so taken aback by how Geri even got a gun because he does not even own such a thing. The audio is really impressive, that someone could generate such emotional lies while the lifeless body of their once loved one bounces around next to them. While a baby, they claim as their own, starves of oxygen and blood in their mother's corpse.

After the Defendant dumps off Geri's lifeless body, he flees the hospital bay, and continues on to protect his number one priority, himself, by calling his father to ensure Huff did exactly what he was instructed to. There is a call to Bill Nantz as soon as the Defendant hangs up with 911. Bill Nantz got to the murder scene before the police while that DVR receiver was sitting right on top of

38

a pile of clothes in the Defendant's kitchen. By 7:15pm EST, that DVR receiver was long gone.

In a final act of self-preservation, the Defendant instructed his own family members to help him obstruct justice. Directing them to get rid of items at the murder scene. Even after being arrested, even after being indicted, even after being detained pretrial – nothing could deter Daniel Nantz from attempting to skirt responsibility for his actions. It seems that the Defendant's greatest fear is being faced with the truth of his character and his actions. Now, after years of carrying on in the dark at least some of his actions against his fellow man, against his community, against his own family have been brought to the light.

Nothing will bring back Geri. Nothing will bring back Amelia. Nothing can heal the suffering of losing a child for Ms. Bowman. Nothing can replace the mother Geri's children lost. Nothing can heal the trauma of watching your granddaughter die in your arms after you make the gut-wrenching decision to remove life support. There are no winners in this case, only loss due to one man's cowardice actions. And so ends another chapter in the tormented story that is methamphetamine trafficking in Eastern Kentucky.

**V.    Conclusion:**

The government anticipates calling the following witnesses to address the contested sentencing enhancements, facts, and 18 U.S.C. § 3553(a) factors:

(1) **David Huff [45 minutes]:** Mr. Huff will testify to the Defendant's pattern of violence and premeditation leading up to the murder of Ms. Johnson. He will testify to the kidnapping of S.M. for purposes of securing a pistol for the Defendant. Mr. Huff will testify to the Defendant's actions concerning the obstruction enhancement. Finally, Mr. Huff had the opportunity to observe Ms. Johnson in her final weeks of pregnancy and can relay his

observations about her physical capabilities.

(2) **S.M. [45 minutes]:** S.M. will testify to finding McIntosh's firearm and selling it. S.M. will testify to the Defendant's statements that the firearm was his or intended for him. S.M. will testify to the Defendant's role in his kidnapping and his eye-witness account of Ms. Johnson's state when the Defendant transported her body back to the kidnapping scene.

(3) **K.H. [20 minutes]:** K.H. will testify to the Defendant's propensity for violence by detailing events in which she was victimized by the Defendant. K.H. will detail how the Defendant has a previous criminal conviction for attacking a vulnerable victim. Including but not limited to, the Defendant cutting K.H.'s neck with a pair of scissors and punching her in the head when K.H. was 33-weeks pregnant.

(4) **Alecia Rains and Amber Smith [20 minutes each]:** Ms. Rains and Ms. Smith will testify to the Defendant's escalating pattern of violent behavior towards Ms. Johnson leading up to Ms. Johnson's murder. They can also testify to Ms. Johnson's physical state and vulnerability during her late term pregnancy given their personal observations. Finally, they can testify to their observations regarding the Defendant's home surveillance system.

(5) **Breton Hopkins [20 minutes]:** Mr. Hopkins will testify to the Defendant's escalating pattern of violence towards Ms. Johnson leading up to Ms. Johnson's murder. Mr. Hopkins, having lived with the Defendant in 2019, can also testify to the Defendant's home surveillance system. Finally, Mr. Hopkins will testify to the Defendant's family members attempting to contact him in 2019 and a gun case that he witnessed the Defendant hid on the Nantz compound.

(6) **ATF TFO Jesse Armstrong [40 minutes]:** TFO Armstrong will testify to his

40

processing of the crime scene, including the blood trail which indicates Ms. Johnson attempted to flee or escape the Defendant. He will testify to the search for the DVR receiver. Furthermore, TFO Armstrong can testify to relevant investigative steps and the Defendant's multiple interviews if they become relevant during the sentencing hearing, as well as his interactions with William "Bill" Nantz.

(7) **ATF SA John Barnett [20 minutes]:** SA Barnett will testify to the Defendant's obstruction enhancement concerning jail calls and in-person visits with family members.

(8) The government anticipates approximately 3-5 family members preparing statements to address the Court concerning victim impact, including Ms. Johnson's mother, aunts, and possibly children.

For the reasons set forth above, the government respectfully requests the Court apply the following sentencing enhancements over the Defendant's objections: (1) the application of U.S.S.G. §3C1.1 for the Defendant's willful obstruction of justice; and (2) the application of U.S.S.G. §3A1.1(b)(1) for the Defendant's knowledge that his victim was vulnerable. The government reserves the right to present additional witnesses and/or additional exhibits to support the contested enhancements and contested facts.

Respectfully submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By:   */s/ Jenna E. Reed*
      Assistant United States Attorney
      601 Meyers Baker Road, Suite 200
      London, Kentucky 40741
      (606) 330-4829
      Jenna.Reed@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2023, I electronically filed this document through the ECF system, which will send notice of the filing to all counsel of record.

<u>*/s/ Jenna E. Reed*</u>
Assistant United States Attorney